**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DONNA L. EARLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.:  2:06cv727** |
| | ) | |
| **RHEEM MANUFACTURING** | ) | **JUDGE KEITH WATKINS** |
| **COMPANY, a corporation and CAL** | ) | |
| **MEARS, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**COME NOW** Defendants Rheem Manufacturing Company and Cal Mears (hereinafter, collectively "Rheem" or Defendants) and respectfully submit the following Memorandum of Law in Support of Their Motion for Summary Judgment based on principles of judicial estoppel.[1]  Defendants filed their Motion for Summary Judgment on May 25, 2007 (Doc. no. 17).

**I.    SUMMARY OF PERTINENT FACTS AND LAW**

Donna Early ("Plaintiff" or "Early") started to work at Rheem as an Assembler in 1993 approximately a year after her discharge from active duty service in the U.S. Army.  After commencing employment with Rheem, Early enlisted in the Alabama National Guard in 1993. In August 2000, Plaintiff sustained a slip and fall injury while attending routine weekend drill.

---

[1]  If this motion is not dispositive, or is unresolved by the Court, Defendants plan to file a supplemental motion for summary judgment and accompanying memorandum of law based on the substantive grounds that Early has failed to show that there is a genuine issue as to any material fact and that Rheem is entitled to judgment as a matter of law on both of Early's claims (USERRA and ERISA).  Defendants will file such motion and brief before the dispositive motion deadline on July 31, 2007. Defendants propose to proceed in this fashion in anticipation that this motion will be dispositive and that the parties and the Court will not have to expend additional resources.

In July through August of 2004, Plaintiff presented Rheem with new confusing, inconsistent medical restrictions provided by her Veterans Administration ("V.A.") approved physician. Plaintiff resisted Rheem's repeated requests that she provide clarification from her physician of these confusing restrictions which lead to her ceasing to work actively at Rheem as of August, 2004. On September 3, 2004, Plaintiff filed Chapter 13 Bankruptcy.  On December 21, 2005, after Plaintiff had abandoned her job for over sixteen (16) months by neither working nor complying with Rheem's request for clarification of her restrictions, Rheem terminated Plaintiff's employment in accordance with Company policy under the belief that Plaintiff had abandoned her job with no intention of returning to work at Rheem.

On February 23, 2006 plaintiff filed a disability discrimination charge with the EEOC relating to her 2000 injury and summer 2004 disputes with Rheem over her new medical restrictions and her 2005 termination which charge she has not pursued. On August 13, 2006 Plaintiff filed this suit claiming that Rheem violated the Uniform Services Employment and Re-employment Rights Act ("USERRA") in relation to her August 2000 slip and fall injury, and violated the Employee Retirement Income Security Act ("ERISA") in relation to her retirement and disability benefits.

Even though her bankruptcy is still pending, and is scheduled to continue for approximately two (2) more years, Plaintiff has never disclosed to the Bankruptcy Court her EEOC, USERRA or ERISA claims against Rheem and Mr. Mears various of which relate back to actions and disputes from 2000, 2001, 2004, 2005 . At the time that Plaintiff filed for bankruptcy on September 3, 2004, she clearly was aware of disputes with her employer Rheem that could arise to claims against Rheem and/or Employee Relations manager Mr. Mears, but she never reported this to the bankruptcy court even after this suit was filed.  Plaintiff had a

continuing duty to update her bankruptcy pleadings to list her EEOC charge and this lawsuit as potential assets.

Rheem is entitled to summary judgment as a matter of law on any alleged discrimination, retaliation or statutory violation claims asserted by Early or other claims that have existed during the pendency of her bankruptcy case because Early is judicially estopped from asserting those claims.  "Judicial estoppel is an equitable concept invoked at a court's discretion" and designed "to prevent the perversion of the judicial process."  *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1286 (11th Cir. 2002)(citation omitted).  A debtor seeking shelter under the bankruptcy laws must disclose all assets, or potential assets, to the bankruptcy court.  11 U.S.C. §§ 521(1), and 541(a)(7).  The duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy court; rather, a debtor must amend his financial statements if circumstances change.  *See Burnes*, 291 F.3d at 286 (citing *In re Coastal Plains,* 179 F.3d 197, 208 (5th Cir. 1999)); *De Leon v. Comcar Indus., Inc.,* 321 F.3d 1289 (11th Cir. 2003).

Early possesses a financial motive to secret assets in her Chapter 13 bankruptcy case.  To allow Early to pursue her discrimination, retaliation, statutory violation or other claims in this action would constitute a mockery of the judicial system.

For the foregoing reasons, Rheem respectfully submits that this Court should enter summary judgment in favor of Rheem and Mears as to all counts contained in Early's Complaint, dismiss the Complaint and all claims in this lawsuit against Rheem and Mears with prejudice, and tax costs against Plaintiff.

## II.    STATEMENT OF FACTS

**A.    RHEEM MANUFACTURING COMPANY.**

Plaintiff worked at Rheem's manufacturing plant located in Montgomery, Alabama, at 2600 Gunter Park Drive, East which is in the business of manufacturing various types of water heaters for residential and commercial applications.    Defendant Cal Mears is Rheem's Montgomery Plant Employee Relations Manager hired in 2004.

**B.    PLAINTIFF WORKED AT RHEEM FROM 1993 UNTIL 2004.**

Rheem hired Plaintiff on April 2, 1993, as an Assembler.  An Assembler performs the manual tasks incident to the process of manufacturing water heaters.  Rheem water heaters are produced on a moving assembly line, so the specific task[s] performed by an Assembler varies according to the particular product being manufactured on the line and his/her location on the line.  *See* Assembler Job Description, attached hereto as Ex. A

Prior to applying for employment and being hired by Rheem in 1993, Plaintiff was in the active duty military from 1987 to 1992.  Early Depo., attached hereto as Ex. B, p. 12, lns. 1-12; p. 16, l. 23 – p. 17, l. 3. During her employment with Rheem, Plaintiff enlisted in the Alabama National Guard.  *Id.* at p. 20, l. 18 – p. 21, l. 5.  Plaintiff testified that Rheem never interfered with her National Guard duties, whether 2 or 3-day weekends or 2 or 3-week summer exercises. *See* Early Depo., Ex. B, p. 34, lns. 20-24; p. 36, lns. 2-8.

On August 27, 2000, Plaintiff sustained a slip and fall injury while attending regularly scheduled weekend drill with the Alabama National Guard.  *See* Early Interrogatory Responses 7-13, attached hereto as Ex. C; Early Depo., Ex. B, p. 36, l. 9 – p. 38, l. 20.   A military physician diagnosed Plaintiff with degenerative disk disease following her injury, and plaintiff was on medical leave until June 22, 2001.  *Id.* at p. 72, lns. 4-11.

When Plaintiff returned to work in 2001, Rheem assigned her duties on the assembly line consistent with the restrictions imposed by her physician. *See* June 8, 2001 Work Restrictions Form and Attachments (showing that Rheem's video of proposed job was viewed and approved by Dr. Tarabein), attached hereto as Ex. D. Plaintiff's primary treating physician for her back condition/injury was then and continued to be Dr. R.M. Tarabein, a neurologist with offices in Selma and Mobile approved by the National Guard. From June 2001 forward, Dr. Tarabein periodically confirmed work restrictions for Plaintiff similar to those in Exhibit "D". *See* Composite Exhibit Consisting of January 4, 2002 – June 3, 2004 Work Restriction Forms, attached hereto as Ex. E. Plaintiff acknowledges that Rheem always complied with Dr. Tarabein's restrictions for the remainder of the time she worked at Rheem. Early Depo., Ex. B, p. 73, lns. 3-13. [2]

On or about July 7, 2004, Plaintiff presented a medical restrictions summary from Dr. Tarabein in which he imposed new, different and contradictory work restrictions relative to his long-standing diagnosis of "Lumbar Sacral Disease/Cervicalgia." Specifically, the new, different and contradictory restrictions were, ***"total restriction of [right] arm (still may use [right] hand)***." The specific "Physical Limitations" stated on Dr. Tarabein's July 2004 report regarding lifting, standing, stooping, etc., remained the same as in previous reports from 2001. *See* July 7, 2004 Work Restrictions Form, attached hereto as Ex. G; Lewis Aff., Ex. F at ¶ 5.

---

[2] On April 6, 2004, Plaintiff sustained a work-related injury to the fourth and fifth fingers on her left hand, but no bones were broken and no stitches were required. *See* Lewis Aff., attached hereto as Ex. F at ¶3. Because the hand injury was work related, Plaintiff received workers' compensation medical benefits from Rheem. Early Depo., p. 79, l. 11 – p. 80, l. 7; p. 81, l. 6 – p. 82, l. 5. Plaintiff's primary treating physician for her hand injury was Dr. Edward Palmer, an orthopedic surgeon. Although Plaintiff's work-related injury is largely irrelevant to this lawsuit, Plaintiff mentions it in her Complaint, and implies that she was forced to take medical leave, which was not the case. *See* Complaint at ¶¶ 23-25. Plaintiff's treating physician determined when and under what restrictions Plaintiff was able to work. *See* Lewis Aff., Ex. F at ¶ 3; Early Depo., Ex. B, p. 81, l. 6 – p. 83, l. 6.

Due to the confusing and inherently contradictory nature of the new restrictions, Plaintiff's supervisor, Norm Lewis, requested assistance from Defendant Cal Mears, Rheem's Employee Relations Manager.  Lewis Aff., Ex. F at ¶¶ 6-7.

## C.    PLAINTIFF ABANDONED HER JOB AFTER AUGUST 11, 2004.

On or about August 11, 2004, Cal Mears met with Plaintiff at the request of her supervisor Lewis.  *See* Mears Aff., attached hereto as Ex. H at ¶ 5.    Mears reviewed Dr. Tarabein's new work restrictions with Plaintiff, and explained to Plaintiff that the new "total restriction" against use of the right arm was confusing to Rheem because it appeared to contradict the longstanding physical limitations previously stipulated by Dr. Tarabein in numerous medical notes and reports.  *Id.* at ¶ 5; *see also* July 7, 2004 Work Restrictions Form, Ex. G; Composite Exhibit, Ex. E.  The inherent contradiction of the new total restrictions against use of her right arm appeared to be inconsistent and inherently contradictory to the physical limitations also prescribed by Dr. Tarabein allowing use of the right hand to perform full duty sedentary tasks lifting 0-10 pounds, full duty light lifting tasks involving weights of 10-20 pounds, and partial duty tasks lifting weights of 20-50 pounds.  In Rheem's view, these modified restrictions made no sense on their face.  Mears Aff., Ex. H, at ¶ 4. [3]

Mr. Mears asked Plaintiff to have Dr. Tarabein clarify the new restrictions.  *Id.* at ¶ 6.  Plaintiff refused and told Mears that Rheem had all the information it needed.  Early Depo., Ex. B, p. 116, l. 20 – p. 117, l. 8; p. 135, l. 1 –  p. 138, l. 16; p. 144, l. 19 – p. 145, l. 6.  Mr. Mears handed Plaintiff a brochure about Rheem's Short Term Disability insurance coverage ("STD"),

---

[3]    In 2004, Dr. Tarabein was the subject of disciplinary proceedings before the Alabama Board of Medical Examiners for misconduct in his medical practice, including over-prescribing pain medications and administering unnecessary treatments to his patients.  Dr. Tarabein paid a $40,000.00 fine, committed to take certain courses and had his license placed on probationary suspension for two (2) years.   *See* Stipulation and Consent Order, attached hereto as Ex. I.

which she could use if she wished to apply.  Mears Aff., Ex. H at ¶ 6; *see also* August 11, 2004

Memorandum, attached hereto as Ex. J.[4]

After meeting with Mr. Mears, Plaintiff met briefly with Alfred Gardner, Rheem's

Human Resources Director.  Plaintiff told Gardner that she intended to apply for V.A. disability

benefits.  Gardner knew that Early already had a V.A. disability rating, so he interpreted

Plaintiff's remark to mean that she was seeking benefits for total disability.  Gardner also

observed that Plaintiff did not appear upset following her meeting with Mr. Mears.  Gardner

Aff., attached hereto as Ex. L at ¶ 9.

In an effort to get the needed clarification of the new confusing medical restrictions,

Mears met again with Plaintiff on August 20, 2004, and renewed his request for clarification

from Dr. Tarabein.  Mears Aff., Ex. H at ¶ 7.  Again, Plaintiff refused and stated that she

believed her physician had provided all he was required to provide.  *Id.*  She again told Mears

that Rheem already had all the information it needed.  Early Depo., Ex. B, p. 116, l. 20 – p. 117,

l. 8; p. 135, l. 1 – p. 138, l. 16; p. 144, l. 19 – p. 145, l. 6

Following his August 20, 2004 meeting with Plaintiff, Mears wrote a letter to her

confirming what had transpired in their meetings and reiterating, yet again, the request for

---

[4]  STD is provided insurance coverage for a maximum period of six (6) months (26 weeks) to Rheem employees at various locations at no cost to them.  Long Term Disability insurance coverage ("LTD") (an optional coverage) is available to Rheem employees at various locations for a monthly premium payable by the employee.  *See* Wright Aff., attached hereto as Ex. K, at ¶ 2 (exhibit to Wright affidavit not necessary to disposition of issue before the Court and intentionally omitted).  In both cases, the benefits are provided through traditional group disability insurance policies arranged by Rheem as Plan Sponsor.  The insurance company providing benefits changes from time to time based on periodic cost/benefit analyses conducted by Rheem as Plan Sponsor.  At all times relevant to Plaintiff's claims in this lawsuit, Prudential Insurance Company of America ("Prudential") was the insurance company for both the group short term disability and long term disability policies covering Rheem employees such as Plaintiff.  *Id.*  The importance of this is that Rheem plays no role in eligibility determinations, a fact of which Plaintiff is aware as she admitted in her deposition.  *Id* at ¶ 4; Early Depo., Ex. B, p. 148, l. 6 – p. 152, l. 9; p. 291, lns. 3-12.  This means that Plaintiff has sued the wrong parties under ERISA, a point that will be addressed in Rheem's supplemental motion for summary judgment, if necessary.

clarification of Dr. Tarabein's confusing restrictions.  *Id.* at ¶ 7; *see also* August 20, 2004 Letter, attached hereto as Ex. M.  Plaintiff did not reply to Mear's letter.

Plaintiff never provided any clarification of Dr. Tarabein's restrictions, nor did she ever return to work at Rheem.[5]  Mears Aff., Ex. H, at ¶ 8.  Instead, Plaintiff enrolled at Capps College in its Medical Assistant program in November of 2004.  Early Depo., Ex. B, p. 167, lns. 21-23.  As part of her curriculum, Plaintiff participated in an externship during the Summer of 2005 at Cancer Care Center South ("Cancer Care").  On or about September 27, 2005, Plaintiff became a Certified Medical Assistant and applied for and obtained permanent employment at Cancer Care effective on or about October 3, 2005.  Plaintiff has been continuously employed by Cancer Care and by various other medical providers as a medical assistant ever since.  *Id.* at p. 190, lns. 3 – 22.

Plaintiff's application to Capps College dated November 1, 2004, states that "My last job was not my best.  Since I've been in the military I've enjoy [sic] work with the health and medical field.  I've feel [sic] as I've begin [sic] a new start in life for me and children.  I feel I can benefit some one [sic] life or help someone out.  I pray and ask God for guidness [sic] throw [sic] this all.  I need a new start."  *See* Capps College Application, attached hereto as Ex. P.  As will be shown more fully below, Plaintiff has admitted that she routinely lied about her background on several subsequent employment applications, beginning with the one she

---

[5]    Initially, Plaintiff applied for short-term disability benefits.  Mears Aff., Ex. H at ¶ 8.  Rheem's records reflect that Plaintiff applied to Prudential for STD benefits in July or August 2004 and received those benefits for the period August 16th, 2004, through October 3, 2004, but Prudential discontinued benefits effective October 4, 2004, on the grounds that Plaintiff had not provided Prudential with sufficient medical documentation to establish a qualifying disability under the short term disability policy.  Plaintiff appealed the denial of further STD benefits, but the decision was upheld by a Prudential appeals committee.  *See* Wright Aff,, Ex. K at ¶ 3 (exhibit to Wright affidavit not necessary to disposition of issue before the Court and intentionally omitted).  Rheem delegates all aspects of short term disability and long term disability benefits insurance eligibility determinations to the relevant insurance company and plays no role whatsoever in that process.  Prudential was solely responsible for the decision to discontinue Plaintiff's benefits.  *Id.* at ¶ 4; s*ee also* Prudential Financial Short-Term Disability Coverage Booklet, attached hereto as Ex. N at 7, 22.  *See* January 27, 2005 Letter, attached hereto as Ex. O.

submitted to her first employer after Capps College in 2005. Plaintiff failed to disclose that she had ever worked for Rheem and misrepresented that she had been on active military duty for most or all of the time that she had, in fact, worked at Rheem. Early Depo., Ex. B, p. 220, l. – p. 223, l. 10; p. 237, l. 20 – p. 239, l. 2; p. 241, lns. 14-19; p. 242, lns. 3-13.

Plaintiff remained a Rheem employee on indefinite medical leave from August 11, 2004 forward, all the while pursuing her education and new career. Rheem's Human Resources Department notified Plaintiff in writing on July 13, 2005, that her certification for intermittent FMLA leave had expired on June 28, 2005 and that no renewal FMLA certification had been submitted, and Rheem offered to assist Plaintiff in this regard. Mears Aff., Ex. H at ¶ 9; *see also* July 13, 2005 Letter, attached hereto as Ex. Q. Plaintiff failed to respond to this July 13, 2005 letter, as she had failed to respond to Mr. Mears' August, 2004 verbal and written requests that she provide clarification of Dr. Tarabein's inconsistent restrictions to enable her to return to work. Mears Aff., Ex. H at ¶ 9.

Finally, on or about December 21, 2005, Rheem terminated Plaintiff's employment under the belief that Plaintiff had abandoned her job with Rheem and had no intention of returning to work. As an administrative practice, Rheem routinely terminates employees who have been on leave for twelve consecutive months or more. *See* Rheem Hourly Employee Handbook section on medical leaves of absence attached hereto as Ex. R; Gardner Aff., Ex. L at ¶¶ 12-13 ; January 3, 2006 Letter, attached hereto as Ex. S.

In sum, Plaintiff refused to comply with Rheem's requests for clarification of Dr. Tarabein's inconsistent restrictions and did not cooperate with Rheem's efforts to ensure that she was assigned to a job that conformed to those restrictions. As a result, Plaintiff was placed on medical leave whereupon she embarked on a new career. After over sixteen (16) months passed,

Rheem gave notice to Plaintiff that her employment was terminated.  Plaintiff then filed an EEOC charge and subsequently sued Rheem.

Plaintiff filed an EEOC charge against Rheem fifteen (15) months ago and this suit nine and a half (9 1/2) months ago, but never disclosed her claims against Rheem to the Bankruptcy Court although her bankruptcy is still pending.

## III.     SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Jameson v. Arrow Co*., 75 F.3d 1528 (11th Cir. 1996).  The party asking for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or by pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.' "  *Id*. at 324.  Thus, in response to Rheem's submissions, Early must by her own affidavits, deposition excerpts, answers to interrogatories or other proper evidence, designate the

specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Early must meet her burden by doing more than "simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Furthermore, "[i]n an employment discrimination case, the plaintiff must produce sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion." *Jameson*, 75 F.3d at 1531; *see also Alphin v. Sears Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991).

Thus, to the extent that Rheem shows that Early will be unable to offer evidence sufficient to establish an element essential to any of her claims on which she will bear the burden of proof at trial or to the extent that Rheem argues that such a deficiency exists and Early fails to offer the Court sufficient evidence in her responsive summary judgment submissions, Rheem is entitled to summary judgment.

## IV.    ARGUMENT

### A.    EARLY IS JUDICIALLY ESTOPPED FROM PURSUING PRE-PETITION CLAIMS OR CLAIMS THAT AROSE DURING THE PENDENCY OF HER BANKRUPTCY CASE.

Rheem is entitled to summary judgment as a matter of law on any alleged discrimination claims asserted by Early that have existed during the pendency of her bankruptcy case because Early is judicially estopped from asserting said claims. "Judicial estoppel is an equitable concept invoked at a court's discretion" and designed "to prevent the perversion of the judicial process." *Burnes*, 291 F.3d at 1285 (citation omitted). The standard of review for a district court's application of judicial estoppel is abuse of discretion. *Id.* at 1284. A debtor seeking shelter under the bankruptcy laws must disclose all assets, or potential assets, to the bankruptcy court.

11 U.S.C. §§ 521(1), and 541(a)(7).  The duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy court; rather, a debtor must amend his financial statements if circumstances change.  *See Burnes*, 291 F.3d at 286 (citing *In re Coastal Plains,* 179 F.3d 197, 208 (5th Cir. 1999)).  Full and honest disclosure in a bankruptcy case is "crucial to the effective functioning of the federal bankruptcy system." *Id.*  For example, creditors rely on a debtor's disclosure statements in determining whether to contest or consent to a no asset discharge.  Bankruptcy courts also rely on the accuracy of the disclosure statements when considering whether to approve a no asset discharge and what amount of repayment schedule to approve in a Chapter 13 case.  Accordingly, "the importance of full and honest disclosure cannot be overstated." *Id.*  In sum, Plaintiff had a continuing obligation and duty to disclose this litigation to the bankruptcy court, but she totally ignored this duty both misleading and disadvantaging the court and her creditors.

Although the Supreme Court has noted that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," *New Hampshire v. Maine,* 532 U.S. 742, 750 (2001) (citations omitted), courts generally consider two factors.  "First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding.  Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Burnes,* 291 F.3d at 1285 (citation omitted).  *See also De Leon v. Comcar Indus., Inc.,* 321 F.3d 1289 (11th Cir. 2003) (holding that the rule that the doctrine of judicial estoppel bars a plaintiff from asserting claims previously undisclosed to the bankruptcy court where the plaintiff both knew about the undisclosed claims and had a motive to conceal them from the bankruptcy court, applies equally in Chapter 7 and Chapter 13 bankruptcy cases).

In *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1286 (11th Cir. 2002), the Eleventh Circuit applied the doctrine of judicial estoppel to bar plaintiffs who fail to disclose causes of action in past or concurrent bankruptcies.  *Burnes* was an employment discrimination class action lawsuit suit brought by 35 individuals against Pemco.  Chapter 13 debtor Billups was one of the individually named plaintiffs and had worked for Pemco since 1992.  Billups, who filed for Chapter 13 bankruptcy on July 3, 1997, filed charges with the EEOC on January 30, 1998 (six months after his bankruptcy filing).  On December 9, 1999, Billups, along with thirty-five other individuals, filed an employment discrimination suit against Pemco in the Northern District of Alabama seeking both monetary and injunctive relief.   Billups never amended his Chapter 13 schedule of assets or statement of financial affairs to include his lawsuit against Pemco, which he filed over two years after his bankruptcy.  *Burnes,* 291 F.3d at 1284.  While the class action was pending, Billups converted his bankruptcy case to a Chapter 7.  *Id.*  Again, he never disclosed the employment discrimination claim in his petition and schedules.  *Id.*  Shortly after Billups' Chapter 7 discharge, Pemco moved for summary judgment on Billups' class action claims on the basis of judicial estoppel.  *Id.*  In particular, Pemco asserted that Billups was judicially estopped from pursuing his discrimination claims in the class action because he failed to amend his bankruptcy filing to add his lawsuit as a potential asset.  *Id.*  The district court agreed, granting Pemco's summary judgment motion with respect to Billups.  *Id.*

The Eleventh Circuit affirmed the district court's judgment on appeal.  The Court found that the evidence was sufficient to infer that Billups was aware of his discrimination lawsuit during the pendency of his bankruptcy proceedings and that he had financial motive and the requisite intent to conceal the claims from the bankruptcy court.  *Id.* at 1288.  The Court further explained that the underlying purpose of the doctrine of judicial estoppel was to insure the

protection of the integrity of the courts and to prevent parties from playing "fast and loose" with the court or otherwise making a mockery of the judicial system. *Id.* at 1285. *See also Barger v. City of Cartersville,* 348 F.3d 1289 (11th Cir. 2003) (following the analysis of *De Leon* and *Burnes* and concluding that the debtor was judicially estopped from proceeding in a state court action when the schedules did not include the asset of the state court action and that asset was not administered by the Chapter 7 trustee). Consequently, the Court affirmed the dismissal of Burnes' monetary damage claims.

The Eleventh Circuit addressed a similar factual circumstance in *De Leon v. Comcar Indus., Inc.,* 321 F.3d 1289 (11th Cir. 2003). In *De Leon*, plaintiff De Leon filed a Charge of Discrimination with the EEOC on December 2, 1999. The EEOC sent De Leon correspondence on July 7, 2000, explaining that if the EEOC brought a civil action, he would have the right to intervene in the action, or if it decided not to bring suit, he would be issued a right-to-sue letter. On October 11, 2000, De Leon hired counsel to "gather information". Subsequently, on November 7, 2000, De Leon filed bankruptcy. On April 19, 2001, the EEOC issued a right-to-sue letter, and on May 14, 2001, De Leon filed a discrimination suit. He never amended his bankruptcy filing to add his lawsuit as a potential asset. The defendant in the discrimination suit filed a motion to dismiss, asserting that De Leon was judicially estopped from pursuing his discrimination claims because he failed to disclose the lawsuit as an asset in his bankruptcy case. Only after the defendant filed its motion to dismiss did De Leon file an amended petition to reopen the bankruptcy estate in April 2002. The district court granted the defendant's motion, finding that De Leon was judicially estopped from pursuing his claims.

On appeal, the Eleventh Circuit affirmed the district court's judgment, finding that the district court had properly applied the doctrine of judicial estoppel to De Leon's retaliation and

discrimination claims. *Id.* at 1292. The court reasoned that because De Leon certainly knew about his claim and possessed a motive to conceal it because his amount of repayment in the bankruptcy would be less, it could "infer from the record his intent 'to make a mockery of the judicial system.'" *Id.* The Eleventh Circuit reasoned:

> In May of 2002, this court affirmed the application of judicial estoppel in a Chapter 7 bankruptcy case. *Burnes v. Pemco Aeroplex, Inc.,* 291 F.3d 1282, 1283 (11th Cir. 2002). De Leon attempts to distinguish *Burnes* because that case involved a debtor who filed for bankruptcy under Chapter 7, which allows for the complete discharge of debts. De Leon filed for bankruptcy under Chapter 13 through which his debts would be discounted and repaid. However, a financial motive to secret assets exists under Chapter 13 as well as under Chapter 7 because the hiding of assets affects the amount to be discounted and repaid. *Burnes* made no distinction based on the type of bankruptcy at issue. We also conclude that any distinction between the types of bankruptcies available is not sufficient enough to affect the applicability of judicial estoppel because the need for complete and honest disclosure exists in all types of bankruptcies. Accordingly, we hold that the rule established in *Burnes,* that judicial estoppel bars a plaintiff from asserting claims previously undisclosed to the bankruptcy court where the plaintiff both knew about the undisclosed claims and had a motive to conceal them from the bankruptcy court, applies equally in Chapter 13 bankruptcy cases.

In *Snowden v. Fred's Stores of Tennessee, Inc.*, 419 F. Supp. 2d 1367 (M.D. Ala. 2006), the Middle District of Alabama, distinguishing *Burnes and De Leon*, held that, under the particular facts, that employee was not be judicially estopped from filing an FLSA claim after filing for bankruptcy when there was no evidence of a motive to deceive. Under facts that are greatly distinguishable from those in the case at bar, the plaintiff in *Snowden* ("Glaston") filed for bankruptcy on September 19, 2002, started working for the defendant in September 2003, and learned from a customer in April of 2005 that her employer may have violated her rights under the Fair Labor Standards Act ("FLSA"). *Id.* at 1369. On April 13, 2005, Glaston opted into an already existing lawsuit against her employer. On June 3, 2005, less than two months

after Glaston joined the FLSA lawsuit, the defendant moved for summary judgment against Glaston based on judicial estoppel grounds.[6]   On August 22, 2005 (four months after Glaston first learned about and opted into the FLSA lawsuit), Glaston moved the bankruptcy court to amend her bankruptcy plan to reflect her participation in the lawsuit against her employer in her schedule of assets.   *Id.*

Declining to apply judicial estoppel to these facts, the court found that although Glaston stated in her 2002 bankruptcy pleadings that she did not have any unliquidated claims at the time that she filed her documents, this statement was not inconsistent with her claims in her FLSA suit.   While the court held that the employee's four-month delay in amending the bankruptcy schedule was not conclusive proof of an intent to mislead bankruptcy court, the court did acknowledge that "a delay in amending bankruptcy filings can be probative of a party's intent, and a lengthy delay alone could warrant a finding that the plaintiff intended to mislead the bankruptcy court."   *Id.* at 1374.   In fact, hypothetically presenting facts similar to those in this case, the court stated:

> Indeed, if Glaston had learned of her claims when they began to accrue in September 2003, yet failed to amend her bankruptcy filings until two years later and only after FST moved for summary judgment, this court would certainly not abuse its discretion to conclude that she was attempting to manipulate the judicial process in her favor and, accordingly, apply judicial estoppel.

*Id.* at 1372.   The court's hypothetical scenario is similar to the one at bar and, thus, supports the

---

[6]   In *Snowden*, the Court criticized Defendant for moving for summary judgment only two months after Plaintiff joined the FLSA lawsuit.   In Early's case, Rheem discovered that she was in Chapter 13 bankruptcy in March of 2006 shortly after Plaintiff filed an EEOC charge against Rheem.   In contrast to the defendants in *Snowden*, after discovering the bankruptcy, Rheem waited 14 months to depose Plaintiff and file its motion for summary judgment on judicial estoppel grounds.   Rheem did so in large measure to afford the Plaintiff a lengthy opportunity to voluntarily amend her bankruptcy pleadings on her own accord.   Rheem did immediately proceed to file its motion for summary judgment on May 25, 2007 (Doc. no. 17), the day following Plaintiff's deposition because, in Rheem's view, Plaintiff did not under the law or notions of fairness deserve an opportunity to amend her bankruptcy filings after it became clear to all concerned from her deposition that she had been "caught" "playing fast and loose" with the Courts.   *See Burnes*, 291 F.3d at 1288; *Coastal Plains*, 179 F.3d at 205.

application of judicial estoppel in this case.

Unlike the plaintiff in *Snowden*, but like the Plaintiffs in *Burnes* and *De Le*on, the evidence clearly shows that Early possesses a "financial motive to secret assets" in her Chapter 13 bankruptcy case. Donna Early filed a Chapter 13 Bankruptcy case on September 3, 2004, and her case is still pending.[7] *See* Petition for Bankruptcy, attached hereto as Ex. T, Statement of Financial Affairs, p. 2, ¶ 7. Early's injury during her National Guard drill duty occurred in 2000, and her conflict with Rheem/Mears over her new and contradictory medical restrictions occurred in July and August of 2004, and her last day of work with Rheem was on August 11, 2004. Clearly, at the time that she filed for bankruptcy on September 3, 2004, she was aware of ongoing disputes with her employer that could arise to legal claims against her employer, but she never reported this potential lawsuit to the bankruptcy court.

Finally, on or about December 21, 2005, Rheem terminated Plaintiff's employment under the belief that Plaintiff had abandoned her job and had no intention of returning to work. Early filed a Charge of Discrimination with the E.E.O.C. on February 23, 2006. She filed this lawsuit on August 13, 2006. Throughout 2006 and 2007 to date, Early knew she had alleged claims against her employer, but despite her continuing duty to update her bankruptcy pleadings to list this lawsuit as a potential asset, Early has failed to report this to the bankruptcy court.[8]

**B.    There is Strong Collateral Evidence that Plaintiff's Failure to Report this Suit to the Bankruptcy Court was an Intentional Deception.**

Although the Court can and should infer that Plaintiff's actions were calculated to deceive the Bankruptcy Court solely from her failure to disclose that she had claims against

---

[7]   Early is no stranger to Chapter 13 bankruptcy proceedings. She filed a Chapter 13 bankruptcy in 1996 and her case was closed in 2001, three years before she filed again in 2004.

[8]   Early has been represented by competent bankruptcy counsel during both of her bankruptcy proceedings. *See Burnes*, 291 F.3d at 1284 (Eleventh Circuit pointing out that plaintiff had a lawyer for the entirety of his bankruptcy proceedings).

Rheem, Defendants can show additional collateral evidence of Plaintiff's intent to deceive.    The Eleventh Circuit in *Burnes* considered the particular issue of judicial estoppel and the omission of assets in a bankruptcy case, and concluded that deliberate or intentional manipulation can be inferred from the record.    291 F.3d at 1287.

First, Plaintiff received a V.A. disability rating of 20% for her 2000 slip and fall injury on November 18, 2002.  *See* Early Depo., Ex. B, p. 60, l. 13-17.  Plaintiff thereafter sought to have the 20% rating increased.  Her efforts in this regard were in progress when she filed for bankruptcy in 2004.  On October 6, 2006 the V.A. notified Plaintiff that it had increased her disability rating from 20% to 60% retroactive to July 1, 2002. In addition to increasing her monthly disability amount, this resulted in Plaintiff receiving a lump sum back payment of at least $10,000.00.  *Id*. at p. 60, l. 22 – p. 62, l. 7.  In her deposition Plaintiff testified that she used approximately $3,000.00 of the money to purchase a car for a teenage child and repaid some loans to her brother.  She testified that she could not remember what she did with the rest of the money, and did not say that she recalled sending any of the money to the bankruptcy court.  *Id.* at p. 64, l. 4 – p. 65, l. 12.  Importantly, Plaintiff did not report this large lump sum of disposable income to the Bankruptcy Court nor did she previously ever reveal to the Court that she had a claim pending to have her disability rating, and thus her monthly payment, increased.  See Bankruptcy Schedule B, no. 20.

Plaintiff's bankruptcy plan provided for payment of her creditors over fifty-five (55) months.  *See* Bankruptcy Plan, attached hereto as Ex. U, at p. 2, ¶3.  Sixty (60) months is the longest Chapter 13 payment plan allowed by law.  *See* 11 U.S.C. §§ 1322(d), 1329(c).  Even though Plaintiff schedule was near the outer limit for paying her creditors, she did not disclose her receipt of this sizeable amount of disposable income or that her monthly V.A. benefit

increased by nearly $600.00 per month from $199.00 to $794.00. Clearly this omission prejudiced Plaintiff's creditors and the bankruptcy court. During her bankruptcy, Plaintiff has made twenty-one (21) of thirty-three (33) scheduled payments, meaning that she has missed her payment thirty-six percent (36%) of the time. *See* Chapter 13 Trustee Print Out, attached hereto as Ex. V. Plaintiff has not made up the missed payments. *Id.*

Additionally, on January 30, 2006, the Chapter 13 Bankruptcy Trustee moved to dismiss Plaintiff's bankruptcy due to failure to comply with her payment schedule. *See* Trustee's Motion to Dismiss, attached hereto as Ex. W. In response to the Trustee's Motion to Dismiss, Plaintiff filed an Objection wherein she stated that she "was hospitalized for two months." *See* Objection to Conditional Dismissal, attached hereto as Ex. Y. During Plaintiff's deposition, she acknowledged that her attorney had represented to the Bankruptcy Court that she had been hospitalized for a two-month period when, in fact, she "missed a couple of days" of work due to illness.[9] Early Depo., Ex. B, p. 286, l. 1 – p. 287, l. 15. This misrepresentation strongly indicates that Plaintiff mislead the Bankruptcy Court in an attempt to excuse her failure to make payments. The Court denied the motion to dismiss because, by the time the hearing occurred for the motion on July 10, 2006, Plaintiff had resumed making her payments. *See* Order Denying Motion to Dismiss, attached hereto as Ex. X.

Also, when Plaintiff filed for bankruptcy on September 3, 2004, she represented that she had made no charitable contributions within the preceding twelve (12) months. *See* Petition for Bankruptcy, Ex. T, at p. 2, # 7. Yet on January 26, 2005, Plaintiff filed her federal and state income tax returns for the calendar year 2004 and claimed deductions for charitable contributions in the amount of $3,450.00, $3,000.00 of which Plaintiff claimed was donated in

---

[9]   Rheem assumes that Plaintiff's attorney was simply providing to the Bankruptcy Court information that was provided by his client.

cash.  *See* 2004 Tax Return, attached hereto as Ex. Z at Form 1040, Sched. A, Itemized Deductions, Line 15, Form 40 Sched. A, Itemized Deductions Line 14.  Unless there is a missing piece to this puzzle of which Rheem is unaware, apparently Plaintiff either made $3,450.00 in charitable contributions between September 3, 2004 and December 31, 2004 without informing the Bankruptcy Court, or her 2004 federal and state tax returns are false.

Finally, Plaintiff has admitted that she routinely lied about her background on several employment applications, beginning with the one she submitted to Cancer Care in 2005.  *See* Employment Applications (with misrepresentations highlighted), attached hereto as Ex. AA.  In these applications, Plaintiff represented that she had attended the Military Police Academy and that she had served as a member of the Military Police Force ("M.P.") while on active duty in the U.S. Army.  When confronted with the fact that her military records contained no evidence of Military Police training or service, Plaintiff initially insisted that her representations in this regard were "typos" she made filling out the job applications.  When pressed, Plaintiff eventually admitted that she had lied and that she had never been an M.P., but just wanted to be one and had taken about two and a half hours of M.P. related courses while in the National Guard.  *See* Early Depo., Ex. B,  p. 200, l. 10 – p. 215, l. 22; p. 223, l. 11 – p. 224, l. 5; p. 232, l. 15 – p. 233, l. 15. In these same applications, Plaintiff failed to disclose that she had ever worked for Rheem and misrepresented that she had been on active military duty for most or all of the time that she had, in fact, worked at Rheem.  *See* Employment Applications (with misrepresentations highlighted), Ex. AA.  Plaintiff also claimed to have been a "med tech" in the Army, another fabrication. Early Depo., Ex. B, p. 241, lns. 14-19.  Plaintiff admitted that she made these misrepresentations to inflate her prior employment experience knowing that they would be relied upon by her

prospective employer[s]. *Id.* at p. 220, l. – p. 223, l. 10; p. 237, l. 20 – p. 239, l. 2; p. 242, lns. 3-14.

In sum, Plaintiff has now admitted under oath to a pattern of submitting falsified documents about herself and her affairs. All of these misrepresentations in combination buttress the inference that Early's omission of assets in her bankruptcy case constituted deliberate and intentional manipulation. Early's admitted misrepresentations, when coupled with the inference of intentional manipulation court's make solely on the basis of the debtor's failure to disclose potential causes of action, makes the case for deception overwhelming.[10]

To allow Early to pursue her discrimination claims in this action would constitute a "mockery of the judicial system." *See De Leon*, 321 F.3d at 1292 (citing *Burnes*, 291 F.3d at 1285-87). For these reasons, Defendants are entitled to summary judgment on all of Early's claims that existed during the pendency of her bankruptcy case

---

[10]   Early should not be allowed to go back to the bankruptcy court and amend her schedules now that she has been caught in her deception. That type of remedy has been considered and rejected by the Eleventh Circuit:

> In an attempt to remedy the situation, Billups argues that he should now be allowed to re-open his bankruptcy case to amend his filings and include his lawsuit against Pemco. We disagree. The success of our bankruptcy laws requires a debtor's full and honest disclosure. Allowing Billups to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing potential assets only if he is caught concealing them. This so-called remedy would only diminish the necessary incentive to provide the bankruptcy court with a truthful disclosure of the debtors' assets. *See Traylor v. Gene Evans Ford, LLC,* 185 F.Supp.2d 1338, 1340 (N.D. Ga. 2002)(denying a debtor's request to back up and disclose a previously undisclosed claim to the bankruptcy court in the face of an adversary's challenge); *Scoggins v. Arrow Trucking Co.,* 92 F.Supp.2d 1372, 1376 (S.D. Ga. 2000)(same); *Chandler v. Samford University,* 35 F.Supp.2d 861, 863-865 (N.D. Ala. 1999)(applying the doctrine of judicial estoppel to bar a plaintiff from asserting a previously undisclosed tort claim, even though she eventually informed her attorney and the bankruptcy court of the claim).

*Burnes*, 291 F.3d at 1288.

## V.     CONCLUSION

Plaintiff has failed to disclose the claims she is asserting in this litigation in her bankruptcy case and should be judicially estopped from continuing this litigation. For the foregoing reasons, Rheem submits that this Court should enter summary judgment in favor of Rheem and Mears as to all counts against it contained in Early's Complaint, dismiss the Complaint and all claims in this lawsuit against Rheem and Mears with prejudice, and tax costs against Plaintiff.

Respectfully submitted,

s/Henry C. Barnett, Jr.
**HENRY C. BARNETT, JR. (BAR037)**
*ATTORNEY FOR DEFENDANTS*

**OF COUNSEL:**
CAPELL & HOWARD, P. C.
150 South Perry Street
Post Office Box 2069
Montgomery, Alabama  36104
(334) 241-8000
(334) 323-8888

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of June, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Trina S. Williams
Vicky U. Toles
TOLES & WILLIAMS, LLP
1015 South McDonough Street
Montgomery, Alabama 36104

s/Henry C. Barnett, Jr.
OF COUNSEL

# EXHIBIT A



## Water Heaters

# Job Description

**\* Job Title:** Assembler

**\* Category:** Manufacturing

**Emp. Classification:** Hourly

**Level:**

**Location:** Montgomery

**WORK ENVIRONMENT:** May be exposed to high noise levels.

**PHYSICAL DEMANDS:** Continuous lifting of 5-25 lbs; Frequent lifting of 25-60 lbs; Occasional lifting of 60+ lbs. Frequent strain due to body position and unsupported lifting. Must be able to walk, stand and/or lift repetitively during shift.

**CERTIFICATES LICENSES REGISTRATIONS:** None

**SUPERVISORY RESPONSIBILITIES:** No

**JOB DESCRIPTION**

**Purpose and Scope:**

**Responsibilities:**

ESSENTIAL DUTIES AND RESPONSIBILITIES include the following. Other duties may be assigned.

Will be required to assemble metal units or parts contributing to the forming of a complete water heater or sub-assembly using hand tools, air powered tools and/or jigs.

Will be required to use repetitive motions assembling parts, nuts, bolts, and screws.

Must be able to use common sense in determining whether simple

adjustments are to be made to ensure proper/correct positioning of parts or tools.

Make common sense decisions to reject faulty parts if necessary.

May be utilized in various positions as deemed necessary to supervisor.

Must be able to do job properly and keep up with production.

Must be able to sit, stand, stoop, and kneel for long periods of time.

Assembler must regularly lift and move in repetitive motions to carry out job duties.

Assembler will occasionally be exposed to fumes or airborne particles.

Assembler will occasionally work near moving mechanical parts and is occasionally exposed to wet and/or humid conditions.

Noise level in work environment in usually loud.

Maintain good housekeeping in work area.

Work from written or verbal orders.

Report any tool/machine malfunctions to Leadman or Supervisor.

Observe all departmental safety requirements.

Inspect units or parts for defects and workmanship.

Perform other related duties as required by supervisor.

**Organizational Relationships:**

**MINIMUM JOB REQUIREMENTS**

**Minimum Education:**
High School Diploma/GED

**Background/Experience:**

Must be able to read and write.

**Technical Requirements:**

**Desirable Attributes/Skills:**

**ADDITIONAL TRAINING REQUIREMENTS**

**Required Courses:**
MG 0071 - Assembler

**Other Requirements:**

**References:**

# EXHIBIT B

# ORIGINAL [1]

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    DONNA L. EARLY,

6         Plaintiff,

7    Vs.                                    CIVIL ACTION NO.
                                             2:06-CV-727
8    RHEEM MANUFACTURING COMPANY,
     A Corporation, and CAL MEARS,
9    An Individual,

10        Defendants.

11

12              * * * * * * * * * * * *

13

14

15       VIDEOTAPED DEPOSITION OF DONNA EARLY,

16   taken pursuant to stipulation and agreement before

17   Lisa J. Nix, Registered Professional Reporter and

18   Commissioner for the State of Alabama at Large, in

19   the Law Offices of Capell & Howard, 150 South Perry

20   Street, Montgomery, Alabama on Thursday, May 24,

21   2007, commencing at approximately 9:01 a.m.

22

23              * * * * * * * * * * * *

12

1    A.    I enlisted.

2    Q.    You enlisted in the military?

3    A.    Yes, I did.

4    Q.    What branch?

5    A.    Army.

6    Q.    So you enlisted in the regular Army?

7    A.    Regular Army.

8    Q.    And the date of that enlistment was what?

9    A.    I think it was March or April.  I'm not

10         sure.

11   Q.    Of 1987?

12   A.    Yes.

13   Q.    All right.  Ms. Early, tell me all of the

14         training that you've had in the military.

15   A.    In the military, I was -- start from the

16         front.  I was 63 Juliette, quartermaster/

17         chemical repair.

18   Q.    I didn't hear the first one.

19   A.    63 Juliette.

20   Q.    What is --

21   A.    63 J.

22   Q.    63 Juliette?

23   A.    Yes.

16

1    maintenance department, I did the Sams --

2    the Sams 1 computer.

3    Q.    All right.  Where was your last active duty

4    assignment?

5    A.    My last active duty station was Karlsruhe,

6    Germany.

7              MS. COOK:  I'm sorry?

8              THE WITNESS:  Karlsruhe, K-A-R-S,

9                   I think it's L-R-U-H-E.  I'm

10                   not ...

11   Q.    Tell me what's involved in being in the

12   quartermaster/chemical repair.

13   A.    Technically, I never worked in there.  I

14   just was in the motor pool.  It was just

15   like -- quartermaster/chemical repair is

16   setting up shower units in the field,

17   washing -- big washing machines, and we

18   never did.  So I worked in the maintenance

19   department, taking in job orders, looking

20   at generators, so I really never worked in

21   my MOS in quartermaster.

22   Q.    All right.  So if you enlisted in '87, when

23   did you -- when were you discharged from

1        active duty?

2    A.   I left active duty, I think it was, '92, I

3        believe.  I'm not for sure.

4    Q.   And you went to work for Rheem in 1993; is

5        that correct?

6    A.   I believe so.

7    Q.   Now, I want to get a handle on what you

8        actually did in the military.  I mean,

9        you've told me -- Why don't you just go

10       through.  What have we got?  Around six

11       years in the military --

12   A.   Okay.

13   Q.   -- on active duty.  What did you do on each

14       assignment?

15   A.   On each assignment, the quartermaster, I

16       stayed in the generator department where

17       they have a bunch of generators, from 5K to

18       a 30K.  And I just signed them out to

19       different units.  That's basically what I

20       did as a 63 Juliette.

21   Q.   You didn't actually do any maintenance

22       on --

23   A.   No, nothing but take orders and crank them

1    Q.    Yeah.  Now, remind me what you did there.

2         Was that --

3    A.    Fort Carson, Colorado, I did the motor pool

4         again.

5    Q.    Okay.  All right.  Did you enlist for

6         basically a six-year term?

7    A.    Yes, I think -- I can't remember.  I think

8         I did.

9    Q.    So did you get an early out or anything

10       like that?

11    A.    No.

12    Q.    Then -- And we've covered all the training

13       you can recall from that active duty in the

14       military?

15    A.    (Witness nods head up and down.)

16    Q.    Then it's my understanding that -- well,

17       let me ask you rather than me ...

18           You re-enlisted in the Alabama National

19       Guard?

20    A.    Yes, sir.

21    Q.    When?

22    A.    I'm not sure what date it was.

23    Q.    Let me see if I can find that.  Well,

21

```
1        that's before ...
2            Does September 21, '93 sound about
3        right?
4   A.   It was in '90 something.  I'm not sure when
5        it was.
6   Q.   Okay.  Why did you re-enlist?
7   A.   I missed the military.  I missed the
8        military.
9   Q.   You missed the military.
10           Any military-related service between
11       your discharge in '92 and your
12       re-enlistment in '93?
13  A.   No.
14  Q.   I want to be clear about the branch of the
15       service.  You were not -- you didn't
16       re-enlist or go into the Army Reserve,
17       right?  You went into the Alabama National
18       Guard?
19  A.   No, I went to -- I think it was the Army
20       Reserve out here at -- the 282nd.  I think
21       it's a Reserve unit.
22  Q.   Where was that?
23  A.   Gunter Park.
```

36

1    A.    Two weeks, sometimes three weeks.

2    Q.    But if I understand your testimony, Rheem

3          never gave you any -- never gave you a hard

4          time about being in the National Guard,

5          going to drill or summer camp?

6    A.    (Shakes head from side to side.)

7    Q.    You have to give a verbal answer.

8    A.    No, I don't remember any.

9    Q.    Now, let's talk about August 27th, 2000.

10   A.    August 27, 2000.

11   Q.    That's the day that you had the accident in

12         the kitchen.

13   A.    Okay.

14   Q.    Now, that was a regularly-scheduled weekend

15         drill --

16   A.    Yes.

17   Q.    -- that you'd had notice of since October

18         of '99?

19   A.    Uh-huh.  (Positive response.)  October --

20         No.  The prior year before.

21   Q.    Well, that would have been '99, wouldn't

22         it?

23   A.    Yeah, '90 -- yeah, '99.  That's right.

37

1   Q.  Was there anything -- What was the unit

2       doing that weekend?

3   A.  I can't remember.  Just a regular weekend,

4       I believe.

5   Q.  Same old stuff?

6   A.  Same old stuff.

7   Q.  And I believe you answered in your

8       interrogatories that if you hadn't been

9       injured that Sunday, the 27th, you would

10      have been back at work on Monday.

11  A.  Yes.

12  Q.  Now, tell me about your -- and this was in

13      Monroeville?

14  A.  Monroeville.

15  Q.  And you were helping out with the cooking?

16  A.  Cooking.

17  Q.  Tell me what happened that caused you to

18      sustain a back injury.

19  A.  It was some water out of a refrigerator in

20      the kitchen.  We had two parts to the

21      kitchen, and the water was on the floor.

22      And the carpet -- I mean, the carpet -- the

23      floor is like black and something.  If you

38

1    don't look at the floor good, you don't

2    never know water is on there.  It was just

3    like black cement or something.

4        And I walked in there trying to get

5    something out of the refrigerator, and I

6    slipped between a table and a freezer.

7  Q.  Slipped into a table?

8  A.  It was a table -- I think it was a table,

9    water heater, freezer.  I'm not sure what

10   was in that area.  Table, water heater,

11   freezer, something --

12 Q.  That was leaking or that you fell on?

13 A.  The refrigerator was leaking.

14 Q.  Okay.  And you're telling me now what you

15   fell into?

16 A.  I fell into it.

17 Q.  Okay.  Did you land on your tailbone?

18 A.  I landed on my back.

19 Q.  Okay.

20 A.  I hit my tailbone and landed on my back.

21 Q.  Were there any witnesses?

22 A.  Yes.  Henry Preyer.

23          (Brief interruption.)

60

1    Q.    Where?

2    A.    Coliseum Boulevard, Congressman Dickinson

3          Drive.

4    Q.    Is he National Guard?

5    A.    Yes, he is.

6    Q.    So we've got you back at work on a stool,

7          putting plugs in.

8    A.    Yes.

9    Q.    Is there anything of any significance to

10         this lawsuit that you can remember happened

11         during the remainder of the year 2001?

12   A.    No, not that I remember.

13   Q.    I'm showing that in November of 2002, the

14         VA gave you a 20 percent disability rating.

15   A.    That sounds like it.

16   Q.    That sounds right?

17   A.    That sounds about right.

18   Q.    How much per month did you get for that

19         rating?

20   A.    I think it was 200 and something.  I

21         don't ...

22   Q.    Then I'm showing that in October of '06,

23         they increased your rating to 50 percent.

61

| | | |
|---|---|---|
| 1 | A. | 60. |
| 2 | Q. | 60? |
| 3 | A. | 60. |
| 4 | Q. | All right.  To 60 percent, retroactive to |
| 5 | | July 1st, 2002; is that true? |
| 6 | A. | Excuse me? |
| 7 | Q. | It was retroactive, was it not, the 60 |
| 8 | | percent rating? |
| 9 | A. | Came from the fall in 2001? |
| 10 | Q. | Yeah.  Let me start over.  You first got a |
| 11 | | 20 percent rating. |
| 12 | A. | Yes. |
| 13 | Q. | It was later raised to 60 percent. |
| 14 | A. | Yes. |
| 15 | Q. | And it was made retroactive, was it not? |
| 16 | A. | Yes, they back paid me for ... |
| 17 | Q. | That's what I was going to ask you.  How |
| 18 | | much was that check for the retroactive -- |
| 19 | A. | I don't remember. |
| 20 | Q. | You don't have any idea? |
| 21 | A. | It was over 10,000.  I can't remember |
| 22 | | exactly. |
| 23 | Q. | Okay.  Over 10,000.  Was it over 12,000? |

1    A.    I can't remember.

2    Q.    When did you receive that check?

3    A.    I can't remember what month it was.  It

4          might have been March or April.  I'm not

5          sure what month it was.

6    Q.    Of what year?

7    A.    2006.

8    Q.    What did you do with that money, Ms. Early?

9    A.    Excuse me?

10   Q.    What did you do with that money?

11   A.    It went everywhere --

12              MS. WILLIAMS:  Objection to the

13                   form of the question.

14              MR. BARNETT:  Do you have a

15                   specific objection to the

16                   form?

17                        Let me try to rephrase

18                   it.

19   Q.    Did you just use that for general purposes,

20         or did you make any major purchases?

21   A.    No.  First, I paid my brother back some

22         money.  I didn't pay him everything.  My

23         brother helped me dearly because I almost

64

1       was increased from 20 percent to 60

2       percent.

3   A.   Okay.

4   Q.   Tell me again when you received that lump

5       sum.

6   A.   I'm not sure when I received it.  In May --

7       I mean, March, April.  I'm not sure.

8   Q.   Of which year?

9   A.   '06.

10   Q.   It wasn't '07?  It wasn't just two or three

11       months ago?

12   A.   No, it wasn't two or three months ago.

13   Q.   Now, I asked you if you made any major

14       purchases, and you mentioned that you paid

15       back your brother.

16          Did you make any major purchases like

17       an automobile or --

18   A.   I bought a car.  Yeah, I bought a car.

19   Q.   What car did you buy?

20   A.   A '99 Malibu.

21   Q.   How much did that cost you?

22   A.   3,000.  I'm not sure.  About 3,000, I

23       believe.

65

| | | |
|---|---|---|
| 1 | Q. | What were you driving before that? |
| 2 | A. | A 2001 Neon. |
| 3 | Q. | Why did you trade? |
| 4 | A. | I didn't trade. |
| 5 | Q. | Why did you get a new car? |
| 6 | A. | I have a daughter that's driving.  I have a |
| 7 | | teenager. |
| 8 | Q. | You gave -- or you let the teenager drive |
| 9 | | the Neon? |
| 10 | A. | No -- yes, she drive both of them. |
| 11 | Q. | Okay.  So you needed a second car. |
| 12 | A. | I needed a second car, yes. |
| 13 | Q. | Did you report the $10,000 payment on your |
| 14 | | taxes? |
| 15 | A. | Yes, I think I did.  I'm not sure if I did |
| 16 | | or not. |
| 17 | Q. | Is there any reason that you wouldn't have |
| 18 | | reported it? |
| 19 | A. | No. |
| 20 | Q. | And you know you should have? |
| 21 | A. | Yeah. |
| 22 | Q. | What was your rate of pay when you returned |
| 23 | | to work in June of 2001? |

72

1    A.    Because of my swelling.

2    Q.    What swelling?  Where?

3    A.    In my leg.

4    Q.    What did Dr. Tarabein tell you was wrong

5        with you?

6    A.    He did some nerve -- degenerative disk

7        disease, I believe.

8            (Brief interruption.)

9    A.    I can't pronounce it.

10    Q.    Degenerative disk disease?

11    A.    Disease, yes.

12    Q.    Now, Dr. Tarabein gave you a series --

13        Strike that.

14        The records from Dr. Tarabein and Rheem

15        show that you visited Dr. Tarabein off and

16        on sometimes once a month.

17    A.    Yes, sir.

18    Q.    Sometimes once every other month.

19    A.    Yes, sir.

20    Q.    Am I right so far?

21    A.    Yes, sir.

22    Q.    Until March of 2005.

23    A.    Yes, sir.

73

| | | |
|---|---|---|
| 1 | Q. | And then you stopped seeing Dr. Tarabein? |
| 2 | A. | Yes, sir. |
| 3 | Q. | And after each visit to Dr. Tarabein, he |
| 4 | | filled out a restriction sheet? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Do you know that? |
| 7 | A. | Yes, sir. |
| 8 | Q. | And you would take that to whom at Rheem, |
| 9 | | that restriction? |
| 10 | A. | Norman. |
| 11 | Q. | And Norman would comply with those |
| 12 | | restrictions? |
| 13 | A. | Yes, sir. |
| 14 | Q. | How did you get back and forth to |
| 15 | | Dr. Tarabein's office? |
| 16 | A. | I drove. |
| 17 | Q. | Drove yourself? |
| 18 | A. | Me or my sister, my brother, whoever would |
| 19 | | go with me, wanted to drive with me went |
| 20 | | with me. |
| 21 | Q. | Did you ever see him in any of his offices |
| 22 | | other than the Selma office? |
| 23 | A. | Foley. |

79

1          fingers on your hand in March of 2004?

2    A.    Okay.  I remember I -- it was my left

3          hand.  I don't remember what month, if it

4          was March or April.  I'm not sure what

5          month it was.

6    Q.    You know, I think it was April.  It's April

7          6th as a matter of fact.

8    A.    Okay.

9    Q.    Do you recall that date and injury?

10   A.    Yes, I remember it.

11   Q.    How did that happen?

12   A.    I was standing up -- sitting in a chair at

13         another plugger's job.  I reached for a

14         plug.  And the machine took my glove, and

15         my hand went up in the machine.

16   Q.    Which two fingers were injured?  Could you

17         hold them up for the camera.

18   A.    I know it was two fingers.  I know this

19         one.  I'm not sure if it was these two or

20         what.  I know it was this finger right

21         here.  I've still got a scar from it.

22   Q.    Any other scars?

23   A.    No.  This is the only scar right here.

80

1    Q.    Did Rheem's workers' compensation insurance

2          carrier pay for all the medical care that

3          you needed with respect to those fingers?

4    A.    Yes.  Yes, they did.

5    Q.    Any complaints about the medical care you

6          got?

7    A.    No.

8    Q.    Did your duties change when you -- Strike

9          that.

10         Did you miss any time from work as a

11         result of those injured fingers?

12   A.    Going to the doctor.  That's it.

13   Q.    So your only lost work there was, was going

14         to the doctor?

15   A.    Yes.

16   Q.    And after that injury, you asked for nerve

17         conduction studies; isn't that true?

18   A.    I asked for it?  I don't remember that.

19   Q.    Well, that's what Rheem's records reflect,

20         that you wanted nerve conduction studies.

21   A.    I don't remember that.

22   Q.    Do you remember that you got them?

23   A.    I remember they did some tests on my hand,

81

1        yes.

2    Q.   You know that they were normal?

3    A.   Yes.

4    Q.   Didn't they test both hands?

5    A.   I'm not sure.

6    Q.   You received rehabilitation in connection

7        with those injuries from Rehab Associates;

8        is that right?

9    A.   Yes, I know on my right.  I'm not sure

10       about this hand.  I know I got it for my

11       right hand.

12   Q.   And what was wrong with your right hand?

13   A.   It was swelling real bad.

14   Q.   And what medical explanation did you get

15       for that?

16   A.   Well, I got one diagnosis, carpal tunnel.

17       The other diagnosis I got was tendinitis.

18   Q.   Did you miss any work for that?

19   A.   Yes, I went to rehab and going to the

20       doctor.

21   Q.   But you were given leave for that?

22   A.   Yes, I got workmen's comp for that.

23   Q.   But you got no points for absence?

82

1    A.    No.

2    Q.    You saw Dr. Palmer for your fingers; is

3          that right?

4    A.    I believe so.  I'm not for sure what his

5          name was.

6    Q.    When you -- Did your job change after you

7          injured your fingers for a time?

8    A.    Yes.

9    Q.    How did it change?

10   A.    I went to the heater line.

11   Q.    What did you do?

12   A.    I put on labels.  I make -- built parts.

13   Q.    I heard the labels part.  What was the

14         second one?

15   A.    Build parts.

16   Q.    You built parts?

17   A.    Yes.

18   Q.    Did you sit?

19   A.    Sit.

20   Q.    At a table?

21   A.    No, on some little box.  I had to put a

22         little foam thing inside a little gasket.

23   Q.    Now, that was the -- making parts?

83

1   A.   Yes.

2   Q.   And that job was in accordance with the

3        restrictions from your doctors, right?

4   A.   Yes.

5   Q.   No complaints about that?

6   A.   No.

7   Q.   Do you recall that Rehab Associates gave

8        you an examination in connection with the

9        FCE report that was prepared in connection

10       with your workers' comp?

11  A.   I got an examination.  I don't know what

12       kind it was.

13  Q.   Okay.  Do you remember that they asked you

14       to do a number of tasks?

15  A.   Yes.

16  Q.   Did they tell you how you scored on the

17       effort level?

18  A.   No, I don't -- I don't remember.

19  Q.   You don't remember them telling you that?

20  A.   I don't remember.

21  Q.   Did you do your best?

22  A.   I did my best.

23  Q.   Would you be surprised to learn that Rehab

116

1          you?

2     A.   If you look in my record, it's in there.

3     Q.   I understand that, but you didn't tell him

4          it was in there, did you?

5     A.   My medical record is on your desk.  You'll

6          see it in there.  You'll see JAG signed,

7          and everything is in there.

8     Q.   Listen to the question, Ms. Early.

9     A.   Okay.

10    Q.   You can't swear to this court --

11    A.   No, I cannot swear to that.

12    Q.   -- that you told Cal Mears about that

13         release?

14    A.   No, I cannot swear --

15              MS. WILLIAMS:   Objection to the

16                   form.

17    A.   -- to that.

18    Q.   And you're not swearing to that, are you?

19    A.   No, I'm not swearing to that.

20    Q.   So your approach with Mr. Mears was, it's

21         all in my medical records; you've got all

22         my medical records?

23    A.   Yes.

117

1   Q.   And you told him that on several occasions?

2   A.   Several occasions.

3   Q.   And you didn't ask Dr. Tarabein to furnish

4        clarification because you didn't want to

5        pay for it?

6   A.   No, I asked Dr. Tarabein to give me an

7        excuse for work like he'd been doing.  I

8        told him I had a problem at work.

9   Q.   But, Ms. Early, you knew that Cal Mears was

10       asking for clarification of the right arm

11       restrictions in Exhibit 3, didn't you?

12  A.   No, sir.  I know Cal wanted to put this on

13       the military, not Rheem.

14  Q.   No, we've already covered that.  He never

15       mentioned the military.

16  A.   Yes, he did -- no, sir.  He wanted to get a

17       clarification where the injury was coming

18       from.

19  Q.   Well, he didn't mention the military, did

20       he?  You've already --

21  A.   He mentioned the injury.

22  Q.   -- testified to that.

23  A.   He mentioned the injury, where the injury

135

Q.   Do you see the last paragraph?  Ms. Early,
     I would again request that you or your
     physician provide the company with medical
     clarification of the non-work connected
     restriction cited in the August 11th, 2004
     correspondence which totally restricts the
     use of your right arm while you -- while
     allowing use of the right hand only to
     perform full duty sedentary tasks, so on
     and so forth.

A.   Again, he wanted a non-work condition --
     connection.  He wanted to put it on the
     military again.

Q.   That's not the question I asked you.

A.   That's what the paper -- That's what you're
     reading from, the paper is saying.  Again,
     he's asking for a non-work connection
     restriction.  That's what he's asking me to
     bring in, saying that it's not Rheem, it's
     the military.

Q.   He never said that, though.

A.   This says clarification of non-work
     connection restriction.  That's what that's

136

1      saying.

2  Q.   Dr. Tarabein was your military doctor,

3       wasn't he?

4  A.   Yes, he was.

5  Q.   He was treating you for your military

6       injuries, wasn't he?

7  A.   He gave my -- He gave me a restriction for

8       my military injury.

9  Q.   Right.

10 A.   Okay.  It aggravated it.  He put it on

11      paper, and I gave it to Cal --

12 Q.   Fine.

13 A.   -- and Norman.

14 Q.   Now, is this why you didn't take this

15      letter to Dr. Tarabein and ask him to give

16      clarification?

17 A.   I don't remember taking it to Dr. Tarabein.

18 Q.   You never took it to Dr. Tarabein?

19 A.   I told Dr. Tarabein about my condition.

20 Q.   No, let me -- let's don't talk over each

21      other.  Isn't it true that you never gave

22      this August 20th letter, Exhibit 5, to

23      Dr. Tarabein?

137

1   A.   I don't remember taking this to

2       Dr. Tarabein.

3   Q.   You don't remember?

4   A.   I don't remember taking it.

5   Q.   Well, it's not in his file.

6   A.   Okay.

7   Q.   So if Dr. Tarabein says he never saw this

8       letter, you can't disagree with that?

9   A.   No, I can't -- I won't disagree with him.

10   Q.   Did you consider -- Did you ever consider

11       just dropping this in the mail to

12       Dr. Tarabein or giving him a call and --

13   A.   I told Tarabein about the problem I was

14       having at work.  I could talk to

15       Dr. Tarabein about anything.  I told him I

16       was having a problem -- a problem at work

17       about my arm.  He wrote my restriction out.

18   Q.   You told him you were having problems --

19       medical problems with your right arm?

20   A.   And with the restriction.

21   Q.   Let me see if I understand.  You told him

22       that you were having problems with your

23       right arm and with the restriction?

138

```
1   A.   Yes.

2   Q.   What was it about the restrictions that you

3        were having a problem --

4   A.   That they need clarification or they have a

5        problem with it.  He said tell them to call

6        me.  If you have any problem, call him.  He

7        more -- He more than likely happy to talk

8        to you about my condition.  He never closed

9        this door to Rheem.  He always open his

10       door and ask them -- if you have any

11       question --

12            He even wrote Rheem a letter and told

13       them -- I read the letter -- in 2001.  If

14       you have any question about Donna's

15       condition, please call and contact me.  So

16       I don't see what this problem about --

17  Q.   Do you have -- Cal Mears started in 2001;

18       is that correct?

19  A.   I'm not sure when Cal started.

20  Q.   2004, correct?

21  A.   I'm not sure.

22  Q.   Do you have any evidence that Cal Mears

23       knew anything about your prior medical
```

144

1          asked and answered.

2                    MR. BARNETT:  Well, I haven't

3                    gotten a straight answer in 15

4                    minutes with all due respect,

5                    but ...

6     Q.   Could you have gone back during the August

7          time frame to the assembly line and used

8          the plugger, the pneumatic plugger?

9                    MS. WILLIAMS:  Renew my objection.

10    A.   My arm was still swelling.

11    Q.   The answer to that is yes, I could have or

12         no, I couldn't have.

13    A.   If I went back to the line and plugged, my

14         arm would have got worser.

15    Q.   So you couldn't go back and do that, could

16         you?

17    A.   No, I couldn't go back and plug.

18    Q.   All right.  It's not that hard.

19              What did you do after you received this

20         letter of August 20th from Mr. Mears to

21         clarify or help Rheem clarify the

22         restrictions that he had imposed about your

23         right arm usage?

1   A.   I told Cal he needed to contact
2        Dr. Tarabein.
3   Q.   What else did you do?
4   A.   What else could I do?
5   Q.   I'm asking you if you did anything.
6   A.   No, I didn't.
7   Q.   Now, when you met with Cal Mears the second
8        time, did he call you and ask you to come
9        in?
10  A.   I don't remember.
11  Q.   Did you call him and ask for another
12       meeting?
13  A.   I came in a couple of times.  I don't
14       remember ...
15  Q.   Well, you don't remember who asked for the
16       meeting?
17  A.   No.  I came and asked him has he talked to
18       my doctor.  I don't remember who called who
19       or did what, but I know I called him and I
20       went by there.
21  Q.   You do understand that Mr. Mears can't talk
22       to your doctor without written consent from
23       you, don't you?

148

1       worse or not.

2   Q.   Did you go back to using the plug gun at

3       all in 2000 -- let's see, in the summer of

4       2004?

5   A.   No, I don't think I did.

6   Q.   Now, during one of these meetings with you

7       in August of 2004, Mr. Mears gave you forms

8       for short-term disability if you --

9   A.   Yes.

10   Q.   -- wanted to use them?

11   A.   Yes.

12   Q.   And you filled out those forms, right?

13   A.   Yes.

14   Q.   And you understood that Prudential

15       Insurance Company of America was the

16       disability insurer?

17   A.   Yes.

18   Q.   You saw that on the forms?

19   A.   Yes.

20   Q.   And you understand that Prudential

21       Insurance Company of America made the

22       decisions about whether you were eligible

23       for short-term disability, correct?

149

1    A.    Yes.

2    Q.    Did you ever apply for long-term

3          disability?

4    A.    Yes, I did.

5    Q.    And don't you know that Prudential made

6          that decision as well?

7    A.    Yes, I do.

8    Q.    And what I understand is that Prudential

9          deemed or declared you eligible for

10         short-term disability benefits for some

11         period of time.

12   A.    Uh-huh.  (Positive response.)

13   Q.    Is that correct?

14   A.    (Witness nods head up and down.)

15   Q.    And then determined that you had not

16         furnished sufficient medical documentation

17         and discontinued your benefits; is that

18         right?

19   A.    I submitted everything I had.

20   Q.    I understand that.  I'm just trying to get

21         the facts.

22               Isn't it true that Prudential at some

23         point in time in the fall of '04 determined

1  that the medical documentation you had

2  submitted was not enough to justify paying

3  you the benefits, and they cut them off?

4  A.  Yes.  I'm not sure what happened, but I

5  know they cut it off.

6  Q.  But you know that Prudential made the

7  eligibility determination?

8  You know what an eligibility

9  determination is?

10  A.  Yes, I do.

11  Q.  They made the eligibility determination for

12  the short-term disability benefits to make

13  you eligible, right?

14  Right?

15  A.  Yes.

16  Q.  They made the determination to stop your

17  benefits, right?

18  A.  Yes.

19  Q.  They being Prudential.

20  Prudential -- If you applied for

21  long-term disability, Prudential made the

22  determination not to give you that as well,

23  right?

151

1    A.    Yes.

2    Q.    And the notices that you got about all of

3          those eligibility determinations came from

4          Prudential, did they not?

5    A.    Yes, they did.

6    Q.    You don't have any evidence that Rheem

7          played any role in those eligibility

8          determinations, do you?

9    A.    I don't know.  I don't know about that.

10   Q.    You don't know about that?

11   A.    No.

12   Q.    Well, if I say to you that Prudential is an

13         independent insurance company --

14   A.    Yeah.

15   Q.    -- do you have any reason to dispute that?

16   A.    No, I don't.

17   Q.    If I say to you that Prudential makes the

18         eligibility determinations without any

19         input from Rheem, do you have any basis for

20         disagreeing with that?

21   A.    Maybe.  Maybe not.  I'm not sure about

22         that.

23   Q.    Well, what gives you the maybe, maybe not

152

1      part?  What is it that you know fact-wise

2      that makes you say maybe, maybe not?

3  A.  I don't know for sure.

4  Q.  You don't know -- you don't know -- You

5      don't have any evidence that Rheem has

6      input in eligibility --

7  A.  No, I don't.

8  Q.  -- determinations, do you?

9  A.  No.

10 Q.  You appealed Prudential's denial of your

11     disability benefits?

12 A.  Yes, I did.

13 Q.  And do you know that a Prudential board of

14     review reviewed your appeal?

15 A.  Yes, I do.

16 Q.  And isn't it true that they still upheld

17     the earlier decision --

18 A.  Yeah.

19 Q.  -- by their -- by their claims people not

20     to pay benefits?

21 A.  Yes.

22 Q.  And if I tell you that Rheem played no role

23     in the appeals process --

| 1 | Q. | And for what purpose did you go back? |
|---|----|----|
| 2 | A. | I wanted to go talk about this, see what |
| 3 | | they came up with. |
| 4 | Q. | And who did you talk to? |
| 5 | A. | Nobody.  I got put off twice, I believe. |
| 6 | Q. | So you went out there to see somebody, but |
| 7 | | you didn't ever actually -- |
| 8 | A. | No. |
| 9 | Q. | -- meet with anybody? |
| 10 | | Not Mears, not Gardner? |
| 11 | A. | Huh-uh.  (Negative response.) |
| 12 | Q. | Not -- |
| 13 | A. | I called and called and called. |
| 14 | Q. | Who did you call? |
| 15 | A. | I called and asked to speak to somebody.  I |
| 16 | | couldn't talk.  They would not put me |
| 17 | | through.  I talked to Jenny. |
| 18 | Q. | Did you tell her what the purpose of your |
| 19 | | call was? |
| 20 | A. | Yes, it was. |
| 21 | Q. | Now, you started school at VA expense at |
| 22 | | Capps College in November of '04, right? |
| 23 | A. | I believe that's what it was. |

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

190

1   Q.   Four and six what?

2   A.   Between four and $600 a month.

3   Q.   You did an internship at Cancer Care in

4        '05; is that right?

5   A.   Yes.

6   Q.   That was part of your training at Capps

7        College?

8   A.   Yes.  I am still employed there.

9   Q.   You're still employed at Cancer Care?

10  A.   Yes, I am.

11  Q.   You're employed there part-time?

12  A.   Full-time now.  I just went back.

13  Q.   Pardon me?

14  A.   I just went back.

15  Q.   Okay.  Our records show that you started

16       your externship on August 16th, 2005.  Does

17       that sound right to you?

18  A.   I can't remember the day I started.

19  Q.   Pardon me?

20  A.   I can't remember what day I started.

21  Q.   If their files show August 16th, 2005 --

22  A.   I have no problem if that's what it shows.

23  Q.   And you applied for permanent employment at

200

1   a patient without using your right arm.

2   A.   Someone get on the left side, someone get

3        on the right side.  You hold them like

4        this.  Put the patient into your arm and

5        move the patient.

6   Q.   And so when you were going through this

7        training, you didn't use your right arm?

8   A.   My arm was very sore.  I barely used my

9        right arm.

10  Q.   Look at Exhibit 8, please.  You filled this

11       out -- It says it was e-mailed 9-28-05.  Is

12       that when you e-mailed it --

13  A.   Yes, it is.

14  Q.   -- to Cancer Care?

15  A.   Yes, it is.

16  Q.   And you had already been working there as a

17       medical assistant?

18  A.   Yes, I was.

19  Q.   Had you filled out an application before

20       this?

21  A.   I don't recall.

22  Q.   So your career objective was to become a

23       registered medical assistant?

201

```
 1    A.    Yes.

 2    Q.    You say that you were in the military

 3          police academy.

 4    A.    That was a typo.  I told Angela about that.

 5    Q.    I'm sorry?

 6    A.    That was a typo about my ...

 7    Q.    You put in military police academy as a

 8          typo?

 9    A.    It was a mistake, 1984.

10    Q.    Pardon?

11    A.    It was a typo, 1984.  It was supposed to

12          have been 1986.

13    Q.    No.  I'm talking about -- look under U.S.

14          Army.

15    A.    Okay.

16    Q.    It says that you were in the military

17          police academy.

18    A.    I attended the military police academy.

19          You know how you go to, like, weekend

20          drill.  Weekend drill, you go to, like --

21          up there to -- what that station name?  I

22          can't remember where it was.  Anniston.

23          Anniston National Guard.
```

202

1  Q.  Do you have any military police training?

2  A.  I attended.  I didn't finish it.  No, I

3      didn't finish it.

4  Q.  Well, I asked you about all your military

5      training this morning.

6  A.  That's because I didn't finish it.

7  Q.  Well, there's nothing in your military

8      records to indicate that you've had any

9      military police training.

10  A.  I didn't finish it.

11  Q.  There's nothing to indicate that you

12      started it.

13  A.  Yes, it is.  It should be where I started

14      it.

15  Q.  How many classes of military police --

16  A.  I only did one at the unit.

17  Q.  Pardon?

18  A.  One at the unit.

19  Q.  You went with your unit --

20  A.  No, at the unit.  At the unit.

21  Q.  In Monroeville?

22  A.  In Monroeville.

23  Q.  Tell me all of the --

203

```
 1    A.   I wanted to go to the military police
 2         academy.
 3    Q.   You wanted to go?
 4    A.   Yeah, I wanted to go.  And I signed up for
 5         it, to go to military police academy.
 6    Q.   All right.  And how much -- Did you attend
 7         the military police academy?
 8    A.   No, I didn't attend the military police
 9         academy.  They had class.
10    Q.   What class?
11    A.   Okay.  When my unit got Iraq -- go to Iraq,
12         I went to Grove Hill National Guard.  I
13         went to Grove Hill National Guard.
14    Q.   Grove Hill?
15    A.   Grove Hill National Guard.
16    Q.   Grove Hill?
17    A.   Grove Hill.
18    Q.   That's a town, right?
19    A.   Yes.
20    Q.   And what did you do at Grove Hill that
21         involved the military academy?
22    A.   We did some guard duty, went to Mississippi
23         for training.
```

204

1    Q.    You went to Mississippi?

2    A.    Yeah, I went to Mississippi.

3    Q.    For what kind of training?

4    A.    Field training.

5    Q.    In police work?

6    A.    No, we just went to field training.  I

7          never did get to the military police

8          academy.  I did not finish it.

9    Q.    Well, let's get down and see if we can't --

10         It's not true that you attended the

11         military police academy.

12   A.    It's true.  I did not finish it.

13   Q.    Well, then I want to know how much military

14         police academy attendance you had.

15   A.    Just a little bit.  I did not finish the

16         academy.

17   Q.    I know you didn't finish.  I want to know

18         if you actually ever started.

19   A.    I started a couple of classes on the

20         military police academy.  Yes, I did.

21   Q.    Do you know why that's not in your record?

22   A.    I don't know why it's not in my record.

23   Q.    Okay.  Where did you attend those?

205

1   A.   In Monroeville National Guard.  Monroeville

2         National Guard.

3   Q.   Memorial?

4   A.   Monroeville.

5   Q.   National Guard.

6   A.   Yes.

7   Q.   All right.  Now, did everybody in your unit

8         attend these classes?

9   A.   No.  No, sir.

10   Q.   How many people did?

11   A.   Just two.

12   Q.   And what were you trained to do?

13   A.   I was going to leave here and go to Selma,

14         leave Selma National Guard to go to

15         Anniston.  And when my unit got activated,

16         I never did finish it.

17   Q.   How many classes and how many hours did you

18         have of military --

19              MS. WILLIAMS:  I'm going to

20                 object.  The question has been

21                 asked and answered.

22              MR. BARNETT:  I'm sorry, counsel.

23                 I think this whole police

206

| | |
|---|---|
| 1 | academy is a fabrication.  I'm |
| 2 | entitled to probe the witness |
| 3 | for veracity. |
| 4 | MS. WILLIAMS:  Can you ask a |
| 5 | different question? |
| 6 | MR. BARNETT:  Your objection is |
| 7 | noted. |
| 8 | Q.  How many hours did you spend in class that |
| 9 | had to do with military -- |
| 10 | A.  We did -- We did one or two hours.  That |
| 11 | was it. |
| 12 | Q.  Okay. |
| 13 | A.  Fill the paperwork out and go to school. |
| 14 | Q.  All right.  And what did you learn to do in |
| 15 | those one or two hours? |
| 16 | A.  We had to make sure -- had to do a |
| 17 | background check. |
| 18 | Q.  Anything else? |
| 19 | A.  That's it. |
| 20 | Q.  And you think it was fair to the cancer |
| 21 | center and you think it was honest to put |
| 22 | on here that you attended the military |
| 23 | police academy? |

1   A.   I was assigned to the police academy.

2   Q.   All right.

3   A.   I would have finished it.

4   Q.   Well, Ms. Early, if this is your idea of

5      telling the truth, that's all I'm trying

6      to find out.

7   A.   So are you saying that -- just because I

8      was appointed to the military police

9      academy, I shouldn't have put it on here?

10   Q.   Ms. Early, I'm asking you that -- given

11      your real record in the military, do you

12      think it was honest to put military police

13      academy on here?

14   A.   Yes, I think it was.

15   Q.   Okay.  That's all I want to know.

16   A.   Okay.

17   Q.   Now, this says below it, military police

18      1984 through 2003.

19   A.   That was a typo.

20   Q.   Okay.  That's a typo.

21        As a United States military police

22      officer and achievement in law enforcement

23      included leadership, teamwork, positive

208

```
 1        work ethic and cross-functional skills.  It

 2        also entailed hands-on experience in

 3        aspects of -- secreted military

 4        installation overseas --

 5   A.   Yes.

 6   Q.   -- bases.  Is any of that true?

 7   A.   No, I didn't go overseas being a military

 8        police officer.

 9             (Brief interruption.)

10   A.   I didn't go overseas being a military

11        police officer.  That was very --

12             MS. WILLIAMS:  Slow down.

13   Q.   Were you ever a military police office?

14   A.   I went to training to be a military police

15        officer.

16   Q.   And you've described that three hours of

17        training?

18   A.   I went to it.

19   Q.   Okay.

20   A.   I went three hours of training.  A

21        recruiter -- I went three hours -- Sams 1

22        was one hour.  It's not even a school.

23   Q.   I didn't understand you.  Are you saying --
```

209

1   A.   Sams 1 computer is not even a school.  It's

2        on-hands training.

3   Q.   Are you talking about background checks?

4   A.   No, I'm talking about Sams 1 computer.

5   Q.   Talking about what?

6   A.   You asked me about military police academy

7        and Sams 1 computer.  Okay?  Sam 1 computer

8        is on-hands training.

9   Q.   I'm not asking you about the Sams 1

10       computer.

11   A.   You asked me about military police academy.

12   Q.   I'm asking you about the last paragraph on

13       that page.

14   A.   That's what I'm telling you.  I'm

15       describing it to you.  Military police

16       officer and Sams 1 computer -- there is no

17       school.  I mean, you talk about it.  Sams 1

18       for an hour or two, you're through it.  Get

19       your certification.  Okay?

20   Q.   Ms. Early, under oath to this federal judge

21       that's going to have this case, were you

22       ever a United States military police

23       officer?

210

1    A.    I did not finish MP school.

2    Q.    The answer is no, correct?

3    A.    No, sir, I never finished.

4    Q.    You were never a military police officer or

5          even close to it, were you?

6    A.    No, sir.  I went to school -- I was going

7          to school for it.

8    Q.    How long is the training to become a United

9          States --

10   A.    I never did finish it.  I never did --

11   Q.    How long is the training, if you know?

12   A.    No, sir, I don't know.

13   Q.    All right.  You don't even know what it

14         takes to be a military police officer, do

15         you?

16   A.    Yes, I do, sir.

17   Q.    What does it take?

18   A.    I did it when my unit went to Iraq.  That's

19         what we did.  We trained as a military

20         police officer with that.  We did different

21         stuff.

22   Q.    Is this this two hours we talked about?

23   A.    No, sir.

211

```
 1   Q.   One hour?

 2   A.   No, sir.  No, sir.

 3   Q.   All right.  We're going to get to the

 4        bottom of this.  If you don't start giving

 5        me straight answers --

 6   A.   I'm giving you straight answers.

 7   Q.   Well, I don't know what the implications

 8        are, lying about your military record.

 9   A.   I'm not lying about my military record.

10   Q.   All right.  So you were, under oath to this

11        federal judge, a military police officer?

12   A.   Sir, I went to school for a military police

13        officer.

14   Q.   Well, you stated to Capps College that you

15        were a United States military police

16        officer.  Is that true or false?

17   A.   Where I state that at?

18   Q.   Right in that paragraph at the bottom of

19        the page.

20   A.   That's what I -- That's a typo.  I told

21        you, I went to military police officer ...

22   Q.   All right.  So your testimony under oath is

23        that -- the fact -- your statement that you
```

1          were in the military police from '84 to

2          2003 --

3     A.   That's a typo.

4     Q.   -- is a typo?

5     A.   '84, I was still in school, sir.

6     Q.   Yeah, I understand.  And it was also a typo

7          that you said that as a military police

8          officer --

9     A.   I got all that from -- from the MOS thing.

10         That's where I got that from.

11    Q.   Okay.  But you were not in law enforcement

12         and you never had a leadership or teamwork

13         role in law enforcement, did you?

14    A.   Sir, when my unit got deployed to Iraq,

15         that's what we did.

16    Q.   Did your unit have a doctor attached to it?

17    A.   A doctor?

18    Q.   A medical doctor.

19    A.   No.

20    Q.   Does it have a medic?

21    A.   No, we don't have no doctor or a medic

22         attached to it, so everybody -- everybody

23         had a specific job to do.  So when we got

213

1        back, that's what we did.

2    Q.   So anything your unit did, you consider

3        yourself to be -- have done?

4    A.   You can cross-train in that, sir.

5    Q.   Ms. Early, I'm going to tell you what.  I'm

6        going to stay here till Saturday if I have

7        to to get a straight answer.

8    A.   Okay.  That's --

9    Q.   And I believe the judge will back me up on

10       this, so let's try to go through it.

11          You never had any leadership or

12       teamwork experience in the military police,

13       did you?

14    A.   I did have leadership training.

15    Q.   Who did you lead?

16    A.   I wasn't on no -- no war field or nothing.

17    Q.   Well, military police -- I'm not going to

18       argue with you.  But military police

19       oftentimes have nothing to do with

20       wartime.  They have military police --

21    A.   Yes.

22    Q.   -- all over bases all over this country.

23    A.   What I'm saying, I signed up for military

214

1      police academy.

2    Q.   I've got you.

3    A.   Okay?

4    Q.   All right.  Now, these are your words

5         here.  It also entailed hands-on experience

6         in aspects of secreted military

7         installation overseas base.

8    A.   Overseas -- that's what I --

9    Q.   What experience do you have with respect to

10        secret military installations of overseas

11        bases from the standpoint of military

12        police work?

13   A.   I never had no secret military overseas

14        bases.

15   Q.   So the bottom line is, you made this up and

16        put this on here because you think it would

17        make your resume look --

18   A.   No, I was training to be a military police

19        officer in Monroeville National Guard after

20        they left.

21   Q.   But when you filled out this application in

22        September of 2005, you knew you were no

23        more than a police -- of a police officer

215

1     than I am.

2  A.   I wanted to try, and I signed up for it.

3  Q.   Okay.  Well, if you think this is an honest

4     answer, tell the jury and the judge that

5     right now.

6  A.   I did.

7  Q.   You think this is an honest answer?

8  A.   That's an honest answer.  I wanted --

9  Q.   An honest statement?

10  A.   An honest statement.  The only thing, the

11     secret military installation, the only

12     thing, I was over at the military

13     installation when I was in Germany, but I

14     wasn't a police officer then.

15  Q.   Well, you hadn't even been to the one or

16     two hours of classes when you were in

17     Germany, had you?

18  A.   No.

19  Q.   And you don't know why there's no evidence

20     whatsoever of military police training in

21     your military --

22  A.   I signed up for military police officer.

23  Q.   Who can -- Excuse me.  I'm sorry.  I'm

220

1    Q.    Let's move to former employers.  You

2          represent to Cancer Care that you were in

3          the Alabama National Guard from '84 to '86

4          and from '86 to 2001.  Is that correct?

5    A.    Yeah, that look like ...

6    Q.    That's not --

7    A.    I got my time mixed up on there.

8    Q.    That's not accurate, is it?

9    A.    No.

10   Q.    And you didn't tell them about Rheem, did

11         you?

12   A.    No, I didn't.  It should have been Alabama

13         National -- I mean Army and then Alabama

14         National Guard.  The time is messed up.

15   Q.    Well, this would indicate to the reader

16         that you were continuously in the Alabama

17         National Guard from 1984 to 2001.

18   A.    It should have been Alabama Army -- Army

19         and then Alabama National Guard.  That's

20         what it should have been.

21   Q.    Whatever you say.

22               Why didn't you list Rheem?

23   A.    Why should I list Rheem?

221

1    Q.    Why should you list Rheem?

2    A.    Yeah.

3    Q.    Because you stated at the bottom that you

4          certify that the facts contained in this

5          application are true and complete to the

6          best of your knowledge.

7    A.    Yes.

8    Q.    And that false statements would lead to

9          your termination.

10   A.    I didn't have to list Rheem, did I?  I

11         didn't list every job I had.  I was --

12         Sonitrol, a bunch of jobs I didn't list.

13   Q.    Now, you didn't finish high school until

14         '86, right?

15   A.    Yes.

16   Q.    Okay.  But you've got yourself in the

17         National Guard in '84.

18   A.    I don't know why I put '84 there.

19   Q.    Yeah.  But you left Rheem off because you

20         didn't want them to know you'd ever worked

21         for Rheem?

22   A.    Yeah, I didn't want them to know.  A lot of

23         jobs I had I didn't put it on there.

222

1   Q.   And you think that's being honest with a

2         prospective employer?

3   A.   I just left it off.

4   Q.   I just want to know if that -- if you think

5         it's honest to leave off your most recent

6         full-time job when you apply for a job.

7   A.   I mean, recent will be National -- well,

8         no, it wouldn't.  I just left it off.

9   Q.   I know.  And all I'm asking is for your

10        idea of honesty, Ms. Early.

11   A.   I'm giving you my honesty.

12   Q.   And do you think this was honest, to leave

13        off a job that you had from 1993 through

14        December of 2005 and which was your most

15        recent full-time work?

16   A.   My recent full-time work, I didn't want to

17        put it on there.  They were probably going

18        to call.

19   Q.   You knew that the reason employers ask for

20        prior places of employment is so they can

21        call for references, didn't you?

22   A.   Yeah, and I didn't want them to call there.

23   Q.   What was it that you were afraid of that

223

1          they would find out?

2     A.   Nothing.  I just didn't want them to call.

3     Q.   You were still on active -- on Rheem's list

4          of employees when you filled this out,

5          weren't you?

6     A.   2005?  Yes, I was.

7     Q.   Okay.  So you were actually an employee of

8          Rheem, albeit out on medical leave, when

9          you filled this out?

10    A.   Yes.

11    Q.   Your favorite pastime employment -- your

12         favorite past employment was as an MP?

13    A.   That's the last thing I qualified for.

14    Q.   Military --

15    A.   Military.  I put it down to be military.  I

16         didn't put Rheem on there period.

17    Q.   All right.  But your favorite past

18         employment was as an MP?

19    A.   MP.

20    Q.   All right.  Now, an MP is a military police

21         officer --

22    A.   Yes.

23    Q.   -- correct?

224

1    A.    Yes, it is.

2    Q.    And the military -- An MP has gone through

3          military police training and has a

4          certification --

5    A.    Yes.

6    Q.    -- and that's his MO, right?

7    A.    Yes.

8    Q.    Okay.

9    A.    And that's what I was -- when my unit left,

10         my unit left and went over there, that's

11         what I was doing.

12   Q.    And you think this application is accurate

13         and truthful?

14   A.    I do.

15   Q.    All right.  That's what I want to know.

16               MR. BARNETT:  Let's make that 10.

17               (Defendant's Exhibit 10 was marked

18               for identification.)

19   Q.    I'm going to show you Exhibit 10, please.

20         Do you recognize this as your job

21         description at Cancer Care?

22   A.    Yes.

23   Q.    All right.  Under working conditions, it

232

1       How many times did you serve as gate

2   guard?

3   A.   Three or four times a year.

4   Q.   Three or four times a year?

5   A.   (Witness nods head up and down.)

6   Q.   Is that in your record, military record?

7   Should it be?

8   A.   The time I did gate guard shouldn't be in

9   our record.

10              (Defendant's Exhibit 13 was marked

11              for identification.)

12  Q.   Did you fill out this application to Alfred

13  Newman, M.D., Exhibit 13?

14  A.   Yes.

15  Q.   Do you see where it says under college that

16  you attended military school --

17  A.   Yes, I did.

18  Q.   -- from '88 to '89?

19  A.   It would have been '86 to '87.  '87 is ...

20  Q.   Do you see where you checked yes, I

21  graduated?

22  A.   I graduated my courses, yes.

23  Q.   Do you see where you indicated you had a

233

```
 1          military degree as a military policeman?
 2   A.     Supposed to have been Sams 1 and Sams -- 63
 3          Juliette.
 4   Q.     I'm sorry?  What?
 5   A.     I put a slash there.  Then I put 63
 6          Juliette and Sams 1.
 7   Q.     Let me just ask you this.  Is that your
 8          handwriting where it says degrees -- or
 9          degree, colon?
10   A.     Yes.
11   Q.     Did you put MP?
12   A.     Yeah, I did put MP there.
13   Q.     And that stands for military police,
14          correct?
15   A.     Yes.
16   Q.     On the next page, it asked for your
17          previous employment.  And, again, you left
18          out your 12 years at Rheem, 12 --
19   A.     Yes, I did.
20   Q.     The same reason?  You didn't want them to
21          know about Rheem?
22   A.     Yes, I was still employed at Rheem -- no, I
23          wasn't.  I wasn't employed then.
```

1          That's not true, is it?

2     A.   The little time I did it, yeah.

3     Q.   Pardon?

4     A.   The little time I did.

5     Q.   This says responsibilities.

6     A.   Responsibilities, 63 Juliette, I really

7          didn't do that neither in the Army National

8          Guard -- the National Guard.

9     Q.   Didn't do what either?

10    A.   63 Juliette.

11    Q.   Okay.  So neither one of these is --

12    A.   I really didn't do neither one of them.

13    Q.   Then we drop down to, may we contact your

14         supervisor for a reference.

15    A.   Uh-huh.  (Positive response.)

16    Q.   And that's Ms. Lee?

17    A.   Yes.

18    Q.   Is she a friend of yours?

19    A.   Yes, she is.  She's pretty nice.

20    Q.   Once again, you listed your

21         responsibilities as 63-J and MP.

22    A.   Yes.  I really didn't do either one of

23         those.

238

```
            (Brief interruption.)

 1

 2   A.    I really didn't have -- we didn't have a

 3         unit -- really, 63 Juliette was not really

 4         down there.  That's what I was slotted for.

 5   Q.    But the meaning of this is that you listed

 6         responsibilities that you never had.

 7   A.    Responsibilities -- You have a job in the

 8         military, and the job has been faded out.

 9         My 63 Juliette had been faded out way

10         before.

11   Q.    Okay.  Well, so you did have some 63

12         Juliette experience?

13   A.    And some cross-training MP, yes.

14   Q.    Well, why don't we do it this way.

15   A.    Okay.

16   Q.    Why don't you look at that camera down

17         there --

18   A.    Okay.

19   Q.    -- who is the judge in this case --

20   A.    Okay.

21   Q.    -- and tell the judge whether you were ever

22         a military policeman.

23   A.    Sir, I trained as a gate guard.  I trained
```

239

```
 1        as a 63 Juliette.  And nine time out of

 2        ten, I did something else in the military.

 3   Q.   Were you a military -- Were you a member of

 4        the military police?

 5   A.   Was I a member -- Talking about has I

 6        qualified to be a military police officer?

 7        No, I was not qualified.  I was just a gate

 8        guard as a military police officer.  That's

 9        it.

10   Q.   How much training did you have to be a gate

11        guard?

12   A.   What you mean, what kind of training to be

13        a gate guard?

14   Q.   Well, did you have any training to be a

15        gate guard?

16   A.   Yes, you have training to be a gate guard.

17   Q.   How much?

18   A.   I don't remember.  I did it in Germany.

19   Q.   What does a gate guard do?

20   A.   Flag people in, check ID's, check cars,

21        check for drugs, check for -- do traffic

22        violations, stuff like that.

23                  (Defendant's Exhibit 14 was marked
```

241

```
 1              MR. BARNETT:  The application to

 2              American Family Care was

 3              filled out February 7th of

 4              '07.

 5              MS. COOK:  So it's leaving the job

 6              at Urology for the job at

 7              American Family Care?

 8              MR. BARNETT:  That's my

 9              understanding.

10   Q.   Is that correct, Ms. Early?

11   A.   Yes.

12   Q.   Was there any gap in your employment?

13   A.   Probably a couple of days.  I'm not sure.

14   Q.   All right.  Now, you listed down here your

15        education, that you were a med tech at Fort

16        Benning, Georgia in 2000 and 2001.

17   A.   I lied on -- I lied on that.

18   Q.   Okay.  You lied on that?

19   A.   Yes, I did.

20   Q.   All right.  U.S. military, dates of

21        service, '86 to '02.  List service

22        schools:  Med tech, quartermaster/

23        chemical.  Only quartermaster/chemical is
```

242

```
 1        true, right?
 2   A.   Yes.
 3   Q.   Now, on employment history, once again you
 4        left Rheem off.
 5   A.   Yes, I did.
 6   Q.   Do you see the certification at the bottom,
 7        that you certify to the prospective
 8        employer that your resume, et cetera and
 9        this application are true and correct?
10   A.   Yes, I did.
11   Q.   And you lied to make yourself more
12        attractive as an employee?
13   A.   Yes, because I didn't have but one year of
14        medical assistant.
15   Q.   Well, you were never a medical assistant in
16        the Army or at Fort Benning.
17   A.   No.  No.
18   Q.   Why did you leave out your military
19        service -- maybe I'm missing it, but I
20        don't see anything in here about active
21        duty military service.
22   A.   I've got Army, Army National Guard.
23   Q.   You've got from 6-02 to 10-06 under the
```

286

1                     for identification.)

2    Q.   Why did you represent to the bankruptcy

3         court that you'd been hospitalized for two

4         months?

5    A.   Hospitalized for two months?  I was sick.

6         I had to take radiation.  I don't

7         remember -- sick for two months?

8    Q.   I didn't hear your answer.

9    A.   I was sick.

10   Q.   For two months?

11   A.   I was sick with my thyroid.

12   Q.   Why did you tell the bankruptcy court you

13        were hospitalized for two months?

14   A.   I don't remember telling them

15        hospitalized.  I was sick for two months,

16        the whole month of -- the whole month of --

17        what month that was?  I was sick.

18   Q.   What doctor were you being treated for your

19        thyroid by?

20   A.   I was treated at the VA.  When was this?

21   Q.   So you're saying you were sick for two

22        months?

23   A.   I was sick with my heart.

287

1   Q.   Were you unable to work for two months?

2   A.   I was sick.

3   Q.   For how long?

4   A.   The whole month, my heart and my thyroid

5       was acting up.

6   Q.   How much work did you miss?

7   A.   I went to radiation, then I went -- this

8       was in 2005.  I had radiation.  In 2006, I

9       took medicine for it.

10   Q.   Yes, ma'am.

11   A.   Yes, I was.

12   Q.   So how much work did you miss?

13   A.   I missed a couple of days.

14   Q.   Okay.  Not two months?

15   A.   No.

16   Q.   When you answered your interrogatories, you

17       said that you had not seen any physician

18       about mental or emotional illness or

19       distress.  Is that still true?

20   A.   I talked to my pastor.

21   Q.   Have you given us all of the documents that

22       you have in your possession that relate in

23       any way to this lawsuit?

291

1       gun at that time.

2   A.  Yes.

3   Q.  So again, I'll ask the question.  Do you

4       have any reason to believe that Rheem lied

5       to you in any respect --

6   A.  I don't know.

7   Q.  -- when you signed up for that insurance?

8   A.  I don't know.

9   Q.  Do you know of any lies or falsehoods they

10      made to you that encouraged you to sign up

11      for that insurance?

12  A.  Not at this time.

13                  MR. BARNETT:  Can we have five

14                      minutes?  We're not going to

15                      take an official break.

16                  MS. COOK:  We can probably do it

17                      in less than five.

18                  MR. BARNETT:  Yeah, we can

19                      probably do it in less than

20                      five.

21                  (Brief recess was taken.)

22                  VIDEOGRAPHER:  We're back on the

23                      record.

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **DONNA L. EARLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.:  2:06cv727** |
| | ) | |
| **RHEEM MANUFACTURING** | ) | |
| **COMPANY, a corporation and CAL** | ) | |
| **MEARS, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### RESPONSE TO DEFENDANT, RHEEM MANUFACTURING COMPANY'S
### FIRST INTERROGATORIES TO PLAINTIFF

Pursuant to Rule 33 of the <u>Federal Rules of Civil Procedure</u>, Defendant **RHEEM**

**MANUFACTURING COMPANY** (hereinafter "RHEEM" or "Defendant"), serves Plaintiff,

Donna Early (herein after "Plaintiff") with the following Interrogatories to be answered fully and

under oath within thirty (30) days from the date of service.  Pursuant to Rule 33, these

Interrogatories are continuing in nature and require supplemental responses if additional

information regarding them is obtained by Plaintiff.  If any Interrogatory cannot be responded to

in full, it should be answered to the fullest extent possible and the reasons) should be set forth

regarding why it could not be answered in full.  If in response to any interrogatory, Plaintiff

asserts a claim of privilege, please give a full explanation of all reason for asserting the privilege,

and then comply with the response to the extent that the privilege or other reason does not apply

to said particular response or part thereof, as required by Rule 33 of the <u>Federal Rules of Civil</u>

<u>Procedure.</u>

## DEFINITIONS

Defendant sets forth the following definitions of various words and phrases that are contained in the attached requests for discovery. Defendant provides the following definitions for the purpose of clarifying the meaning of various words and phrases contained herein in order to help the Plaintiff understand the objectives of these discovery efforts and to locate and furnish the relevant information and materials. It is, therefore, expressly stipulated and agreed by the Defendant that an affirmative response on the part of the Plaintiff will not be construed as an admission that any definition contained herein is either factually correct or legally binding on Plaintiff.

     1.     The term "you" or "yours" applies to the Plaintiff, her attorneys and agents.

     2.     "Document" means the original or any copy of any written, recorded, transcribed, printed or impressed matter of whatever kind, however produced or reproduced, including but not limited to sound or pictorial recordings, computerized information, books, pamphlets, letters, memoranda, telegrams, electronic or mechanical transmissions, communications of all kinds, reports, operating statements, working papers, handwritings, charts, papers, writings, printings, transcriptions, tapes and recordings of all kinds.

     3.     "Health Care Provider" includes, but is not limited to, doctors, physicians, doctor of medicine, doctor of osteopathy, psychologist, social worker, counselor, psychiatrist.

     4.     "Identify" when used with respect to an individual means to state the person's full name and address.

     5.     "Legal Proceedings" includes, but is not limited to, civil, criminal, regulatory, and worker's compensation.

## INTERROGATORIES

1.      If you have ever been a party to a legal proceedings, either as a plaintiff or defendant, please state the complete style of the case, including the name of the court.

**RESPONSE:  Divorce – Donna Early v. Sam Early, Circuit Court of Montgomery County.**

2.      Describe, in detail, each item of damage you claim you sustained as a result of the matter alleged in the Complaint.  Please provide calculations upon which you base your damages, and the evidence and facts in support thereof.

**RESPONSE:  Loss of income, bankruptcy, and lower income.  I was making approximately $1200.00 per month from my employment at Rheem.**

3.      Identify every Health Care Provider you have seen or been treated by since January 1, 1993.

**RESPONSE:  Maxwell Air Force Base, Dr. Tarabein, Dr. Wool, VA Medical Center – Montgomery and Birmingham, Dr. Albert Lester, and Jackson Hospital for my heart.**

4.      For each health care provider you have seen or been referred by, state the reason(s) such provider was seen or treatment was sought.

**RESPONSE:  VA Medical Center – heart, back, thyroid; Dr. Tarabien – leg and arm, Dr. Wool – SVT heart, Maxwell Air Force Base Doctors, and Rheem's Doctor – back and hand.**

5.      If you have ever sought or received psychological, psychiatric, or any other kind of medical or therapeutic treatment for alleged mental anguish or emotional distress suffered by you as a result of your work (RHEEM or elsewhere), name the provider an give details of the treatment and medications you received.

**RESPONSE:  Rev. and Mrs. Bobby Campbell – Daily counseling.**

6.      If you have ever been prescribed or have taken any medications intended to address, treat or alleviate mental illness, anxiety, depression, neurosis, psychosis, stress, any mood or affective disorder, any psychological condition, or have received any other treatment for such conditions.  List the medication[s] and identify the person or clinic from whom you received the medication or treatment.

**RESPONSE:  Not Applicable.**

7.      Describe in detail the location and circumstances of the slip and fall injury you sustained on or about August 27, 2000, while at National Guard drill/duty (hereinafter the "Injury").

**RESPONSE:  I was in the kitchen preparing lunch.  While preparing lunch, I looked in the refrigerator, when I turned around I slipped on some water and ice.  When I tried to get up – I couldn't.**

8.      Were you on regularly scheduled Saturday-Sunday weekend drill for the Alabama National Guard when you sustained the injury on or about August 27, 2000, or on some other non-regularly scheduled duty?  If on non-regularly scheduled duty, please explain it.

**RESPONSE:  Regularly scheduled drill duty.**

9.      Did you furnish written orders to Rheem concerning the weekend duty for the drill during which you sustained the injury?  If not, why not?

**RESPONSE:  Yes, I informed Rheem of the duty and it was calendared on the "yearly planner".**

10.      What were the start and end dates you were scheduled to be on drill duty for the National Guard when you sustained the injury?

**RESPONSE:  August 26, 2000 through August 27, 2000.**

11.    Was your National Guard duty for the drill in question scheduled to end on Sunday, August 27, 2000, so that you would have been due to return to work at Rheem on Monday, August 28, 2000, if you had not sustained the injury?  If not, please explain.

**RESPONSE:  Yes.**

12.    For the drill/duty of August 27, had your unit been called up for duty (activated) under federal control by the United States Army?  If so, explain why and when your unit was activated.

**RESPONSE:  Every drill weekend is activated.**

13.    For the drill/duty on August 27, 2000, had you unit been called up (activated) for emergency or special duty by the Governor of Alabama?  If so, explain why and when.

**RESPONSE:  No.**

14.  If you have applied for any form of disability insurance (long term or short term) including, but not limited to social security disability, military and/or workers' compensation, (or are contemplating applying), give complete detail or your application, and the response to it.

**RESPONSE:  I have applied for unemployment benefits, social security disability benefits, and disability with Rheem and was denied disability.  However, the Department of Veteran Affairs granted my disability claim based upon a 50% combined or overall rating for the degenerative disc disease at L4-5 with right lumbar radiculopathy symptoms.**

15.    List every employer you have worked for, including full and part time jobs, and temporary employment agencies, since high school, and give your reasons for leaving.

**RESPONSE: U.S. Army (ETS), U.S. Army National Guard (Disabled), Cancer Center of Montgomery (Currently employed part-time), Central Alabama Urology (Not enough hours), American Family Care (Current Employer).**

16.     Describe in detail your efforts to find employment since the date your employment was terminated by RHEEM as alleged in the Complaint.

**RESPONSE: I participated in the Veteran Affairs Vocational Rehabilitation Program to assist in obtaining employment.**

17.     List all sources of income or financial assistance, (include disability, worker's compensation, unemployment benefits, and all amounts of payments and assistance) you have received from any source since leaving RHEEM, and the time period during or for which you received such income or financial assistance.

**RESPONSE: Food Stamps (approx. $300/month), The Department of Human Resources (paid Alabama Power and Alabama Gas – approx. twice), Veteran Affairs Vocational Rehabilitation Program (approx. $400 per month during rehabilitation), The Department of Veteran Affairs ($210.00 for disability), churches (paid Alabama Power, Alabama Gas, Montgomery Water Works, and Mortgage – months varied approx. six times), friends (monthly) and family(monthly).**

18.     List every current and former RHEEM employee with whom you or your attorneys or agents have had contact about this lawsuit since leaving RHEEM.

**RESPONSE: Not applicable.**

19.     List all occasions on which you have ever testified under oath in a deposition or court proceeding.

**RESPONSE: Divorce proceedings.**

20.     List each school and education institution you have attended since April 21, 1993 (your RHEEM hire date), and give the dates of attendance.

**RESPONSE:  Early Childhood Development – Trenholm Technical College, Medical Assistant Program - Capps College, Troy State University.**

21.     Explain fully why you contend in your lawsuit that Rheem violated ERISA?  In you answer state specifically what facts support your allegations as to how and when Rheem violated ERISA.

**RESPONSE:  I applied for short - term and long -term disability and was denied.**

22.     Describe all ERISA protected benefits, including, but not limited to, retirement benefits, you claim you lost as a result of Rheem's actions.

**RESPONSE:  Although I paid into the disability plans I was denied once I was injured.**

23.     For each benefit[s] listed in your previous answer, state your understanding of the eligibility requirements you would have to have met to be eligible for it/them.

**RESPONSE:  I had to apply for benefits and if denied it was necessary to appeal.**

Dated: 2-19-07

DONNA L. EARLY

STATE OF ALABAMA          )
                          )
MONTGOMERY COUNTY         )

Before me, a notary public in and for said state and county, personally appeared **DONNA L. EARLY,** who has been properly identified, and states on oath that the information

stated above is true and correct to the best of her knowledge subject to the law for perjury and the penalties thereof.

Sworn to and subscribed before me this the 19th day of February, 2007.

Notary Public
State of Alabama At Large
Commission Expires: 1-26-09

TRINA S. WILLIAMS (SAN 046)
VICKY U. TOLES (UND 014)
Attorney for Plaintiff

OF COUNSEL:
TOLES & WILLIAMS, LLP
P.O. Box 501
Montgomery, Alabama  36101
(334) 832-9915

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing by depositing a copy of the same in the U.S. Mail, postage prepaid, this the 19th day of February, 2007 upon the following:

Capell & Howard, P.C.
Henry C. Barnett, Jr.
150 South Perry Street
Montgomery, Alabama  36104

TRINA S. WILLIAMS (SAN 046)

# EXHIBIT D



# SELMA NEUROLOGY CENTER
## RASSAN M. TARABEIN, M.D.

429 LAUDERDALE STREET
SELMA, AL 36701

OFFICE: (334) 875-9911
FAX: (334) 874-0027

Date: _Dionna Early_

Accident Date: _____

Name of Injured: _____ D.O.B. _____

Description of Injury: _____

Diagnosis: _LS disc dz / Cervicalgia_

Treatment Plan: _Blocks PRN_

Medications Prescribed: _NSAIDS_

If restricted from immediate return to work, explain reason in detail: _____

_____

May return to unrestricted work (date): _____

May return to restricted work (date): _6 - 8 - 01 ⟶ 9 - 7 - 01_

Restrictions: _____

PHYSICAL LIMITATIONS:

| | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting 0 - 10 lbs. | X | | |
| Light - lifting 10 - 20 lbs. | X | | |
| Moderate - lifting 20 - 50 lbs. | | X | |
| Heavy - lifting 50-100 lbs. | | | X |
| Pulling/Pushing, Carrying | X | | |
| Reaching or Working Above Shoulders | | X | |
| Walking Hrs. per day   ( 2 ) hrs / shift | X | | |
| Standing Hrs. per day   ( 2 ) | X | | |
| Sitting Hrs. per day   ( 4 ) | X | | |
| Stooping Hrs. per day   ( ) | | | |
| Kneeling Hrs. per day   ( ) | | | X |
| Bending Hrs. per day   ( ) | | | X |
| Repeatedly work Hrs. per day   ( ) | X | | X |
| Climbing Hrs. per day   ( ) | X | | |

Doctor's Signature _____

June 19, 2001

Dr. Mendez:

This video shows the requirements of the Assembler positions installing bung plugs in water tanks. The work pace is reasonable and the tool used to install the plugs is suspended on a counter-balanced pulley above the line. Lifting is minimal. There's no kneeling or stooping, no appreciable bending, and no work above shoulder level. While these jobs are normally performed in a standing position, for the purpose of this video, I taped one operator standing and one sitting. I propose we allow Ms. Early to stand or sit as necessary for her comfort — and we're certainly willing to permit this.

Please advise if you or Dr. Tarabein have any concerns

Don Reckart
Employment Manager



# Selma Neurology & Pain Clinic

### R. M. Tarabein, M.D.

1023 Med. Ctr. Pkwy
Suite 307
Selma AL 36701
**(334) 877-9911**

www.mydoctor.com/tarabein

To: Dr Mendez

Date: 06 21 2001

Re: Ms Donna Early

Dear Dr Mendez:

I agree that Ms Early would be able to perform the job you demonstrated to me at my office yesterday.

Should you have any further question please do not hesitate to contact me.

Sincerely

R. M. Tarabein, M.D.





RMT/III/061700

# EXHIBIT E

**Information Redacted Pursuant to General Order No. 2:04-mc-3228**



# SELMA NEUROLOGY CENTER

RASSAN M. TARABEIN, M.D.

OFFICE: (334) 875-4184
FAX: (334) 874-0027

429 LAUDERDALE STREET
SELMA, AL 36701

Date: 01-04-02                                    Accident Date: _____

Name of Injured: Donna Early                      D.O.B. _____

Description of Injury: _____

Diagnosis: L-S disc dx / cerviclagia

Treatment Plan: Block pen

Medications Prescribed: NSAIDS

If restricted from immediate return to work, explain reason in detail: _____

May return to unrestricted work (date): 1.4.02 — 03-06-02

May return to restricted work (date): _____

Restrictions: _____

| PHYSICAL LIMITATIONS: | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting 0 - 10 lbs. | X | | |
| Light - lifting 10 - 20 lbs. | | X | |
| Moderate - lifting 20 - 50 lbs. | | | X |
| Heavy - lifting 50-100 lbs. | X | | |
| Pulling/Pushing, Carrying | | O | |
| Reaching or Working Above Shoulders | X | | |
| Walking Hrs. per day (2) left/right | X | | |
| Standing Hrs. per day (2) | X | | |
| Sitting Hrs. per day (4) | | | X |
| Stooping Hrs. per day ( ) | | | X |
| Kneeling Hrs. per day ( ) | | | |
| Bending Hrs. per day ( ) | X | | |
| Repeatedly work Hrs. per day ( ) | X | | |
| Climbing Hrs. per day ( ) | | | |

Physician Signature



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: Donna Early                    Date: 5·16·02

Injury related: ☐Yes    ☐No    Type of injury: ................................

Symptoms: ..................................................................................

Diagnosis: : C C S  Red

Today's treatment: Brace PW

Medication(s): NSAIDS

Treatment plan: Btacds PW

.............................................................................................

May return to unrestricted work on: .................................................

May return to restricted work on: 5·6·02 ———— 7-15·02

Restrictions: .............................................................................

| Physical Limitations | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary – lifting        0 – 10lbs. | ✔ | | |
| Light-lifting        10 – 20lbs. | ✔ | | |
| Moderate – lifting        20 – 50lbs. | | ✔ | |
| Heavy – lifting        50 –100lbs. | | | ✔ |
| Pulling/Pushing, Carrying | ✔ | | |
| Reaching or Working Above Shoulders | ✔ | ◯ | |
| Walking ........4.....Hrs. per day | ✔ | | |
| Standing.....4.....Hrs. per day | ✔ | | |
| Sitting........4.....Hrs. per day | ✔ | | |
| Stooping ......./......Hrs. per day | | | ✔ |
| Kneeling ......./......Hrs. per day | | | ✔ |
| Bending ......./...... Hrs. per day | | | ✔ |
| Repeatedly work..4.... Hrs. per day | ✔ | | |
| Climbing.........2........ Hrs. per day | ◯ | ✔ | |

Remarks: ...............................................

R. M. Tarabein, M.D.

ESNC, Inc. 00                    Page 1/1



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: Donna Early                    Date: 7-25-02

Injury related: ☐Yes    ☐No   Type of injury: ......................

Symptoms: ..........................................................

Diagnosis: : CLS ..................................................

Today's treatment: Block's Prn ...................................

Medication(s): NSAIDs ............................................

Treatment plan: Block's prn ......................................

May return to unrestricted work on: .............................

May return to restricted work on: 7-25-02 — 9-25-02

Restrictions: ....................................................

| Physical Limitations | | Full Duty | Partial Duty | No Duty |
|---|---|---|---|---|
| Sedentary - lifting | 0 - 10lbs. | X | | |
| Light-lifting | 10 - 20lbs. | X | | |
| Moderate - lifting | 20 - 50lbs. | | X | |
| Heavy - lifting | 50 -100lbs. | | X | |
| Pulling/Pushing, Carrying | | X | | X |
| Reaching or Working Above Shoulders | | X | | |
| Walking ......4.........Hrs. per day | | X | | |
| Standing....4.........Hrs. per day | | X | | |
| Sitting.........4.......Hrs. per day | | X | | |
| Stooping ....1........Hrs. per day | | | | |
| Kneeling ....1......Hrs. per day | | | | X |
| Bending .......1.....Hrs. per day | | | | X |
| Repeatedly work....4.... Hrs. per day | | X | | X |
| Climbing............2..... Hrs. per day | | | X | |

Remarks: .........................................................

R. M. Tarabein, M.D.

ESNC, Inc./III

Page 1/1



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: Donna Early                    Date: 9/24/02

Injury related: ☐Yes    ☐No    Type of injury: ...........................................

Symptoms: ...............................................................................................

Diagnosis: CTS

Today's treatment: Blocks prn

Medication(s): NSAIDS

Treatment plan: Blocks prn

May return to unrestricted work on: ...........................................

May return to restricted work on: 9-24-02 — 11-23-02

Restrictions: ...............................................

| Physical Limitations | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting        0 - 10lbs. | X | | |
| Light-lifting              10 - 20lbs. | X | | |
| Moderate - lifting         20 - 50lbs. | | X | |
| Heavy - lifting            50 -100lbs. | | | X |
| Pulling/Pushing, Carrying | X | | |
| Reaching or Working Above Shoulders | X | | |
| Walking ....4.... Hrs. per day | X | | |
| Standing ...4.... Hrs. per day | X | | |
| Sitting ....4.... Hrs. per day | X | | |
| Stooping .....1..... Hrs. per day | | | X |
| Kneeling ....1..... Hrs. per day | | | X |
| Bending ....1.... Hrs. per day | | | X |
| Repeatedly work 2.... Hrs. per day | X | | |
| Climbing....2.... Hrs. per day | | X | |

Remarks:

R. M. Tarabein, M.D.

ESNC, Inc./III                    Page 1/1



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: Donna Eady                    Date: 11-14-02

Injury related: ☐ Yes    ☐ No   Type of injury: .......................................................

Symptoms: ...........................................................................................................

Diagnosis: ....... CLS

Today's treatment: ...... Blocks  prn

Medication(s): ...... NSAIDS

Treatment plan: ...... Blocks  prn

May return to unrestricted work on: .................................................................

May return to restricted work on: 11-14-02 ⟶ 12-11-02

Restrictions: .......................

| Physical Limitations | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting      0 - 10lbs. | X | | |
| Light-lifting          10 - 20lbs. | X | | |
| Moderate - lifting   20 - 50lbs. | | | |
| Heavy - lifting     50 -100lbs. | | X | |
| Pulling/Pushing, Carrying | | | X |
| Reaching or Working Above Shoulders | X | | |
| Walking ...... 4 ...Hrs. per day | X | | |
| Standing..... 1 ... Hrs. per day | X | | |
| Sitting........ 4 ...Hrs. per day | X | | |
| Stooping ....... 1 ....Hrs. per day | | | |
| Kneeling ........ 1 ... Hrs. per day | | | X |
| Bending ......... 1 ... Hrs. per day | | | X |
| Repeatedly work .. 2 .. Hrs. per day | X | | X |
| Climbing........ 2 ... Hrs. per day | | X | |

Remarks: .......................

R. M. Tarabein, M.D.

ESNC, Inc./ig          Page 1/1



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: Dana Early                    Date: 12-11-02

Injury related: ☐Yes    ☐No    Type of injury: .................................

Symptoms: ....................................................................

Diagnosis: CLS

Today's treatment: Blocks pn

Medication(s): NSAIDS

Treatment plan: Blocks pn

............................................................................

May return to unrestricted work on: ...................................

May return to restricted work on: 12-11-02 22-10-03

Restrictions: ...............................................................

| Physical Limitations | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting    0 - 10lbs. | X | | |
| Light-lifting          10 - 20lbs. | X | | |
| Moderate - lifting    20 - 50lbs. | | X | |
| Heavy - lifting       50 - 100lbs. | | | X |
| Pulling/Pushing, Carrying | X | | |
| Reaching or Working Above Shoulders | X | | |
| Walking ............. Hrs. per day | X | | |
| Standing ............ Hrs. per day | X | | |
| Sitting ............. Hrs. per day | X | | |
| Stooping ............ Hrs. per day | | | X |
| Kneeling ............ Hrs. per day | | | X |
| Bending ............. Hrs. per day | | | X |
| Repeatedly work ..... Hrs. per day | X | | |
| Climbing ............ Hrs. per day | | X | |

Remarks: .....................................................................

R. M. Tarabein, M.D.

PSNC, Inc./III                          Page 1/1



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: Donna Early                     Date: 2/13/03

Injury related: ☐ Yes    ☐ No    Type of injury:

Symptoms:

Diagnosis: : C.h.S.

Today's treatment: Blocks prn

Medication(s): NSAIDS

Treatment plan: Blocks prn

May return to unrestricted work on:

May return to restricted work on: 2/13/03 ——— 3/13/03

Restrictions:

| Physical Limitations | | Full Duty | Partial Duty | No Duty |
|---|---|---|---|---|
| Sedentary – lifting | 0 – 10lbs. | X | | |
| Light-liting | 10 – 20lbs. | X | | |
| Moderate – lifiting | 20 – 50lbs. | | X | |
| Heavy – lifting | 50 –100lbs. | | | X |
| Pulling/Pushing, Carrying | | | | X |
| Reaching or Working Above Shoulders | | X | | |
| Walking ..........4.....Hrs. per day | | X | | |
| Standing........5....Hrs. per day | | X | | |
| Sitting............4.....Hrs. per day | | X | | |
| Stooping ......1......Hrs. per day | | X error | | |
| Kneeling ......1......Hrs. per day | | | | X |
| Bending .........Hrs. per day | | | | X |
| Repeatedly work......... Hrs. per day | | X | | X |
| Climbing................. Hrs. per day | | | X | |

Remarks:


R. M. Tarabein, M.D.
ESNC, Inc./III

Page 1/1



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: Donna Early                Date: 4-16-03

Injury related: ☐Yes    ☐No   Type of injury: .............................................

Symptoms: ...............................................................................................

Diagnosis: : .......... C L S

Today's treatment: ......... Blocks pRn

Medication(s): ......... N S A I D S

Treatment plan: ......... Blocks pRn

.............................................................................................................

May return to unrestricted work on: .............................................................

May return to restricted work on: 4-16-03 ——— 5-16-03 ............................

Restrictions: ...........................................................................................

| Physical Limitations | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary – lifting          0 - 10lbs. | X | | |
| Light-lifting                10 - 20lbs. | X | | |
| Moderate – lifting           20 - 50lbs. | | X | |
| Heavy – lifting              50 -100lbs. | | | X |
| Pulling/Pushing, Carrying | X | | |
| Reaching or Working Above Shoulders | X | | |
| Walking .......7......Hrs. per day | X | | |
| Standing......7....... Hrs. per day | X | | |
| Sitting...........7...... Hrs. per day | X | | |
| Stooping .......1...Hrs. per day | | | X |
| Kneeling .......1...Hrs. per day | | | X |
| Bending ............. Hrs. per day | | | X |
| Repeatedly work......... Hrs. per day | X | | |
| Climbing..................... Hrs. per day | | X | |

Remarks:

R. M. Tarabein, M.D.

(ESNC, Inc./III                Page 1/1



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: Donna Early                    Date: 5-14-03

Injury related: ☐Yes    ☐No    Type of injury: .............................................

Symptoms: ........... CLS

Diagnosis: : ........... Blocks PRN

Today's treatment: ........... NSAIDS

Medication(s): ........... Blocks PRN

Treatment plan: ...........................................................................

.....................................................................................

.....................................................................................

May return to unrestricted work on: ....................................................

May return to restricted work on: 5-16-03 ⟶ 6-16-03

Restrictions: ........................................................................

| Physical Limitations | | Full Duty | Partial Duty | No Duty |
|---|---|:---:|:---:|:---:|
| Sedentary – lifting | 0 - 10lbs. | X | | |
| Light-lifting | 10 - 20lbs. | X | | |
| Moderate – lifting | 20 - 50lbs. | | X | |
| Heavy – lifting | 50 -100lbs. | | | X |
| Pulling/Pushing, Carrying | | X | | |
| Reaching or Working Above Shoulders | | X | | |
| Walking ......4.....Hrs. per day | | X | | |
| Standing......4.....Hrs. per day | | X | | |
| Sitting.........4.....Hrs. per day | | X | | |
| Stooping .......Hrs. per day | | | | X |
| Kneeling .......Hrs. per day | | | | X |
| Bending ............ Hrs. per day | | | | X |
| Repeatedly work......... Hrs. per day | | X | | |
| Climbing................... Hrs. per day | | | X | |

Remarks: ...........

R. M. Tarabein, M.D.

ESMC, inc./lll                    Page 1/1

RECEIVED
MAY 16 2003
HUMAN RESOURCES



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: **Donla Early**                    Date: **6-12-03**

Injury related: ☐Yes    ☐No    Type of injury: .........

Symptoms: ...... **C L S**

Diagnosis: ...... **Blocks prn**

Today's treatment: ...... **NSAIDS**

Medication(s): ...... **Blocks prn**

Treatment plan: ......

.................

May return to unrestricted work on: .........

May return to restricted work on: **6-12-03** ──────➤ **7-17-03**

Restrictions: .........

| Physical Limitations | | Full Duty | Partial Duty | No Duty |
|---|---|---|---|---|
| Sedentary - lifting | 0 - 10lbs. | X | | |
| Light-lifting | 10 - 20lbs. | X | | |
| Moderate - lifting | 20 - 50lbs. | | X | |
| Heavy - lifting | 50 -100lbs. | | | X |
| Pulling/Pushing, Carrying | | X | | |
| Reaching or Working Above Shoulders | | X | | |
| Walking ............Hrs. per day | | X | | |
| Standing............Hrs. per day | | X | | |
| Sitting................Hrs. per day | | X | | |
| Stooping............Hrs. per day | | | | X |
| Kneeling ............Hrs. per day | | | | X |
| Bending ............Hrs. per day | | | | X |
| Repeatedly work.........Hrs. per day | | X | | |
| Climbing..................Hrs. per day | | | X | |

Remarks: .........

R. M. Tarabein, M.D.

ESNC, Inc./III

**RECEIVED**

JUN 13 2003

Page 1/1    HUMAN RESOURCES



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: _Donna Early_     Date: _7-17-03_

Injury related: ☐Yes   ☐No  Type of injury: ..........................

Symptoms: ..........................

Diagnosis: : _CLS_

Today's treatment: _Blocks prn_

Medication(s): _Blocks prn, Nsaids_

Treatment plan: ..........................

..........................

May return to unrestricted work on: ..........................

May return to restricted work on: _7/17/03 — 8/20/03_

Restrictions: ..........................

| Physical Limitations | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting     0 - 10lbs. | X | | |
| Light-lifting     10 - 20lbs. | X | | |
| Moderate - lifting     20 - 50lbs. | | X | |
| Heavy - lifting     50 -100lbs. | | | X |
| Pulling/Pushing, Carrying | | | X |
| Reaching or Working Above Shoulders | X | | |
| Walking .............. Hrs. per day | X | | |
| Standing ............. Hrs. per day | X | | |
| Sitting.................. Hrs. per day | X | | |
| Stooping .............. Hrs. per day | | | |
| Kneeling ...............Hrs. per day | | | X |
| Bending ............. Hrs. per day | | | X |
| Repeatedly work......... Hrs. per day | X | | |
| Climbing.................. Hrs. per day | | X | |

Remarks:

R. M. Tarabein, M.D.

ESNC, Inc./III                Page 1/1



# Eastern Shore Neurology
## R. M. Tarabein, M.D.

www.mydoctor.com/tarabein
(251) 625-0909

### Patient's Physical Activity Restriction(s) Summary

Patient's name: Donna Early                 Date: 9-21-03

Injury related: ☐Yes    ☐No    Type of injury:

Symptoms:

Diagnosis: : CLS

Today's treatment: Blocks prn

Medication(s): Blocks prn, Nsaids

Treatment plan:

May return to unrestricted work on:

May return to restricted work on: 9-21-03 — 9-25-03

Restrictions:

| Physical Limitations | | Full Duty | Partial Duty | No Duty |
|---|---|---|---|---|
| Sedentary - lifting | 0 - 10lbs. | X | | |
| Light-lifting | 10 - 20lbs. | X | | |
| Moderate - lifting | 20 - 50lbs. | | X | |
| Heavy - lifting | 50 -100lbs. | | X | |
| Pulling/Pushing, Carrying | | X | | X |
| Reaching or Working Above Shoulders | | X | | |
| Walking .....6......Hrs. per day | | X | | |
| Standing....4......Hrs. per day | | X | | |
| Sitting.........6......Hrs. per day | | X | | |
| Stooping ....0......Hrs. per day | | X | | |
| Kneeling ....0......Hrs. per day | | | | ✓ |
| Bending ....0..... Hrs. per day | | | | ✓ |
| Repeatedly work......... Hrs. per day | | X | | ✓ |
| Climbing.................. Hrs. per day | | | X | |

Remarks:



R. M. Tarabein, MD
ESNC, Inc./III

Page 1/1



# EASTERN SHORE
# NEUROLOGY CLINICS, INC.

Rassan M. Tarabein, M.D.

**Daphne**
28080 US Highway 98 Suite D
Daphne, Alabama 36526
Office: (334) 621-9106
Fax: (334) 621-9165

**Foley**
1721 North Bunner Street
Foley, Alabama 36535
Office: (334) 971-1650
Fax: (334) 971-9101

Date: _9-05-03_     Accident Date: _____

Name of Injured: _Donna Early_    D.O.B. _____

Description of Injury: _____

Diagnosis: _CLS_

Treatment Plan: _Blocks prn_

Medications Prescribed: _Nsaids / blocks prn_

If restricted from immediate return to work, explain reason in detail: _____

May return to unrestricted work (date): _____

May return to restricted work (date): _9-25-03_ →

Restrictions: _____

**PHYSICAL LIMITATIONS:**

| | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting 0-10 lbs. | X | | |
| Light - lifting 10-20 lbs. | X | | |
| Moderate - lifting 20-50 lbs. | | | |
| Heavy - liftings 50-100 lbs. | | X | |
| Pulling/Pushing, Carrying | | | X |
| Reaching or Working Above Shoulders | X | | |
| Walking Hrs. per day ( ) | X | | |
| Standing Hrs. per day ( ) | X | | |
| Sitting Hrs. per day ( ) | X | | |
| Stooping Hrs. per day ( ) | X | | |
| Kneeling Hrs. per day ( ) | | | X |
| Bending Hrs. per day ( ) | | | X |
| Repeatedly work Hrs. per day ( ) | | | X |
| Climbing Hrs. per day ( ) | X | | |
| | | V | |

Doctor's Signature _[signature]_



# EASTERN SHORE
# NEUROLOGY CLINICS, INC.

### Rassan M. Tarabein, M.D.

| DAPHNE | FOLEY |
|---|---|
| 28080 US Highway 98 Suite D | 1721 North Bunner Street |
| Daphne, Alabama 36526 | Foley, Alabama 36535 |
| Office: (334) 621-9106 | Office: (334) 971-1650 |
| Fax: (334) 621-9165 | Fax: (334) 971-9101 |

Date: 12-10-03     Accident Date: _____

Name of Injured: Donna Early     D.O.B. _____

Description of Injury: _____

Diagnosis: L5 disc Dx. / cervicalgia

Treatment Plan: Blocks prn

Medications Prescribed: NSAIDS

If restricted from immediate return to work, explain reason in detail: _____

May return to unrestricted work (date): _____

May return to restricted work (date): 12-10-03 thru 1-16-03

Restrictions: _____

PHYSICAL LIMITATIONS:

| | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting 0-10 lbs. | X | | |
| Light - lifting 10-20 lbs. | X | | |
| Moderate - lifting 20-50 lbs. | | X | |
| Heavy - liftings 50-100 lbs. | | | X |
| Pulling/Pushing, Carrying | | | |
| Reaching or Working Above Shoulders | O | X | |
| Walking Hrs. per day (2) | X | | |
| Standing Hrs. per day (2) | X | | |
| Sitting Hrs. per day (4) | X | | |
| Stooping Hrs. per day (Ø) | | | X |
| Kneeling Hrs. per day (Ø) | | | X |
| Bending Hrs. per day (Ø) | | | X |
| Repeatedly work Hrs. per day ( ) | | | |
| Climbing Hrs. per day ( ) | X | O | |

Doctor's Signature _____



# EASTERN SHORE
# NEUROLOGY CLINICS, INC.

RASSAN M. TARABEIN, M.D.

**DAPHNE**
28080 US HIGHWAY 98 SUITE D
DAPHNE, ALABAMA 36526
OFFICE: (334) 621-9106
FAX: (334) 621-9165

**FOLEY**
1721 NORTH BUNNER STREET
FOLEY, ALABAMA 36535
OFFICE: (334) 971-1650
FAX: (334) 971-9101

Date: 2-19-04    Accident Date: _____

Name of Injured: DONNIA EARLY    D.O.B. _____

Description of Injury: _____

Diagnosis: C & LS disc di

Treatment Plan: SPINAL BLOCK PRN + REPEAT EMG 1 w/u

Medications Prescribed: NSAIDS

If restricted from immediate return to work, explain reason in detail: _____

May return to unrestricted work (date): _____

May return to restricted work (date): 2-19-04 Thru 2-19-05

Restrictions: _____

**PHYSICAL LIMITATIONS:**

| | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting 0-10 lbs. | ✓ | | |
| Light - lifting 10-20 lbs. | ✓ | | |
| Moderate - lifting 20-50 lbs. | | ✓ | |
| Heavy - liftings 50-100 lbs. | | | ✓ |
| Pulling/Pushing, Carrying | ✓ | | |
| Reaching or Working Above Shoulders | | ✓ | |
| Walking Hrs. per day (4) | ✓ | | |
| Standing Hrs. per day (2) | ✓ | | |
| Sitting Hrs. per day (2) | | ✓ | |
| Stooping Hrs. per day (∅) | ✓ | | |
| Kneeling Hrs. per day (∅) | | | ✓ |
| Bending Hrs. per day (∅) | | | ✓ |
| Repeatedly work Hrs. per day (8) | | | ✓ |
| Climbing Hrs. per day | ✓ | | |

Doctor's Signature _____



# EASTERN SHORE
# NEUROLOGY CLINICS, INC.

### Rassan M. Tarabein, M.D.

Daphne
28080 US Highway 98 Suite D
Daphne, Alabama 36526
Office: (334) 621-9106
Fax: (334) 621-9165

Foley
1721 North Bunner Street
Foley, Alabama 36535
Office: (334) 971-1650
Fax: (334) 971-9101

Date: 5-6-04

Accident Date: _____

Name of Injured: Donna Early _____ D.O.B. _____

Description of Injury: _____

Diagnosis: LS disc Dz./cervicalgia

Treatment Plan: Blocks prn

Medications Prescribed: NSAIDS

If restricted from immediate return to work, explain reason in detail: _____

May return to unrestricted work (date): _____

May return to restricted work (date): 5-6-04 thru to 6-9-04

Restrictions: _____

| PHYSICAL LIMITATIONS: | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting 0-10 lbs. | X | | |
| Light - lifting 10-20 lbs. | X | | |
| Moderate - lifting 20-50 lbs. | | X | |
| Heavy - liftings 50-100 lbs. | | | X |
| Pulling/Pushing, Carrying | X | | |
| Reaching or Working Above Shoulders | | X | |
| Walking Hrs. per day (6) | X | | |
| Standing Hrs. per day (4) | X | | |
| Sitting Hrs. per day (6) | X | | |
| Stooping Hrs. per day (0) | | | X |
| Kneeling Hrs. per day (0) | | | X |
| Bending Hrs. per day (0) | | | X |
| Repeatedly work Hrs. per day ( ) | X | | |
| Climbing Hrs. per day ( ) | X | | |

Doctor's Signature _____



# EASTERN SHORE
# NEUROLOGY CLINICS, INC.

## Rassan M. Tarabein, M.D.

**Daphne**
28080 US Highway 98 Suite D
Daphne, Alabama 36526
Office: (334) 621-9106
Fax: (334) 621-9165

**Foley**
1721 North Bunner Street
Foley, Alabama 36535
Office: (334) 971-1650
Fax: (334) 971-9101

Date: 6-3-04      Accident Date: _____

Name of Injured: DONNA EARLY     D.O.B. _____

Description of Injury: _____

Diagnosis: LS disc DZ / CERVICALGIA

Treatment Plan: BLOCKS PRN

Medications Prescribed: NSAIDS

If restricted from immediate return to work, explain reason in detail: _____

_____

May return to unrestricted work (date): _____

May return to restricted work (date): 6-3-04 → 7-7-04

Restrictions: _____

| PHYSICAL LIMITATIONS: | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting 0-10 lbs. | X | | |
| Light - lifting 10-20 lbs. | X | | |
| Moderate - lifting 20-50 lbs. | | X | |
| Heavy - liftings 50-100 lbs. | | | X |
| Pulling/Pushing, Carrying | X | | |
| Reaching or Working Above Shoulders | | X | |
| Walking Hrs. per day (6) | X | | |
| Standing Hrs. per day (4) | X | | |
| Sitting Hrs. per day (6) | X | | |
| Stooping Hrs. per day (∅) | | | X |
| Kneeling Hrs. per day (∅) | | | X |
| Bending Hrs. per day (∅) | | | X |
| Repeatedly work Hrs. per day (∅) | X | | |
| Climbing Hrs. per day | X | | |

Doctor's Signature _____

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DONNA L. EARLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.:  2:06cv727** |
| | ) | |
| **RHEEM MANUFACTURING** | ) | **JUDGE KEITH WATKINS** |
| **COMPANY, a corporation and CAL** | ) | |
| **MEARS, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**AFFIDAVIT OF NORM LEWIS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before me, a notary public in and for said county and state, personally appeared Norm Lewis, who is known to me, and who after being first duly sworn, deposes and states as follows:

1.      My name is Norm Lewis, and I am a Production Supervisor for Rheem Manufacturing Company ("Rheem").   Plaintiff worked at Rheem's manufacturing plant located in Montgomery, Alabama, at 2600 Gunter Park Drive, East.   I was Plaintiff's direct supervisor when the events described below took place.

2.      Plaintiff informed me that in August of 2000, she sustained a slip and fall injury while attending weekend drill with the Alabama National Guard.   When Plaintiff returned to work in 2001, Rheem assigned her duties consistent with the restrictions imposed by her physicians.

3.      On April 6, 2004, Plaintiff sustained a work-related injury to the fourth and fifth fingers on her left hand and received workers' compensation benefits.

1

Plaintiff's primary treating physician for her hand injury was Dr. Edward Palmer, an orthopedic surgeon, and he determined when and under what restrictions Plaintiff was able to work. I followed those restrictions.

4.     On or about June 28, 2004, while Plaintiff was still working under light duty restrictions ordered by Dr. Palmer due to her work-related hand injury, Dr. Mahgoub Abdalla Eltoum, the physician treating Plaintiff for the back injury she sustained in 2000 while on weekend military duty, re-certified Plaintiff's eligibility for intermittent FMLA leave for periodic physical therapy treatments for her back injury. The intermittent FMLA leave was for a period of one year, beginning on June 28, 2004.

5.     On or about July 7, 2004, Plaintiff presented to me a medical restrictions summary from Dr. Tarabein in which he imposed new and different work restrictions relative to his long-standing diagnosis of "Lumbar Sacral Disease/Cervicalgia." Specifically, the new restrictions were, ***total restriction of [right] arm (still may use [right] hand).***" The specific "Physical Limitations" stated on Dr. Tarabein's report regarding lifting, standing, stooping, etc., remained the same as in previous reports. I had always followed Dr. Tarabein's restrictions.

6.     I did not understand the new restrictions and was not sure whether Rheem had a job that complied with "total restriction of the right arm (still may use right hand)." I referred Plaintiff to Human Resources for clarification of Dr. Tarabein's new orders, particularly the total restriction of right arm use.

7.     When Plaintiff gave me Dr. Tarabein's new restrictions, she was already on very light duty and had been for awhile. Plaintiff was sitting at a bench color sorting plastic plugs and, at times, inserting a small piece of foam in a water heater component.

2

This was the lightest job I could think of for Plaintiff to do and I was not sure the new orders allowed Plaintiff to perform even that job. That is why I asked for assistance from Human Resources.

8.    To my knowledge, Plaintiff never provided any clarification of Dr. Tarabein's restrictions, nor did she ever return to work at Rheem after August 12, 2004.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June __6__, 2007.

_____

**NORM LEWIS**

Sworn to and subscribed before me on this the _6_ day of June, 2007 .

Leah Sable Kennedy Price
Notary Public
My Commission Expires: May 13, 2009

[SEAL]

3

# EXHIBIT G

**Information Redacted Pursuant to General Order No. 2:04-mc-3228**



# EASTERN SHORE NEUROLOGY CLINICS, INC.

RASSAN M. TARABEIN, M.D.

**DAPHNE**
28080 US HIGHWAY 98 SUITE D
DAPHNE, ALABAMA 36526
OFFICE: (334) 621-9106
FAX: (334) 621-9165

**FOLEY**
1721 NORTH BUNNER STREET
FOLEY, ALABAMA 36535
OFFICE: (334) 971-1650
FAX: (334) 971-9101

Date: _7-7-04_    Accident Date: _____

Name of Injured: _Donna Early_    D.O.B. _____

Description of Injury: _____

Diagnosis: _LS disc DZ / cervicalgia_

Treatment Plan: _Blocks PRN_

Medications Prescribed: _NSAIDS_

If restricted from immediate return to work, explain reason in detail: _____

_____

May return to unrestricted work (date): _____

May return to restricted work (date): _7-7-04 → 8.6.04_

Restrictions: _total restriction of Rt arm use (still may use Rt hand_

| PHYSICAL LIMITATIONS: | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting 0-10 lbs. | ✓ | | |
| Light - lifting 10-20 lbs. | ✓ | | |
| Moderate - lifting 20-50 lbs. | | ✓ | |
| Heavy - liftings 50-100 lbs. | | | ✓ |
| Pulling/Pushing, Carrying | ✓ | | |
| Reaching or Working Above Shoulders | | ✓ | |
| Walking Hrs. per day          ( 6 ) | ✓ | | |
| Standing Hrs. per day         ( 4 ) | ✓ | | |
| Sitting Hrs. per day          ( 6 ) | ✓ | | |
| Stooping Hrs. per day         ( 0 ) | | | |
| Kneeling Hrs. per day         ( 0 ) | | | ✓ |
| Bending Hrs. per day          ( 0 ) | | | ✓ |
| Repeatedly work Hrs. per day  (   ) | | | ✓ |
| Climbing Hrs. per day         (   ) | ✓ | | |

Doctor's Signature _____

**FAXED**
7/13/04



# EASTERN SHORE
# NEUROLOGY CLINICS, INC.

### Rassan M. Tarabein, M.D.

| | |
|---|---|
| **Daphne** | **Foley** |
| 28080 US Highway 98 Suite D | 1721 North Bunner Street |
| Daphne, Alabama 36526 | Foley, Alabama 36535 |
| Office: (334) 621-9106 | Office: (334) 971-1650 |
| Fax: (334) 621-9165 | Fax: (334) 971-9101 |

Date: 8-11-04    Accident Date: _____

Name of Injured: Donna Forby    D.O.B. _____

Description of Injury: _____

_____

Diagnosis: _____

Treatment Plan: Spinal Block PRN

Medications Prescribed: NSAIDS

If restricted from immediate return to work, explain reason in detail: _____

_____

May return to unrestricted work (date): _____

May return to restricted work (date): 8-11-04 ——→ 9/15/04

Restrictions: total restriction of R arm (still may use R hand)

| PHYSICAL LIMITATIONS: | Full Duty | Partial Duty | No Duty |
|---|---|---|---|
| Sedentary - lifting 0-10 lbs. | ✓ | | |
| Light - lifting 10-20 lbs. | ✓ | | |
| Moderate - lifting 20-50 lbs. | | ✓ | |
| Heavy - liftings 50-100 lbs. | | | ✓ |
| Pulling/Pushing, Carrying | ✓ | | |
| Reaching or Working Above Shoulders | | ✓ | |
| Walking Hrs. per day ( ) | ✓ | | |
| Standing Hrs. per day ( ) | ✓ | | |
| Sitting Hrs. per day ( ) | ✓ | | |
| Stooping Hrs. per day ( ) | ✓ | | |
| Kneeling Hrs. per day ( ) | | | ✓ |
| Bending Hrs. per day ( ) | | | ✓ |
| Repeatedly work Hrs. per day ( ) | | | ✓ |
| Climbing Hrs. per day ( ) | ✓ | | |

Doctor's Signature _____

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DONNA L. EARLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.: 2:06cv727** |
| | ) | |
| **RHEEM MANUFACTURING** | ) | **JUDGE KEITH WATKINS** |
| **COMPANY, a corporation and CAL** | ) | |
| **MEARS, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**AFFIDAVIT OF CAL MEARS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before me, a notary public in and for said county and state, personally appeared Clarence Mears, who is known to me, and who after being first duly sworn, deposes and states as follows:

1.     My name is Clarence Mears, and I am the Employee Relations Manager for Rheem Manufacturing Company ("Rheem"). As the Employee Relations Manager, I act as a liaison between Rheem and its employees. Plaintiff worked at Rheem's manufacturing plant located in Montgomery, Alabama, at 2600 Gunter Park Drive, East.

2.     Plaintiff's personnel file reflects that Plaintiff sustained a slip and fall injury in 2000 while on weekend duty with the Alabama National Guard. She received treatment for that injury from a number of physicians including Dr. Tarabein. Plaintiff told me in casual conversation about her injury and that she had V.A. disability, and I told her that I also had a V.A. disability rating.

1

3.    On or about July 7, 2004, Plaintiff presented a medical restrictions summary from Dr. Tarabein in which he imposed new and different work restrictions relative to his long-standing diagnosis of "Lumbar Sacral Disease/Cervicalgia." Specifically, the new restrictions were, ***"total restriction of [right] arm (still may use [right] hand)."*** The specific "Physical Limitations" stated on Dr. Tarabein's report regarding lifting, standing, stooping, etc., remained the same as in previous reports.

4.    Due to the confusing and inherently contradictory nature of the new restrictions, Plaintiff's supervisor, Norm Lewis, asked me for assistance, but I could not understand the new orders either, which, in my view, were confusing.

5.    On or about August 11, 2004, I met with Plaintiff to discuss this issue. I reviewed Dr. Tarabein's new work restrictions with Plaintiff, and explained to Plaintiff that the new "total restriction" against use of the right arm was confusing to Rheem because it appeared to contradict the longstanding physical limitations previously stipulated by Dr. Tarabein in numerous medical notes and reports.

6.    I informed Plaintiff that Rheem needed clarification from Dr. Tarabein to ensure that Rheem identified a work assignment for her that conformed to the new restrictions. I asked Plaintiff to obtain the necessary clarification from Dr. Tarabein and also told Plaintiff that Rheem could not return her to duty without further guidance from Dr. Tarabein. Plaintiff became argumentative and stated repeatedly that Rheem already had all of her medical records and that Rheem had everything it needed. I also gave Plaintiff a brochure about Rheem's short-term disability benefits, which she could use if she wished to apply. I recorded these events in a Memorandum dated August 11, 2004.

7.    I met again with Plaintiff on August 20, 2004, and renewed my request for clarification from Dr. Tarabein.  Plaintiff refused to seek clarification and stated that she believed her physician had provided all he was required to provide.  She again stated that Rheem already had all of the information it needed.  Following this August 20, 2004 meeting with Plaintiff, I wrote a letter to her confirming what had transpired in our meeting and reiterating Rheem's need for clarification of Dr. Tarabein's confusing restrictions.

8.    Plaintiff never provided any clarification of Dr. Tarabein's restrictions, nor did she ever return to work at Rheem after August 12, 2004.  Rather, she applied for short-term disability benefits.  To my knowledge, she received those benefits for the period August 16 through October 3, 2004, but the insurer discontinued benefits effective October 4, 2004, on the grounds that Plaintiff had not provided sufficient medical documentation to establish a disability qualifying her for short-term disability benefits.

9.    Plaintiff remained on indefinite medical leave without pay from August 12, 2004 forward.  Rheem's Human Resources Department notified Plaintiff in writing on July 13, 2005, that her certification for intermittent FMLA leave had expired on June 28, 2005 and that no renewal certification had been submitted, and Rheem offered to assist Plaintiff in this regard.  I am unaware of any attempt by Plaintiff to respond to this letter, or to have her expired FMLA certification renewed.  Finally, on or about December 21, 2005, Rheem terminated Plaintiff's employment.  As an administrative policy, Rheem routinely terminates employees who have been on leave for medical reasons for twelve consecutive months or more.  This policy is stated in Rheem's Handbook for Hourly Employees.

10.    To sum up, Rheem asked for clarification of Dr. Tarabein's new restrictions, but Plaintiff refused to cooperate. Rheem did not discharge Plaintiff due to her request for disability benefits, entitlement to retirement benefits, or because of her military service. Rather, Rheem discharged Plaintiff because she abandoned her job.

11.    In my capacity as Employee Relations Manager, I have no duties relating to the administration of Rheem's pension plan, nor do I have any role in the decisions regarding employees' claims for short-term or long-term disability benefits.

12.    I started to work at Rheem on March 1, 2004, only about six (6) months before I met with Plaintiff on August 11, 2004. I knew Plaintiff enough to speak to her, but my first substantive conversation with her was on August 11, 2004, when I made Rheem's first request for clarification of Dr. Tarabein's new orders. I bore no ill will toward Plaintiff, and my only motive in meeting with her was to ensure that Rheem gained a clear understanding of the new medical restrictions and that, if possible, Plaintiff would be placed in a job that conformed with those restrictions. When the new restrictions arrived, Plaintiff was already working in a very light duty position, sorting pieces of light plastic plugs by color and inserting small pieces of foam in a water heater component while seated. Rheem had created this temporary job so Plaintiff could continue working.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June __*b*__, 2007.

_____
**CAL MEARS**

Sworn to and subscribed before me on this the __*6*__ day of June, 2007 .

Leah Sable Kennedy Price
Notary Public
My Commission Expires: May 13, 2009

[SEAL]

# EXHIBIT I

ALABAMA STATE BOARD OF           )
MEDICAL EXAMINERS,               )
                                 )        BEFORE THE MEDICAL LICENSURE
    Complainant,         )        COMMISSION OF ALABAMA
                                 )
vs.                              )
                                 )        CASE NO. 04-008
RASSAN M. TARABEIN, M. D.        )
                                 )
    Respondent.          )

## STIPULATION AND CONSENT ORDER

COME NOW, the Complainant, the Alabama State Board of Medical Examiners, and the Respondent, RASSAN M. TARABEIN, M. D., and jointly submit the following Stipulation and Consent Order:

### STIPULATION

1.    The Respondent admits the allegations in paragraphs 1 through 10 of the Administrative Complaint, acknowledges that the admissions constitute grounds for disciplinary sanctions against the Respondent, acknowledges the authority of the Medical Licensure Commission to exercise jurisdiction in this matter, and consents and agrees to the entry of the Consent Order contained herein.

2.    The Respondent waives his right to an administrative hearing before the Medical Licensure Commission, his right to be represented at such hearing by counsel of his choice, and agrees to waive any and all rights to further notice and formal adjudication of the charges stated in the Administrative Complaint. Further, Respondent waives his right to judicial review of the Consent Order agreed to herein under applicable provisions of the Alabama Administrative Procedure Act.

3.    Respondent understands and acknowledges that the Stipulation and Consent Order, if approved and executed by the Medical Licensure Commission, shall constitute a public record under the laws of the state of Alabama.

4.    The Alabama Board of Medical Examiners stipulates and agrees that the terms and conditions of the Consent Order stated herein constitute a reasonable disposition of the charges contained in the Administrative Complaint, and that such disposition adequately protects the public's health and safety.

5.      It is stipulated and agreed between the parties that this Stipulation and Consent Order be submitted to the Medical Licensure Commission of Alabama, and that such Stipulation and Consent Order are subject to the Commission's approval.  It is further agreed by the Respondent that the Medical Licensure Commission shall be permitted to examine and review, prior to approval of the Stipulation, the records and documents now in the possession of the Board of Medical Examiners concerning the stipulation of facts set forth herein.  It is further agreed by the Respondent and the Board of Medical Examiners that, in the event the Medical Licensure Commission shall decline to accept this Stipulation and Consent Order as a basis for the disposition of the alleged grounds for imposition for disciplinary sanctions and requires the Board of Medical Examiners to present testimony and documentary exhibits at a subsequent hearing, any admissions by the Respondent in this Stipulation shall be null and void, shall not be binding upon the Respondent and shall not be admissible into evidence at the hearing or any other proceeding, and any consideration by the Commission of the Stipulation and Consent Order and the documentary evidence referred to herein, shall not be prejudicial to the rights of the Respondent to receive a fair and impartial hearing.

STIPULATED AND AGREED this **20** day of **October**, 2004.

RASSAN M. TARABEIN, M. D.

Tamela E. Esham, Esq.,
ARMBRECHT JACKSON LLP
Post Office Box 290
Mobile, AL 36601
        Attorneys for Rassan M. Tarabein, M. D.

Robert E. Morrow, Esq., Attorney for the Alabama
Board of Medical Examiners

## CONSENT ORDER

This matter is before the Medical Licensure Commission of Alabama pursuant to an Administrative Complaint filed by the Alabama Board of Medical Examiners on July 19, 2004, and pursuant to a signed Stipulation entered into by the Board of Medical Examiners and the Respondent, RASSAN M. TARABEIN, M. D., on the 20th day of *October*, 2004. The Commission hereby finds that it has jurisdiction of the Administrative Complaint and of the parties hereto pursuant to Ala. Code §34-24-361 (2002).

In consideration of the allegations in the Administrative Complaint and based upon the Stipulation of the parties, the Commission hereby finds that the Respondent, RASSAN M. TARABEIN, M. D., has committed acts which violate Ala. Code §§34-24-360(2), (3), (8) and (11) (2002). The Commission concludes, as a matter of law, that the foregoing facts constitute violations of Ala. Code §§34-24-360(2), (3), (8) and (11) (2002).

Based upon the foregoing findings of fact and conclusions of law, it is the ORDER of the Medical Licensure Commission:

1.    That the license to practice medicine in Alabama of the Respondent, RASSAN M. TARABEIN, M. D., license number MD.00018124, be, and is hereby REPRIMANDED.

2.    That the Respondent, RASSAN M. TARABEIN, M D., be, and is hereby assessed an administrative fine in the amount of Forty Thousand Dollars ($40,000.00). The administrative fine is due and payable to the Medical Licensure Commission with one-half of the balance due and payable in 60 days from the date of this Order and then with the remaining balance due and payable six (6) months later.

3.    That the license to practice medicine of the Respondent, RASSAN M. TARABEIN, M. D., is hereby SUSPENDED, the suspension is immediately stayed, and

Respondent's license to practice medicine in Alabama is hereby placed on PROBATION for a period of two (2) years from the date of this Order, subject to the terms and conditions listed below. Should Respondent fail to meet the terms and conditions listed below, the Commission may suspend or revoke Respondent's license to practice medicine in Alabama.

a.   Random reviews of Dr. Tarabein's practice will be conducted by an individual selected by the Commission and reports made to the Commission. The expense of the review and report ordered herein shall be borne by Respondent.

b.   Respondent shall, within the two-year probation period, successfully complete, and provide to the Commission proof of successful completion of, one of the following courses of continuing medical education:

> "Prescribing Controlled Drugs: Critical Issues and Common Pitfalls.," The Center for Professional Health at Vanderbilt University Medical Center, 1107 Oxford House, Nashville TN 37232-4300, telephone (615) 936-0678, facsimile (615) 936-0676.

> OR

> "Intensive Course in Controlled Substance Management," Case Western Reserve University School of Medicine, 10900 Euclid Avenue, Cleveland OH 44106-4922, telephone (216) 368-2408, facsimile (216) 368-0535.

c.   Respondent shall, within the two-year probation period, successfully complete, and provide to the Commission proof of successful completion of the following course of continuing medical education:

> "Medical Ethics and Professionalism," Case Western Reserve University School of Medicine, 10900 Euclid Avenue, Cleveland OH 44106-4922, telephone (216) 368-2408, facsimile (216) 368-0535

The courses Dr. Tarabein shall attend pursuant to this order may be used to meet the general continuing medical education requirements for the appropriate year(s).

Dr. Tarabein is ordered to contact James B. Hulett, Physician Monitoring

Coordinator for the Alabama State Board of Medical Examiners, (334) 242-2116

or 1-800-227-2606, for information concerning the continuing medical education

courses and proof of compliance.

d.    All prescriptions written for controlled substances by Respondent shall be written

on preprinted, sequentially numbered, duplicate prescription forms.  The original

shall be given to the patient, and the duplicate carbon copy shall be maintained in

the patient's medical chart.  Respondent will make the copies available upon

request of the Commission.

e.    Respondent shall fully pay the fine assessed in paragraph 2 above within one (1)

year of the date of this Order.

The Medical Licensure Commission retains jurisdiction in this matter for the purpose of

entering such further orders and directives as may be necessary to implement the provisions of

this Consent Order.

ORDERED this 27ᵗᴴ day of _____October_____, 2004.


_Jerry N. Gurley_ M.D.

Jerry N. Gurley, M. D., Chairman
Medical Licensure Commission

399890

# EXHIBIT J

# MEMO TO FILE

RE: D. Early, Clock #4624, Assembler, Dept. 09 – 1st shift

DATE: 08/11/2004 – 2:30 pm

SUBJ: Non-work connected disability

On the above date and time the writer met with employee D. Early and Facilitator N. Lewis (Dept. 09) to review a document presented by the employee on 8/11/04 that restricted her ability to perform physical activities related to the essential functions of her current position.

The employee was asked for clarification of conflicting comments presented by Dr. Rassan M. Tarabein M.D; the physician treating her for a VA compensated injury, which totally restricted the use of her right arm.

Ms. Early was further informed the restriction made by her physician, on the RTW documentation dated 8/11/04, appeared to be in direct conflict with physical limitations the physician had approved on the RTW form.

The writer informed Ms. Early; at this time the company could not accommodate the restriction cited by Dr. Tarabein, without further clarification of the restriction and physical limitations. Ms. Early was presented with a Rheem disability application form, and again informed by the writer that she should not RTW until the company received full medical clarification of her non-work connected restriction and physical limitations.

CLM

8/13/04

# EXHIBIT K

**Exhibit to Affidavit Intentionally Omitted**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **DONNA L. EARLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.:  2:06cv727** |
| | ) | |
| **RHEEM MANUFACTURING** | ) | **JUDGE KEITH WATKINS** |
| **COMPANY, a corporation and CAL** | ) | |
| **MEARS, an individual,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**AFFIDAVIT OF CYNTHIA WRIGHT IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before me, a notary public in and for said county and state, personally appeared Cynthia Wright, who is known to me, and who after being first duly sworn, deposes and states as follows:

1.      My name is Cynthia Wright, and I am the Senior Employee Benefits Manager for Rheem Manufacturing Company ("Rheem").  I work in Rheem's corporate offices in Atlanta, Georgia.

2.      Short Term Disability insurance coverage ("STD") is provided to Rheem employees at various locations at no cost to them.  Long Term Disability insurance coverage ("LTD") is available to Rheem employees at various locations for a monthly premium payable by the employee. In both cases, the benefits are provided through traditional group disability insurance policies arranged by Rheem as Plan Sponsor.  The insurance company providing the benefits changes from time to time based on periodic cost/benefit analyses conducted by Rheem as Plan Sponsor.  At all times relevant to

1

Plaintiff's claims in this lawsuit, Prudential Insurance Company of America ("Prudential") was the insurance company for both the group short term and long term disability policies covering Rheem employees such as Plaintiff.

3.    Rheem's records reflect that Plaintiff applied to Prudential for STD benefits in 2004 and received those benefits for the period August 16th through October 3, 2004, but Prudential discontinued benefits effective October 4, 2004, on the grounds that Plaintiff had not provided sufficient medical documentation to establish a qualifying disability under the policy then in force. Plaintiff appealed the denial of benefits, but the decision was upheld by a Prudential appeals committee.

4.    Rheem delegates all aspects of STD and LTD eligibility determinations to the relevant insurance company and plays no role whatsoever in that process. Prudential was solely responsible for the decision to discontinue Plaintiff's benefits.

5.    In my capacity as Senior Employee Benefits Manager, I have no role in the decisions regarding employees' claims for short-term or long-term disability benefits, nor does anyone else employed at Rheem. All such determinations are made solely by the relevant insurance company.

6.    I understand that Plaintiff claims that she was also wrongfully denied LTD benefits. I am not aware of Plaintiff having submitted a claim for LTD benefits, but if she did, and if the claim was denied, Prudential also made that determination. It is my understanding that Prudential's denial of Plaintiff's claim for STD would disqualify her for LTD benefits because the standard waiting period for LTD was totally disabled within the terms of the insurance policy for six (6) months to coincide with exhaustion of STD benefits. Plaintiff did not receive STD benefits for six months.

7.    I have been informed that Plaintiff alleges in her lawsuit that she would have been eligible for ". . . full retirement benefits upon completion of 25 years of service with [Rheem]." Plaintiff is mistaken. Rheem's Pension Plan provides that employees qualify for pension benefits based on combinations of age, years of service and circumstances of employment termination. Plaintiff would have been eligible to receive "normal pension benefits" after 30 years of continuous service and termination of her employment at age 55 or greater. Plaintiff's date of birth is February 20, 1968 and her hire date was April 2, 1993. Therefore, Plaintiff would not have been eligible for normal pension benefits until April 20, 2023, when she would have met both criteria. There are other criteria regarding pension eligibility in cases of a plant shut down or lay off, but none apply to Plaintiff. Pertinent provisions of Rheem's Hourly Pension Plan are attached hereto as Ex. _____.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April _27_, 2007.

_____
**CYNTHIA WRIGHT**

Sworn to and subscribed before me on this the _27_ day of April, 2007 .

Notary Public
My Commission Expires: _2-10-08_

[SEAL]

3

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DONNA L. EARLY, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.: 2:06cv727 |
| | ) | |
| RHEEM MANUFACTURING | ) | JUDGE KEITH WATKINS |
| COMPANY, a corporation and CAL | ) | |
| MEARS, an individual, | ) | |
| | ) | |
|     Defendants. | ) | |

**AFFIDAVIT OF ALFRED GARDNER IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before me, a notary public in and for said county and state, personally appeared Alfred Gardner, who is known to me, and who after being first duly sworn, deposes and states as follows:

1.    My name is Alfred Gardner, and I am the Human Resources Manager for Rheem Manufacturing Company ("Rheem"). As the Human Resources Manager, I am ultimately responsible for all human resources functions, including maintenance of Rheem's personnel records.

2.    Rheem is in the business of designing, manufacturing and marketing various types of water heaters for residential and commercial applications. Plaintiff worked at Rheem's manufacturing plant located in Montgomery, Alabama, at 2600 Gunter Park Drive, East.

3.    Rheem's personnel records reflect that it hired Plaintiff on April 2, 1993, as an Assembler. On or about Monday, August 14, 2000, Plaintiff reported to Rheem

1

that on Saturday, August 12, 2000, she sustained a slip and fall injury while attending regularly scheduled weekend drill with the Alabama National Guard. When Plaintiff returned to work in 2001, Rheem assigned her duties consistent with the restrictions imposed by her physicians.

4.     On April 6, 2004, Plaintiff sustained a work-related injury to the fourth and fifth fingers on her left hand and received workers' compensation benefits. Plaintiff's primary treating physician for her hand injury was Dr. Edward Palmer, an orthopedic surgeon, and he determined when and under what restrictions Plaintiff was able to work.

5.     On or about June 28, 2004, while Plaintiff was still working under light duty restrictions ordered by Dr. Palmer due to her work-related hand injury, Dr. Tarabein, the physician treating Plaintiff for the back injury she sustained while on weekend military duty, re-certified Plaintiff's eligibility for intermittent FMLA leave for periodic physical therapy treatments for her back injury. The intermittent FMLA leave was for a period of one year, beginning on June 28, 2004.

6.     On or about July 7, 2004, Plaintiff presented a medical restrictions summary from Dr. Tarabein in which he imposed new and different work restrictions relative to his long-standing diagnosis of "Lumbar Sacral Disease/Cervicalgia." Specifically, the new restrictions were, *"total restriction of [right] arm (still may use [right] hand)."* The specific "Physical Limitations" stated on Dr. Tarabein's report regarding lifting, standing, stooping, etc., remained the same as in previous reports.

.

2

7.    Due to the confusing and inherently contradictory nature of the new restrictions, Plaintiff's supervisor, Norm Lewis, referred Plaintiff to Human Resources with regard to Dr. Tarabein's new orders, particularly the total restriction of right arm use.

8.    Rheem did not understand the new, confusing and apparently inconsistent, restrictions from Dr. Tarabein and, because of this, was unsure of how to identify an appropriate work assignment for Plaintiff.

9.    Rheem's Employee Relations Manager met with Plaintiff on August 11, 2004 and again on August 20, 2004 to request clarification of Dr. Tarabein's new orders. After one of those meetings, I believe the first one, Plaintiff came to my office and stated that she planned to apply for disability from the V.A. I knew Plaintiff already had a V.A. disability rating, so I interpreted Plaintiff's remark to mean that she was seeking a total disability rating. I also told Plaintiff that Rheem needed the clarification Mr. Mears requested before Rheem could identify a position for her. Plaintiff did not show any signs that she was upset by her meeting with Mr. Mears or by my statements.

10.    Plaintiff never provided any clarification of Dr. Tarabein's restrictions, nor did she ever return to work at Rheem. Rather, she applied for short-term disability benefits. She received those benefits for the period August 16 through October 3, 2004, but the insurer discontinued benefits effective October 4, 2004, on the grounds that Plaintiff had not provided sufficient medical documentation to establish a disability qualifying her for short-term disability benefits. Plaintiff appealed the denial of short-term disability benefits, but the insurer's appeal panel upheld the determination.

3

11.    Rheem delegates all aspects of eligibility determinations to its group insurance carrier and plays no role whatsoever in that process other than furnishing forms to the employee. At the time, Rheem's STD and LTD insurance was provided by Prudential Insurance Company of America, who was solely responsible for the decision to discontinue Plaintiff's benefits.

12.    Plaintiff remained on indefinite medical leave from August 13, 2004 forward. Rheem's Human Resources Department notified Plaintiff in writing on July 13, 2005, that her certification for intermittent FMLA leave had expired on June 28, 2005 and that no renewal certification had been submitted, and Rheem offered to assist Plaintiff in this regard. I am unaware of any attempt by Plaintiff to respond to this letter, or to have her expired FMLA certification renewed. Finally, on or about December 21, 2005, after Plaintiff had been on leave for approximately sixteen (16) months, Rheem terminated Plaintiff's employment because Plaintiff had abandoned her job and had no apparent intention of returning to work. As an administrative practice, Rheem routinely terminates employees who have been on leave for medical reasons for twelve consecutive months or more. This policy is contained in Rheem's Hourly Employee Handbook.

13.    I made the decision to terminate Plaintiff's employment. Rheem did not discharge Plaintiff due to her request for disability benefits, potential future entitlement to pension benefits, or because of her military service. Rather, Rheem discharged Plaintiff solely because she never returned to work after August 12, 2004, and never provided the clarification Mr. Mears and I requested. I am not aware of any attempts by Plaintiff to provide such clarification.

4

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June **6**, 2007.

_Alfred L. Gardner_
**ALFRED GARDNER**

Sworn to and subscribed before me on this the **6** day of June, 2007 .

_Leah Sable Kennedy Price_
Notary Public
My Commission Expires: May 13, 2009

[SEAL]

5

# EXHIBIT M

**Information Redacted Pursuant to General Order No. 2:04-mc-3228**



**Rheem Water Heaters**
2600 GUNTER PARK DRIVE EAST · MONTGOMERY, AL  36109-1413 · Phone (334) 260-1500

August 20, 2004

Ms. Donna Early

Dear Ms. Early,

On August 13, 2004 the writer informed you that the Company was not able, at this time, to accommodate the non-work connected restrictions outlined in correspondence you provided the company dated August 11, 2004. During the session on August 13, 2004 you were provided a copy of the company group disability insurance brochure, with instructions regarding the process for filing a claim.

It should be noted that during our conversation on August 13, 2004, the writer requested that you provide clarification of the right arm restriction noted in correspondence to the company dated August 11, 2004.

On August 20, 2004 you again met with the writer, and the request for clarification of the restriction noted in the August 11, 2004 correspondence was repeated. You indicated, in response to the writer's request for clarification, that you believed your physician had provided the required information.

Ms. Early, I would again request that you or your physician provide the company with medical clarification of the non-work connected restrictions cited in the August 11, 2004 correspondence, which totally restrict the use of your right arm; while allowing use of the right hand only to perform full duty sedentary tasks lifting 0-10 lbs, full duty light lifting tasks involving weights of 10-20lbs, and partial duty tasks lifting weights of 20-50lbs.

Please feel free to contact me at 334/260-1378, if there are questions related to this matter.

Sincerely,

Cal Mears
Employee Relations Manager

Cc: file

# EXHIBIT N

# Rheem Manufacturing Company

## *Montgomery Hourly Employees (Bands 5 to 11)*

### Short Term Disability Coverage

**Prudential** Financial

# Benefit Highlights

## SHORT TERM DISABILITY PLAN

This short term disability plan provides financial protection by paying a portion of your income while you are disabled. The amount you receive is based on the amount you earned before your disability began. Benefits start after the elimination period.

| | |
|---|---|
| **Program Date:** | March 1, 2003 |
| **Contract Holder:** | RHEEM MANUFACTURING COMPANY |
| **Group Contract Number:** | G-32770 |
| **Covered Classes:** | All active full-time hourly Employees located at Montgomery, Alabama who are classified as Bands 5 to 11 based on Employee's pay scale. |
| **Minimum Hours Requirement:** | Employees must be working at least 30 hours per week. |
| **Employment Waiting Period:** | You may need to work for your Employer for a continuous period before you become eligible for the coverage. This continuous period is the period extending from the Employee's date of employment to the first day of the month coinciding with or next following 30 days of continuous full-time employment. |
| **Elimination Period:** | 3 days for disability due to sickness. There is no elimination period for disability due to accident which begins while you are covered. |
| | **Benefits begin the day after the Elimination Period is completed.** |
| **Weekly Benefit:** | $210.00 |
| | Your benefit may be reduced by deductible sources of income and disability earnings. Some disabilities may not be covered under this plan. |
| **Maximum Period of Benefits:** | 26 weeks of benefits. |
| **Cost of Coverage:** | The short term disability plan is provided to you on a non-contributory basis. The entire cost of your coverage under the plan is being paid by your Employer. |

**The above items are only highlights of your coverage. For a full description please read this entire Group Insurance Certificate.**

# Table of Contents

BENEFIT HIGHLIGHTS - SHORT TERM DISABILITY PLAN ...................................................1

CERTIFICATE OF COVERAGE.............................................................................................3

GENERAL PROVISIONS .....................................................................................................4

SHORT TERM DISABILITY COVERAGE - GENERAL INFORMATION ......................................8

SHORT TERM DISABILITY COVERAGE - BENEFIT INFORMATION ........................................9

SHORT TERM DISABILITY - CLAIM INFORMATION.............................................................14

GLOSSARY.......................................................................................................................17

SUMMARY PLAN DESCRIPTION.........................................................................................20

The Prudential Insurance Company of America

# Certificate of Coverage

The Prudential Insurance Company of America (referred to as Prudential) welcomes you to the plan.

This is your Certificate of Coverage as long as you are eligible for coverage and you meet the requirements for becoming insured. You will want to read this certificate and keep it in a safe place.

Prudential has written this certificate in booklet format to be understandable to you. If you should have any questions about the content or provisions, please consult Prudential's claims paying office. Prudential will assist you in any way to help you understand your benefits.

The benefits described in this Certificate of Coverage are subject in every way to the entire Group Contract which includes this Group Insurance Certificate.

The coverage described in this Certificate provides disability income coverage only. It does NOT provide basic hospital, basic medical, or major medical insurance as defined by the New York State Insurance Department.

**Prudential's Address**

The Prudential Insurance Company of America
290 West Mount Pleasant Avenue
Livingston, New Jersey 07039

83500
CERT-1005

3

(S-2)

# General Provisions

## What Is the Certificate?

This certificate is a written document prepared by Prudential which tells you:

- the coverage to which you may be entitled;

- to whom Prudential will make a payment; and

- the limitations, exclusions and requirements that apply within a plan.

## General Definitions used throughout this certificate include:

*You* means a person who is eligible for Prudential coverage.

*We, us, and our* means The Prudential Insurance Company of America.

*Employee* means a person who is in active employment with the Employer for the minimum hours requirement.

*Insured* means any person covered under a coverage.

*Plan* means a line of coverage under the Group Contract.

## When Are You Eligible for Coverage?

If you are working for your Employer in a covered class, the date you are eligible for coverage is the later of:

- the plan's program date; and

- the day after you complete your *employment waiting period*.

*Employment waiting period* means the continuous period of time that you must be in a covered class before you are eligible for coverage under a plan. The period must be agreed upon by the Employer and Prudential.

## When Does Your Coverage Begin?

When your Employer pays the entire cost of your coverage under a plan, you will be covered at 12:01 a.m. on the date you are eligible for coverage, provided you are in *active employment* on that date.

When you and your Employer share the cost of your coverage under a plan, you will be covered at 12:01 a.m. on the latest of:

- the date you are eligible for coverage, if you apply for insurance on or before that date;

- the date you apply for insurance, if you apply within 31 days after your eligibility date; or

- the date Prudential approves your application, if **evidence of insurability** is required.

Evidence of insurability is required if you:

- are a late applicant, which means you apply for coverage more than 31 days after the date you are eligible for coverage; or

- voluntarily canceled your coverage and are reapplying; or

- apply after any of your coverage ended because you did not pay a required contribution; or

- have not met a previous evidence requirement to become insured under any plan the Employer has with Prudential.

An evidence of insurability form can be obtained from your Employer.

---

**Active employment** means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation. You must be working at least 30 hours per week.

Your worksite must be:

- your Employer's usual place of business;

- an alternate work site at the direction of your Employer other than your home unless clear specific expectations and duties are documented; or

- a location to which your job requires you to travel.

Normal vacation is considered active employment.

Temporary and seasonal workers are excluded from coverage.

Individuals whose employment status is being continued under a severance or termination agreement will not be considered in active employment.

**Evidence of insurability** means a statement of your medical history which Prudential will use to determine if you are approved for coverage. Evidence of insurability will be provided at your own expense.

---

## What If You Are Absent from Work on the Date Your Coverage Would Normally Begin?

If you are absent from work due to injury, sickness, temporary layoff or leave of absence your coverage will begin on the date you return to active employment.

## Once Your Coverage Begins, What Happens If You Are Temporarily Not Working?

If you are on a **layoff**, and if premium is paid, you will be covered for a period of 24 months from the date in which your layoff begins.

If you are on a **leave of absence**, and if premium is paid, you will be covered for a period of 24 months from the date in which your leave of absence begins.

With respect to leave under the federal Family and Medical Leave Act of 1993 (FMLA) or similar state law, continuation of coverage under the plan during such leave will be governed by your Employer's policies regarding continuation of such coverage for non-FMLA leave purposes and any applicable law.  Continuation of such coverage pursuant to this provision is contingent upon Prudential's timely receipt of premium payments and written confirmation of your FMLA leave by your Employer.

If you are working less than 30 hours per week, for reasons other than disability, and if premium is paid, you will be covered to the end of the month following the month in which your reduced hours begin.

*Layoff* or *leave of absence* means you are temporarily absent from active employment for a period of time that has been agreed to in advance in writing by your Employer, other than for reasons in connection with any severance or termination agreement.  Your normal vacation time, any period of disability or FMLA leave is not considered a temporary layoff.

## When Will Changes to Your Coverage Take Effect?

Once your coverage begins, any increased or additional coverage will take effect immediately upon the effective date of the change, if you are in active employment or if you are on a covered layoff or leave of absence.  If you are not in active employment due to injury or sickness, any increased or additional coverage will begin on the date you return to active employment.  Any decrease in coverage will take effect immediately upon the effective date of the change.  Neither an increase nor a decrease in coverage will affect a *payable claim* that occurs prior to the increase or decrease.

*Payable claim* means a claim for which Prudential is liable under the terms of the Group Contract.

## When Does Your Coverage End?

Your coverage under the Group Contract or a plan ends on the earliest of:

- the date the Group Contract or a plan is canceled;

- the date you are no longer a member of the covered classes;

- the date your covered class is no longer covered;

- the last day of the period for which you made any required contributions;

- the last day you are in active employment except as provided under the temporary absence from work provisions; or

- the date you are no longer in active employment due to a disability that is not covered under the plan.

## Does the Coverage under a Plan Replace or Affect any Workers' Compensation or State Disability Insurance?

The coverage under a plan does not replace or affect the requirements for coverage by workers' compensation or state disability insurance.

## Does Your Employer Act as Prudential's Agent?

For purposes of the Group Contract, your Employer acts on its own behalf. Under no circumstances will your Employer be deemed the agent of Prudential.

## Does This Certificate Address Any Rights to Other Benefits or Affect Your Employment with Your Employer?

This certificate sets forth only the terms and conditions for coverage and receipt of benefits for Short Term Disability. It does not address and does not confer any rights, or take away any rights, if any, to other benefits or employment with your Employer. Your rights, if any, to other benefits or employment are solely determined by your Employer. Prudential plays no role in determining, interpreting, or applying any such rights that may or may not exist.

## How Can Statements Made in Your Application for this Coverage be Used?

Prudential considers any statements you or your Employer make in a signed application for coverage a representation and not a warranty. If any of the statements you or your Employer make are not complete and/or not true at the time they are made, we can:

- reduce or deny any claim; or
- cancel your coverage from the original effective date.

If a statement is used in a contest, a copy of that statement will be furnished to you or, in the event of your death or incapacity, to your eligible survivor or personal representative.

A statement will not be contested after the amount of insurance has been in force, before the contest, for at least two years during your lifetime.

We will use only statements made in a signed application as a basis for doing this.

If the Employer gives us information about you that is incorrect, we will:

- use the facts to decide whether you have coverage under the plan and in what amounts; and
- make a fair adjustment of the premium.

# Short Term Disability Coverage

## GENERAL INFORMATION

### Who Is in the Covered Class(es) for the Insurance?

The Covered Classes are:

All active full-time hourly Employees located at Montgomery, Alabama who are classified as Bands 5 to 11 based on Employee's pay scale.

### How Many Hours Must You Work to be Eligible for Coverage?

You must be working at least 30 hours per week.

### What Is Your Employment Waiting Period?

You may need to work for your Employer for a continuous period before you become eligible for the coverage. This continuous period is the period extending from the Employee's date of employment to the first day of the month coinciding with or next following 30 days of continuous full-time employment.

### Who Pays for Your Coverage?

Your coverage is paid for by your Employer.

83500
CGI-STD-1001

8

(S-3) (32770-10)

# Short Term Disability Coverage

## BENEFIT INFORMATION

### How Long Must You Be Disabled Before Your Benefits Begin?

You must be continuously disabled through your *elimination period*. Prudential will treat your disability as continuous if your disability stops for 5 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period for disability due to a sickness which begins while you are covered is 3 days. There is no elimination period for disability due to accident which begins while you are covered.

*Elimination period* means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Prudential.

### How Does Prudential Define Disability?

You are disabled when Prudential determines that:

- you are unable to perform the *material and substantial duties* of your *regular occupation* due to your *sickness* or *injury*; and

- you are not working at any job.

The loss of a professional or occupational license or certification does not, in itself, constitute disability.

We may require you to be examined by doctors, other medical practitioners or vocational experts of our choice. Prudential will pay for these examinations. We can require examinations as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Prudential Representative. Refusal to be examined or interviewed may result in denial or termination of your claim.

*Material and substantial duties* means duties that:

- are normally required for the performance of your regular occupation; and

- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

*Regular occupation* means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

*Sickness* means any disorder of your body or mind, but not an injury; pregnancy including abortion, miscarriage or childbirth. Disability must begin while you are covered under the plan.

*Injury* means a bodily injury that is the direct result of an accident and not related to any other cause. Injury which occurs before you are covered under the plan will be treated as a sickness. Disability must begin while you are covered under the plan.

## When Will You Begin to Receive Disability Payments?

You will begin to receive payments when we approve your claim, providing the elimination period has been met. We will send you a payment each week for any period for which Prudential is liable.

## How Much Will Prudential Pay If You Are Disabled?

We will follow this process to figure out your *weekly payment*:

1. The maximum *weekly benefit* is $210.00. This is your *gross disability payment*.

2. Subtract from your gross disability payment any *deductible sources of income*.

That amount figured in item 2 is your weekly payment.

After the elimination period, if you are disabled for less than 1 week, we will send you 1/7th of your payment for each day of disability.

*Weekly payment* means your payment after any deductible sources of income have been subtracted from your gross disability payment.

*Weekly benefit* means the total benefit amount for which you are insured under this plan subject to the maximum benefit.

*Gross disability payment* means the benefit amount before Prudential subtracts deductible sources of income.

*Deductible sources of income* means income from deductible sources listed in the plan that you receive or are entitled to receive while you are disabled. This income will be subtracted from your gross disability payment.

## What Are Your Weekly Earnings?

Weekly earnings means your gross weekly income from your Employer in effect just prior to your date of disability. It does not include income received from commissions, bonuses, overtime pay, any other extra compensation, or income received from sources other than your Employer.

## What Will We Use to Determine Weekly Earnings If You Become Disabled During a Covered Layoff or Leave of Absence?

If you become disabled while you are on a covered layoff or leave of absence, we will use your weekly earnings from your Employer in effect just prior to the date your absence begins.

## What Are Deductible Sources of Income?

Prudential will deduct from your gross disability payment the following deductible sources of income:

83500
CBI-STD-1034

10

(32770-10)

1.  The amount that you receive as loss of time benefits under:

    (a)  a workers' compensation law;

    (b)  an occupational disease law; or

    (c)  any other *act* or *law* with similar intent.

2.  The amount that you receive or are entitled to receive as loss of time disability income payments under any state compulsory benefit act or law.

Prudential will only subtract deductible sources of income which are payable as a result of the same disability.

*Law or act* means the original enactment of the law or act and all amendments.

## What If Subtracting Deductible Sources of Income Results in a Zero Benefit? (Minimum Benefit)

The minimum weekly payment is $210.00.

Prudential may apply this amount toward an outstanding overpayment.

## What If Prudential Determines that You May Qualify for Deductible Income Benefits?

If we determine that you may qualify for benefits under item 2 in the deductible sources of income section, we will estimate your entitlement to these benefits. We can reduce your payment by the estimated amount if such benefits have not been awarded.

However, we will NOT reduce your payment by the estimated amount under item 2 if you:

- apply for the benefits;

- appeal any denial to all administrative levels Prudential feels are necessary; and

- sign Prudential's Reimbursement Agreement form. This form states that you promise to pay us any overpayment caused by an award.

If your payment has been reduced by an estimated amount, your payment will be adjusted when we receive proof:

- of the amount awarded; or

- that benefits have been denied and all appeals Prudential feels are necessary have been completed. In this case, a lump sum refund of the estimated amount will be made to you.

## How Long Will Prudential Continue to Send You Payments?

Prudential will send you a payment each week up to the *maximum period of payment*. Your maximum period of payment is 26 weeks during a continuous period of disability.

We will stop sending you payments and your claim will end on the earliest of the following:

1.  The end of the maximum period of payment.

83500
CBI-STD-1034

(32770-10)

2.  The date you are no longer disabled under the terms of the plan.

3.  The date you fail to submit proof of continuing disability satisfactory to Prudential.

4.  The date you die.

---

*Maximum period of payment* means the longest period of time Prudential will make payments to you for any one period of disability.

---

## What Disabilities Are Not Covered Under Your Plan?

Your plan does not cover any disabilities caused by, contributed to by, or resulting from your:

- intentionally self-inflicted injuries;
- active participation in a riot; or
- commission of a crime for which you have been convicted under state or federal law.

Your plan does not cover a disability which:

- begins within 12 months of the date your coverage under the plan becomes effective; and

- is due to a pre-existing condition.

But, the 12 month period will be reduced if:

- you were covered under a previous short term disability plan;

- the coverage was continuous to a date not more than 60 days prior to the date you entered a Covered Class under Prudential's Group Contract; and

- that coverage was determined by Prudential to be substantially similar to coverage under this Group Contract.

In this case, it will be reduced by the time period during which you were continuously covered under the previous plan.

Your plan does not cover a disability due to war, declared or undeclared, or any act of war.

## What Is a Pre-Existing Condition?

You have a pre-existing condition if:

1.  You received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines, or followed treatment recommendation in the 3 months just prior to your effective date of coverage; or

2.  You had symptoms for which an ordinarily prudent person would have consulted a health care provider in the 3 months just prior to your effective date of coverage.

## What Happens If You Return to Work Full Time and You Become Disabled Again?

1.  If your current disability is related or due to the same cause(s) as your prior disability for which Prudential made a payment:

83500
CBI-STD-1034

(32770-10)

Prudential will treat your current disability as part of your prior claim and you will not have to complete another elimination period if you return to active employment for your Employer on a full time basis for 2 consecutive weeks or less. Your disability will be subject to the same terms of the plan as your prior claim.

2.   If your current disability is unrelated to your prior disability for which Prudential made a payment:

Prudential will treat your current disability as a new claim and you will have to complete another elimination period. Your disability will be subject to all of the plan provisions.

If you become covered under any other group short term disability plan, you will not be eligible for payments under the Prudential plan.

# Short Term Disability Coverage

## CLAIM INFORMATION

### When Do You Notify Prudential of a Claim?

We encourage you to notify us of your claim as soon as possible, so that a claim decision can be made in a timely manner. Written notice of a claim should be sent within 30 days after the date your disability begins. However, you must send Prudential written proof of your claim no later than 90 days after your elimination period ends. If it is not possible to give proof within 90 days, it must be given as soon as reasonably possible..

The claim form is available from your Employer, or you can request a claim form from us. If you do not receive the form from Prudential within 15 days of your request, send Prudential written proof of claim without waiting for the form.

You must notify us immediately when you return to work in any capacity.

### How Do You File a Claim?

You and your Employer must fill out your own section of the claim form and then give it to your attending doctor. Your doctor should fill out his or her section of the form and send it directly to Prudential.

### What Information Is Needed as Proof of Your Claim?

Your proof of claim, provided at your expense, must show:

(1) That you are under the *regular care* of a *doctor*.

(2) The appropriate documentation of your weekly earnings.

(3) The date your disability began.

(4) Appropriate documentation of the disabling disorder.

(5) The extent of your disability, including restrictions and limitations preventing you from performing your regular occupation.

(6) The name and address of any *hospital or institution* where you received treatment, including all attending doctors.

(7) The name and address of any doctor you have seen.

We may request that you send proof of continuing disability, satisfactory to Prudential, indicating that you are under the regular care of a doctor. This proof, provided at your expense, must be received within 30 days of a request by us.

In some cases, you will be required to give Prudential authorization to obtain additional medical information, and to provide non-medical information as part of your proof of claim, or proof of continuing disability. Prudential will deny your claim or stop sending you payments if the appropriate information is not submitted.

***Regular care*** means:

- you personally visit a doctor as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and

- you are receiving the most appropriate treatment and care, which conforms with generally accepted medical standards, for your disabling condition(s) by a doctor whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

***Doctor*** means:

a person who is performing tasks that are within the limits of his or her medical license; and

- is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or

- has a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or

- is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

Prudential will not recognize any relative including, but not limited to, you, your spouse, or a child, brother, sister, or parent of you or your spouse as a doctor for a claim that you send to us.

***Hospital or institution*** means an accredited facility licensed to provide care and treatment for the condition causing your disability.

## Who Will Prudential Make Payments To?

Prudential will make payments to you.

## What Happens If Prudential Overpays Your Claim?

Prudential has the right to recover any overpayments due to:

- fraud;

- any error Prudential makes in processing a claim; and

- your receipt of deductible sources of income.

You must reimburse us in full. We will determine the method by which the repayment is to be made.

Prudential will not recover more money than the amount we paid you.

## What Are the Time Limits for Legal Proceedings?

You can start legal action regarding your claim 60 days after proof of claim has been given and up to 3 years from the time proof of claim is required, unless otherwise provided under federal law.

## How Will Prudential Handle Insurance Fraud?

Prudential wants to ensure you and your Employer do not incur additional insurance costs as a result of the undermining effects of insurance fraud. Prudential promises to focus on all means necessary to support fraud detection, investigation and prosecution.

In some jurisdictions, if you knowingly and with intent to defraud Prudential, file an application or a statement of claim containing any materially false information or conceal for the purpose of misleading, information concerning any fact material thereto, you commit a fraudulent insurance act, which is a crime and subjects you to criminal and civil penalties. These actions will result in denial or termination of your claim, and, where such laws apply, are subject to prosecution and punishment to the full extent under any applicable law. Prudential will pursue all appropriate legal remedies in the event of insurance fraud.

83500
CCLM-STD-1009

(S-1)

# Glossary

**Active employment** means you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation. You must be working at least 30 hours per week.

Your worksite must be:

- your Employer's usual place of business;

- an alternate work site at the direction of your Employer other than your home unless clear specific expectations and duties are documented; or

- a location to which your job requires you to travel.

Normal vacation is considered active employment.

Temporary and seasonal workers are excluded from coverage.

Individuals whose employment status is being continued under a severance or termination agreement will not be considered in active employment.

**Contract holder** means the Employer to whom the Group Contract is issued.

**Deductible sources of income** means income from deductible sources listed in the plan that you receive or are entitled to receive while you are disabled. This income will be subtracted from your gross disability payment.

**Doctor** means:

a person who is performing tasks that are within the limits of his or her medical license; and

- is licensed to practice medicine and prescribe and administer drugs or to perform surgery; or

- has a doctoral degree in Psychology (Ph.D. or Psy.D.) whose primary practice is treating patients; or

- is a legally qualified medical practitioner according to the laws and regulations of the governing jurisdiction.

Prudential will not recognize any relative including but not limited to you, your spouse, or a child, brother, sister, or parent of you or your spouse as a doctor for a claim that you send to us.

**Elimination period** means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Prudential.

**Employee** means a person who is in active employment with the Employer for the minimum hours requirement.

**Employer** means the Contract Holder, and includes any division, subsidiary or affiliate who is reported to Prudential in writing for inclusion under the Group Contract, provided that Prudential has approved such request.

**Employment waiting period** means the continuous period of time that you must be in a covered class before you are eligible for coverage under a plan  The period must be agreed upon by the Employer and Prudential.

83500
CGL-1015

(32770-10)

*Evidence of insurability* means a statement of your medical history which Prudential will use to determine if you are approved for coverage. Evidence of Insurability will be provided at your own expense.

*Gross disability payment* means the benefit amount before Prudential subtracts deductible sources of income.

*Hospital or institution* means an accredited facility licensed to provide care and treatment for the condition causing your disability.

*Injury* means a bodily injury that is the direct result of an accident and not related to any other cause. Injury which occurs before you are covered under the plan will be treated as a sickness. Disability must begin while you are covered under the plan.

*Insured* means any person covered under a coverage.

*Law or act* means the original enactment of the law or act and all amendments.

*Layoff or leave of absence* means you are temporarily absent from active employment for a period of time that has been agreed to in advance in writing by your Employer, other than for reasons in connection with any severance or termination agreement. Your normal vacation time, any period of disability or FMLA leave is not considered a temporary layoff.

*Material and substantial duties* means duties that:

- are normally required for the performance of your regular occupation; and

- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

*Maximum period of payment* means the longest period of time Prudential will make payments to you for any one disability.

*Payable claim* means a claim for which Prudential is liable under the terms of the Group Contract.

*Plan* means a line of coverage under the Group Contract.

*Pre-existing condition* means:

- a condition for which you received medical treatment, consultation, care or services including diagnostic measures, took prescribed drugs or medicines or followed treatment recommendation for your condition during the given period of time as stated in the plan; or

- you had symptoms for which an ordinarily prudent person would have consulted a health care provider during the given period of time as stated in the plan.

83500
CGL-1015

(32770-10)

*Regular care* means:

- you personally visit a doctor as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s); and

- you are receiving the most appropriate treatment and care, which conforms with generally accepted medical standards, for your disabling condition(s) by a doctor whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

*Regular occupation* means the occupation you are routinely performing when your disability occurs. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

*Sickness* means any disorder of your body or mind, but not an injury; pregnancy including abortion, miscarriage or childbirth. Disability must begin while you are covered under the plan.

*We, us, and our* means The Prudential Insurance Company of America.

*Weekly benefit* means the total benefit amount for which an employee is insured under this plan subject to the maximum benefit.

*Weekly earnings* means your gross weekly income from your Employer as defined in the plan.

*Weekly payment* means your payment after any deductible sources of income have been subtracted from your gross disability payment.

*You* means a person who is eligible for Prudential coverage.

**The Summary Plan Description**

**is not part of the**

**Group Insurance Certificate.**

**It has been provided by**

**your Employer and included in**

**your Booklet-Certificate**

**upon the Employer's request.**

# SUMMARY PLAN DESCRIPTION

This booklet is intended to comply with the disclosure requirements of the regulations issued by the U.S. Department of Labor under the Employee Retirement Income Security Act (ERISA) of 1974. ERISA requires that you be given a "Summary Plan Description" which describes the plan and informs you of your rights under it.

**Plan Name**

Rheem Manufacturing Company
Short Term Disability coverage for All active full-time hourly Employees located at Montgomery, Alabama who are classified as Bands 5 to 11 based on Employee's pay scale

**Type of Plan**

Employee Welfare Benefit plan providing Short Term Disability coverage

**Plan Sponsor**

Rheem Manufacturing Company
405 Lexington Avenue
New York, New York  10174

**Employer Identification Number**

13-3254554

**Plan Number**

501

**Plan Administrator**

Rheem Manufacturing Company
Attention: Human Resources
405 Lexington Avenue
New York, New York  10174

**Agent for Service of Legal Process**

Rheem Manufacturing Company
Attention: Human Resources
405 Lexington Avenue
New York, New York  10174

**Plan's Fiscal Year Ends**

December 31

**Continuation of the Plan**

It is intended that this plan will be continued for an indefinite period of time; however, the Company reserves the right to change or terminate the plan or change the insurance carrier, in accordance with the law.

SPD

(32770-10)

**Plan Benefits Provided by**

The Prudential Insurance Company of America
Prudential Plaza
Newark, New Jersey 07102

This Group Contract underwritten by The Prudential Insurance Company of America provides insured benefits under your Employer's ERISA plan(s). The Prudential Insurance Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious.

**Loss of Benefits**

You must continue to be a member of the class to which this plan pertains and continue to make any of the contributions agreed to when you enroll. Failure to do so may result in partial or total loss of your benefits. It is intended that this plan will be continued for an indefinite period of time. But, the employer reserves the right to change or terminate the plan. This booklet describes your rights upon termination of the plan.

**Claim Procedures**

1. **Determination of Benefits**

   Prudential shall notify you of the claim determination within 45 days of the receipt of your claim. This period may be extended by 30 days if such an extension is necessary due to matters beyond the control of the plan. A written notice of the extension, the reason for the extension and the date by which the plan expects to decide your claim, shall be furnished to you within the initial 45-day period. This period may be extended for an additional 30 days beyond the original 30-day extension if necessary due to matters beyond the control of the plan. A written notice of the additional extension, the reason for the additional extension and the date by which the plan expects to decide on your claim, shall be furnished to you within the first 30-day extension period if an additional extension of time is needed. However, if a period of time is extended due to your failure to submit information necessary to decide the claim, the period for making the benefit determination by Prudential will be tolled from the date on which the notification of the extension is sent to you until the date on which you respond to the request for additional information.

   If your claim for benefits is denied, in whole or in part, you or your authorized representative will receive a written notice from Prudential of your denial. The notice will be written in a manner calculated to be understood by you and shall include:

   (a) the specific reason(s) for the denial,

   (b) references to the specific plan provisions on which the benefit determination was based,

   (c) a description of any additional material or information necessary for you to perfect a claim and an explanation of why such information is necessary,

   (d) a description of the Prudential's appeals procedures and applicable time limits, including a statement of your right to bring a civil action under section 502(a) of ERISA following your appeals, and

   (e) if an adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, an explanation of the scientific or clinical judgment for the determination will be provided free of charge upon request.

**2. Appeals of Adverse Determination**

If your claim for benefits is denied or if you do not receive a response to your claim within the appropriate time frame (in which case the claim for benefits is deemed to have been denied), you or your representative may appeal your denied claim in writing to Prudential within 180 days of the receipt of the written notice of denial or 180 days from the date such claim is deemed denied. You may submit with your appeal any written comments, documents, records and any other information relating to your claim. Upon your request, you will also have access to, and the right to obtain copies of, all documents, records and information relevant to your claim free of charge.

A full review of the information in the claim file and any new information submitted to support the appeal will be conducted by the Prudential Appeals Review Unit. The claim decision will be made by a member of the Prudential Claims Management Team. The Prudential Appeals Review Unit and Claims Management Team members are made up of individuals not involved in the initial benefit determination. This review will not afford any deference to the initial benefit determination.

The Prudential Appeals Review Unit shall make a determination on your claim appeal within 45 days of the receipt of your appeal request. This period may be extended by up to 90 days if Prudential determines that special circumstances require an extension of time. A written notice of the extension, the reason for the extension and the date that the Prudential Appeals Review Unit expects to render a decision shall be furnished to you within the initial 45-day period. However, if the period of time is extended due to your failure to submit information necessary to decide the appeal, the period for making the benefit determination will be tolled from the date on which the notification of the extension is sent to you until the date on which you respond to the request for additional information.

If the claim on appeal is denied in whole or in part, you will receive a written notification from Prudential of the denial. The notice will be written in a manner calculated to be understood by the applicant and shall include:

(a) the specific reason(s) for the adverse determination,

(b) references to the specific plan provisions on which the determination was based,

(c) a statement that you are entitled to receive upon request and free of charge reasonable access to, and make copies of, all records, documents and other information relevant to your benefit claim upon request,

(d) a description of Prudential's review procedures and applicable time limits,

(e) a statement that you have the right to obtain upon request and free of charge, a copy of internal rules or guidelines relied upon in making this determination, and

(f) a statement describing any appeals procedures offered by the plan, and your right to bring a civil suit under ERISA.

If a decision on appeal is not furnished to you within the time frames mentioned above, the claim shall be deemed denied on appeal.

If the appeal of your benefit claim is denied or if you do not receive a response to your appeal within the appropriate time frame (in which case the appeal is deemed to have been denied), you or your representative may make a second appeal of your denial in writing to Prudential within 180 days of the receipt of the written notice of denial or 180 days from the date such claim is deemed denied. You may submit with your second appeal any written comments, documents, records and any other information relating to your claim. Upon your request, you will also have access to, and the right to obtain copies of, all documents, records and information relevant to your claim free of charge.

Upon receipt of a second appeal, the Prudential Appeals Review Unit will again conduct a full review of the claim file and any additional information submitted. The claim decision will be made by a member of the Prudential Senior Claims Management Team. The Appeals Unit and Senior Claims Management Team member would not have been involved in the initial benefit determination or in the first appeal.

The Prudential Appeals Review Unit shall make a determination on your second claim appeal within 45 days of the receipt of your appeal request. This period may be extended by up to 90 days if Prudential determines that special circumstances require an extension of time. A written notice of the extension, the reason for the extension and the date by which the Appeals Review Unit expects to render a decision shall be furnished to you within the initial 45-day period. However, if the period of time is extended due to your failure to submit information necessary to decide the appeal, the period for making the benefit determination will be tolled from the date on which the notification of the extension is sent to you until the date on which you respond to the request for additional information.

If the claim on appeal is denied in whole or in part for a second time, you will receive a written notification from Prudential of the denial. The notice will be written in a manner calculated to be understood by the applicant and shall include the same information that was included in the first adverse determination letter as well as your right to appeal the decision to Prudential's Appeal Committee. If a decision on appeal is not furnished to you within the time frames mentioned above, the claim shall be deemed denied upon appeal.

If the second appeal of your benefit claim is denied or if you do not receive a response to your second appeal within the appropriate time frame (in which case the appeal is deemed to have been denied), you or your authorized representative may make a third appeal of your denial in writing to the Prudential Appeals Committee within 180 days of the receipt of the written notice of denial or 180 days from the date such claim is deemed denied. You may submit with your third appeal any written comments, documents, records and any other information relating to your claim. Upon your request, you will also have access to, and the right to obtain copies of, all documents, records and information relevant to your claim free of charge.

Upon receipt of a third appeal, the claim will be directed to Prudential's Appeals Committee by a member of the Prudential Senior Claims Management Team. This Committee will be composed of three members of the Senior Claims Management Team who have not been involved in any previous appeals.

The Prudential Appeals Committee shall make a determination on your third claim appeal within 45 days of the receipt of your appeal request. This period may be extended by up to 90 days if Prudential determines that special circumstances require an extension of time. A written notice of the extension, the reason for the extension and the date by which the Appeals Review Unit expects to render a decision shall be furnished to you within the initial 45-day period. However, if the period of time is extended due to your failure to submit information necessary to decide the appeal, the period for making the benefit determination will be tolled from the date on which the notification of the extension is sent to you until the date on which you respond to the request for additional information.

Your decision to submit a benefit dispute to the third level of appeal has no effect on your right to any other benefits under this plan. If you elect to initiate a lawsuit without submitting to a third level of appeal, the plan waives any right to assert that you failed to exhaust administrative remedies. If you elect to submit the dispute to the third level of appeal, the plan agrees that any statute of limitations or other defense based on timeliness is tolled during the time that the appeal is pending.

If the claim on appeal is denied in whole or in part for a third time, you will receive a written notification from Prudential of the denial. The notice will be written in a manner calculated to be understood by the applicant and shall include the same information that was included in the first adverse determination letter. If a decision on appeal is not furnished to you within the time frames mentioned above, the claim shall be deemed denied on appeal.

## Rights and Protections

As a participant in this plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

### Receive Information about Your Plan and Benefits

- Examine, without charge, at the plan administrator's office and at other specified locations, such as worksites and union halls, all documents governing the plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

- Obtain, upon written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The plan administrator may make a reasonable charge for the copies.

- Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

### Prudent Actions by Plan Fiduciaries

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Assistance with Your Questions**

If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, DC 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.

SPD                                                                                                                (32770-10)

# EXHIBIT O

# Prudential 🌐 Financial

Melanie Coddington
Team Manager

The Prudential Insurance Company Of America
Disability Management Services
PO Box 13480
Philadelphia, PA  19101

Phone:  (800) 842-1718  Ext: 7785
Fax: (877) 889-4885
Hours:  07:00 AM  03:00 PM

January 27, 2005

Rheem Sales Company
Jeanie Golia
2600 Gunter Park Drive East
Montgomery, AL  36109

Claimant: Donna L Early
Control #/Br: 32770 / 00015
Claim #: 10698778
Date of Birth: 02/20/1968

||.|||.|||....||||...||....||||

Dear Ms. Golia:

We have completed our review of Ms. Early's first request for reconsideration of our decision to terminate your claim for Short Term Disability (STD) benefits under the Group Policy #32770 issued to Rheem Manufacturing Company.  We have determined that our decision was appropriate and have upheld our decision to terminate her your claim for STD benefits.

Ms. Early has been advised of our decision in a separate letter and also of her right to appeal.

If you have any questions, please contact me at (800) 842-1718, extension 7785.

Sincerely,

*Melanie Coddington*

Melanie Coddington
Team Manager

# EXHIBIT P

**Information Redacted Pursuant to General Order No. 2:04-mc-3228**



# APPLICATION FOR ADMISSION

**Capps College**
3736 Atlanta Highway
Montgomery, AL 36109
(344) 272-3857

CONFIDENTIAL

Office Use Only

FC: Q    Source: NP
Rep: AJ    Prgm Code: MAD
Start Date: 11-29-04

Amt. $25°° Rcpt: 1422
$25.00 Application Fee

Applicants to Capps College are selected in accordance with non-discriminatory practices.

Applicant's Name: **Donna    Laihny    Early**    SSN:
                    First       Middle/Maiden    Last

Address: _____ City: _____ State ____ Zip ____

Home Phone: (331) _____ Date of Birth: _____ Age: ____

Sex: ☐ Male  ☑ Female    Marital Status: ☐ Married  ☐ Single    Number of Children  2

Do you have any physical handicaps that would prohibit or exclude you from training or working as a medical professional?

☐ Yes  ☑ No    If YES, please explain: _____

---

Name, Address, and Phone For Your Parent, Spouse, or Nearest Relative:    ☑ Parent    ☐ Spouse    ☐ Relative

Name: **Lillie Strother**

Address: _____ ___ _____ Home Phone: _____
                    State ___ Zip ___    Work Phone: ( ) _____

---

## EDUCATIONAL BACKGROUND

High School: **Monroeville County High**    City: **Monroe**    State: **Al**

Did you Graduate? ☑ Yes  What year? **86**    ☐ No    ☐ GED  What Year? ____    Where? ____

Please List ALL Schools or Colleges You Have Attended Since High School:

| Name of School | Address | Dates Attended | Diploma / Certificate |
|---|---|---|---|
| Ed. Beid | Evergreen | 86-87 | N/A |

---

**NOTICE.** As a prerequisite for employment in the medical profession, many, if not all, employers require drug screening and a background investigation. A criminal background, drug addiction, or violation of any laws could prevent you from gaining employment in a medical or allied health company. Therefore, all applicants for admission to a medical training program are required to truthfully and completely answer the following questions.

1. Are you now or have you ever been addicted to the use of alcohol or any other drugs?    ☐ Yes  ☑ No
If YES, explain:
2. Have you ever been under observation or treatment for mental/emotional disorders, alcoholism, or drug addiction?    ☐ Yes  ☑ No
If YES, explain:
3. Have you ever been charged with or arrested for a violation of any law (misdemeanor or felony)?    ☐ Yes  ☑ No
If YES, explain:
4. Have you ever been convicted of or pled no contest to a charge of drug possession, drug use, or drug distribution?    ☐ Yes  ☑ No
If YES, explain:
5. Have you ever been convicted of or pled no contest to a charge of any sex related offense or crime?    ☐ Yes  ☑ No
If YES, explain:
6. Have you ever been convicted of or pled no contest to any other misdemeanor or felony charges?    ☐ Yes  ☑ No
If YES, explain:
7. Do you currently have any physical health problems?    ☑ Yes  ☐ No
If YES, explain: Right Leg L4-L5 Lower Back Right Front swell
8. Do you currently have any emotional or psychological health problems?    ☐ Yes  ☑ No
If YES, explain:

---

Capps College Reserves The Right To Refuse Admission To Any Applicant We Feel May Not Uphold Or Meet Standards Set By The Medical Profession.

Continued on Reverse Side...

**Application For Admission**
Page 2 of 2

### PLEASE ANSWER THE FOLLOWING QUESTION.

There are many reasons for choosing a medical career. Some are obvious, like a good income, steady employment, good working hours, and a professional environment. Other reasons are personal. Think for a few minutes and reflect on why you want a career in the medical field. *Now, in the space below, please write a paragraph about yourself and why you want to become a medical professional.*

I always like to help people out, I'm a very caring + Responable person. I care about sick people, and wish every thing goes well I want to help people in every way, My last Job was not my best. Since I've been in the military I've Enjoy work with the Health and medical part of military, By going in the medical field I've feel as I've begin a New start in life for me and children. I feel I can benefit some one like or help someone out, I pray and ask God for guidness throw this all. I Need a New start,

**This application must be completed in full and in detail, signed and dated by the applicant.**

A $25.00 non-refundable application fee payable to Capps College is required with the application. I understand that the information provided on this application is strictly confidential and is for the sole use of the professional staff of Capps College in evaluating my acceptance to attend Capps College and that falsification or omission of any information on this application will be grounds for denial of admission or dismissal from school. To determine my qualifications for admission, I hereby authorize Capps College to investigate the contents of this application and to run a credit report or background check, if necessary. I also give my permission to check my references and to obtain copies of academic records from other schools that I have attended. If accepted to attend Capps College, I also agree to uphold the school's code of conduct and professionalism standards, all school rules and regulations, and the principles of the medical profession. By my signature below, I hereby certify that, to the best of my knowledge, all information provided in this application is true, accurate and complete.

Signature of Applicant: _Anna R Emily_    Date Signed: _1 Nov 04_

-FOR OFFICE USE ONLY-

☑ RECOMMENDED For Admission          ☐ NOT Recommended For Admission    Reason: ___
By: _Andrea Johnson_  Date Signed: _11-4-04_

☑ ACCEPTED For Admission          ☐ NOT Accepted For Admission    Reason: ___
By: _Sheila Brown_  Date Signed: _11-4-04_

**CAPPS COLLEGE**

# EXHIBIT Q

7/13/2005

DonnaEarly
004624

Dear Donna Early,

This serves to inform you that we did not receive your recertification for your approved Family Medical Leave and as a result, <u>you have no more approved FMLA under this condition</u>. Please note that the law requires recertification either annually or upon the expiration date of the leave. If you would like to discuss this matter, I will be happy to assist you in any way that I can.

Sincerely,

Human Resources

Enclosure
CC: FMLA File

# EXHIBIT R

injured worker. Those appointments are all very necessary for the recuperation of any injured employee. Any and all appointments that are related to each specific injury are to be kept by the employee.

If the appointment can only be scheduled during the employees work shift, the employee is to report to the medical center to sign out for their appointment.

The employee is required to report back to the medical center immediately after his/her appointment with certification of the treatment which has been signed, dated, and time spent at the treatment facility.

## MEDICAL LEAVES

Legitimate illnesses do not normally jeopardize your employment status with the company unless it becomes so frequent as to reduce your value as a productive employee.

If you are going to be out due to your own personal illness/medical leave, it is your responsibility to get word to your supervisor on the first day of your absence. If you are going to be out for three (3) days or more, you must have certification from a health care provider of the need to be out of work. In order not to have an absentee occurrence charged against you, your certification must be effective on the first day you call in. In order to be permitted to return to work you must have a statement from your health care provider notifying the medical center that you are fit for normal/regular duty with no restrictions.

Employees who are eligible for medical leaves are normally granted such leave for the period of disability, up to one (1) year. Employees with less than one year of service will only be granted medical leaves for a period equal to the number of weeks they have been in the employ of the Company prior to the leave commencing.

It is important to note that in some circumstances an employees medical leave may be covered under and run concurrently with the family medical leave act explained below. Some employee medical leaves may also qualify for weekly disability benefits. Be sure to check with the Human Resources Department for the appropriate information and forms.

44

# EXHIBIT S

**Information Redacted Pursuant to General Order No. 2:04-mc-3228**



**Rheem Water Heaters**

2600 GUNTER PARK DRIVE EAST · MONTGOMERY, AL  36109-1413 · Phone (334) 260-1500

January 3, 2006

Donna Early

Dear Donna:

Per our phone conversation, this letter confirms your resignation termination of employment effective Wednesday, December 21, 2005.

You have been on a leave of absence from work at Rheem since August 12, 2004 when you were requested to provide medical clarification of your non-work related restrictions, which you claimed limited your ability to perform tasks required of your job at Rheem.  In October 2004, your claim for short term disability benefits was denied by the insurer due to lack of sufficient medical documentation to support the claim.

It is now well more than a year since you went on leave of absence status and you still have not provided Rheem with medical clarification of your restrictions, nor provided documentation releasing you from restrictions to enable you to return to work at Rheem.  Therefore, you now are considered terminated due to voluntary resignation of employment.

Sincerely,

Alfred J. Gardner
Human Resources Manager

Cc:     Alora Perkins
        Clarence Mears



# EXHIBIT T

**September 3, 2004 Chapter 13 Voluntary Petition, Schedules and
Statement of Affairs
AND
September 7, 2004 Amended Schedules**

ALMB 1 (01/04)

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re

DONNA EARLY
_____
Debtor

Case No. _____

_____
Joint Debtor

### DECLARATION RE: ELECTRONIC FILING OF
### PETITION, SCHEDULES & STATEMENTS

## PART I - DECLARATION OF PETITIONER

I [We] DONNA EARLY _____ and _____
the undersigned debtor(s), *hereby declare under penalty of perjury* that the information I have given my attorney and the information provided in the electronically filed petition, statements, and schedules is true and correct. I consent to my attorney sending my petition, this declaration, statements and schedules to the United States Bankruptcy Court. I understand that this DECLARATION RE: ELECTRONIC FILING is to be filed with the Clerk once all schedules have been filed electronically but, in no event, no later than 15 days following the date the petition was electronically filed. I understand that failure to file the signed image of this DECLARATION will cause my case to be dismissed without further notice.

[X] [If petitioner is an individual whose debts are primarily consumer debts] I am aware that I may proceed under chapter 7, 11, 12 or 13 of Title 11 United States Code and understand the relief available under each such chapter. I request relief in accordance with the chapter specified in this petition. I declare under penalty of perjury that I have read and signed a completed Form B21 Statement of Social Security Number, and that the information on the form is true and correct.

[ ] [If petitioner is a corporation or partnership] I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor. The debtor requests relief in accordance with the chapter specified in this petition.

[X] [If petitioner files an application to pay filing fees in installments] I certify that I completed an application to pay the filing fee in installments. I am aware that if the fee is not paid within 120 days of the filing date of filing the petition, the bankruptcy case may be dismissed and, if dismissed, I may not receive a discharge of my debts.

Dated: _____

Signed: _____
Applicant

_____
Joint Applicant

## PART II - DECLARATION OF ATTORNEY:

I *declare under penalty of perjury* that I have reviewed the above debtor's petition and that the information is complete and correct to the best of my knowledge. The debtor(s) will have signed this form before I submit the petition, schedules, and statements. I will give the debtor(s) a copy of all forms and information to be filed with the United States Bankruptcy Court. I further declare that I have examined the above debtor's petition, schedules, and statements and, to the best of my knowledge and belief, they are true, correct, and complete. If an individual, I further declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12 or 13 of Title 11, United States Code, and have explained the relief available under each such chapter. If an individual, I further declare that the debtor(s) have read and signed a completed Form B21 Statement of Social Security Number, and that I shall retain the form for a period of one (1) year following the closing of the case. This declaration is based on all information of which I have knowledge.

Dated: _____

Signed: _____
Attorney for Debtor(s)

**United States Bankruptcy Court**
**Middle District of Alabama**

IN RE:                                                                          Case No. _____

**Early, Donna La'Shay** _____          Chapter **13** _____
                          Debtor(s)

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR

1.   Pursuant to 11 U.S.C. § 329(a) and Bankruptcy Rule 2016(b), I certify that I am the attorney for the above-named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

For legal services, I have agreed to accept . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____ **1,600.00**

Prior to the filing of this statement I have received . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____

Balance Due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____ **1,600.00**

2.   The source of the compensation paid to me was: ☑ Debtor   ☐ Other (specify):

3.   The source of compensation to be paid to me is: ☑ Debtor   ☐ Other (specify):

4.   ☑ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

     ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation, is attached.

5.   In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

     a.   Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
     b.   Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
     c.   Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
     d.   ~~Representation of the debtor in adversary proceedings and other contested bankruptcy matters;~~
     e.   [Other provisions as needed]

6.   By agreement with the debtor(s), the above disclosed fee does not include the following services:
     **Adversary Proceedings**

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

---

CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

_____ **September  3, 2004** _____          **/s/ Gary A. C. Backus** _____
                    Date                                                         Signature of Attorney

                                                                                 **Backus & Gil, L.L.C.** _____
                                                                                 Name of Law Firm

---

DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR

# UNITED STATES BANKRUPTCY COURT

## NOTICE TO INDIVIDUAL CONSUMER DEBTOR

> The purpose of this notice is to acquaint you with the four chapters of the federal Bankruptcy Code under which you may file a bankruptcy petition. The bankruptcy law is complicated and not easily described. Therefore, you should seek the advice of an attorney to learn of your rights and responsibilities under the law should you decide to file a petition with the court. Neither the judge nor the court's employees may provide you with legal advice.

**Chapter 7: Liquidation ($155 filing fee plus $39 administrative fee plus $15 trustee surcharge)\***

1. Chapter 7 is designed for debtors in financial difficulty who do not have the ability to pay their existing debts.

2. Under Chapter 7 a trustee takes possession of all your property. You may claim certain of your property as exempt under governing law. The trustee then liquidates the property and uses the proceeds to pay your creditors according to priorities of the Bankruptcy Code.

3. The purpose of filing a Chapter 7 case is to obtain a discharge of your existing debts. If, however, you are found to have committed certain kinds of improper conduct described in the Bankruptcy Code, your discharge may be denied by the court, and the purpose for which you filed the bankruptcy petition will be defeated.

4. Even if you receive a discharge, there are some debts that are not discharged under the law. Therefore, you may still be responsible for such debts as certain taxes and student loans, alimony and support payments, criminal restitution, and debts for death or personal injury caused by driving while intoxicated from alcohol or drugs.

5. Under certain circumstances you may keep property that you have purchased subject to a valid security interest. Your attorney can explain the options that are available to you.

**Chapter 13: Repayment of All or Part of the Debts of an Individual with Regular Income ($155 filing fee plus $39 administrative fee)\***

1. Chapter 13 is designed for individuals with regular income who are temporarily unable to pay their debts but would like to pay them in installments over a period of time. You are only eligible for Chapter 13 if your debts do not exceed certain dollar amounts set forth in the Bankruptcy Code.

2. Under Chapter 13 you must file a plan with the court to repay your creditors all or part of the money that you owe them, using your future earnings. Usually the period allowed by the court to repay your debts is three years, but not more than five years. Your plan must be approved by the court before it can take effect.

3. Under Chapter 13, unlike Chapter 7, you may keep all your property, both exempt and non-exempt, as long as you continue to make payments under the plan.

4. After completion of payments under your plan, your debts are discharged except alimony and support payments, student loans, certain debts including criminal fines and restitution and debts for death or personal injury caused by driving while intoxicated from alcohol or drugs, and long term secured obligations.

**Chapter 11: Reorganization ($800 filing fee plus $39 administrative fee)\***

Chapter 11 is designed primarily for the reorganization of a business but is also available to consumer debtors. Its provisions are quite complicated, and any decision for an individual to file a Chapter 11 petition should be reviewed with an attorney.

**Chapter 12: Family Farmer ($200 filing fee plus $39 administrative fee)\***

Chapter 12 is designed to permit family farmers to repay their debts over a period of time from future earnings and is in many ways similar to a Chapter 13. The eligibility requirements are restrictive, limiting its use to those who income arises primarily from a family owned farm.

\* Fees are subject to change and should be confirmed before filing.

## ACKNOWLEDGEMENT

I, the debtor, affirm that I have read this notice.

_____

Case Number

| | |
|---|---|
| **September 3, 2004** | **_/s/ Donna La'Shay Early_** |
| Date | **Donna La'Shay Early** |
| | Debtor |

_____

Joint Debtor, if any

**INSTRUCTIONS**: If the debtor is an individual, a copy of this notice personally signed by the debtor must accompany any bankruptcy petition filed with the Clerk. If filed by joint debtors, the notice must be personally signed by each. Failure to comply may result in the petition not being accepted for filing.

**NOTICE TO INDIVIDUAL CONSUMER DEBTOR**

© 1993-2004 EZ-Filing, Inc [1-800-998-2424] - Forms Software Only

(Official Form 1) (12/03)

| FORM B1 | United States Bankruptcy Court<br>Middle District of Alabama | Voluntary Petition |
|---|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Early, Donna La'Shay** | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names):<br>**fka Donna Strother** | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D.<br>No. (if more than one, state all): **2278** | Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D.<br>No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State & Zip Code): | Street Address of Joint Debtor (No. & Street, City, State & Zip Code): |
| County of Residence or of the<br>Principal Place of Business:    **Montgomery** | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address): | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

## Information Regarding the Debtor (Check the Applicable Boxes)

Venue (Check any applicable box)
- ☑ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor** (Check all boxes that apply) | | **Chapter or Section of Bankruptcy Code Under Which<br>the Petition is Filed** (Check one box) |
|---|---|---|
| ☑ Individual(s)<br>☐ Corporation<br>☐ Partnership<br>☐ Other _____ | ☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank | ☐ Chapter 7      ☐ Chapter 11      ☑ Chapter 13<br>☐ Chapter 9      ☐ Chapter 12<br>☐ Sec. 304 - Case ancillary to foreign proceeding |

| **Nature of Debts** (Check one box) | **Filing Fee** (Check one box) |
|---|---|
| ☑ Consumer/Non-Business    ☐ Business | ☐ Full Filing Fee attached<br>☑ Filing Fee to be paid in installments (applicable to individuals only)<br>Must attach signed application for the court's consideration<br>certifying that the debtor is unable to pay fee except in installments.<br>Rule 1006(b). See Official Form No. 3. |
| **Chapter 11 Small Business** (Check all boxes that apply)<br>☐ Debtor is a small business as defined in 11 U.S.C. § 101<br>☐ Debtor is and elects to be considered a small business under<br>11 U.S.C. § 1121(e) (Optional) | |

Statistical/Administrative Information (Estimates only)
- ☑ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

| Estimated Number of Creditors | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | ☐ | ☑ | ☐ | ☐ | ☐ | ☐ |

| Estimated Assets | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
| ☐ | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| Estimated Debts | | | | | | | |
|---|---|---|---|---|---|---|---|
| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
| ☐ | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

(Official Form 1) (12/03)

FORM B1, Page 2

| Voluntary Petition | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case)* | **Early, Donna La'Shay** |

### Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet)

| Location Where Filed: **None** | Case Number: | Date Filed: |
|---|---|---|

### Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet)

| Name of Debtor: **None** | Case Number: | Date Filed: |
|---|---|---|
| District: | Relationship: | Judge: |

## Signatures

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under Chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United State Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.
I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X  */s/ Donna La'Shay Early*
Signature of Debtor                    **Donna La'Shay Early**

X
Signature of Joint Debtor

Telephone Number (If not represented by attorney)
**September  3, 2004**
Date

### Signature of Attorney

X  */s/ Gary A. C. Backus*
Signature of Attorney for Debtor(s)
**Gary A. C. Backus asb-0680-b50g**
Printed Name of Attorney for Debtor(s)
**Backus & Gil, L.L.C.**
Firm Name
**P.O. Box 1804**
Address
**Montgomery, AL  36102-1804**

**(334) 265-0800**
Telephone Number
**September  3, 2004**
Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X
Signature of Authorized Individual

Printed Name of Authorized Individual

Title of Authorized Individual

Date

**Exhibit A**
(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☐ Exhibit A is attached and made a part of this petition.

**Exhibit B**
(To be completed if debtor is an individual whose debts are primarily consumer debts)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X  */s/ Gary A. C. Backus*                    **9/03/04**
Signature of Attorney for Debtor(s)           Date

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐ Yes, and Exhibit C is attached and made a part of this petition.
☑ No

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

Printed Name of Bankruptcy Petition Preparer

Social Security Number (Required by 11 U.S.C. § 110(c).)

Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X
Signature of Bankruptcy Petition Preparer

Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

**VOLUNTARY PETITION**

**United States Bankruptcy Court**
**Middle District of Alabama**

IN RE:                                                              Case No. _____

**Early, Donna La'Shay** _____    Chapter **13** _____

_____ Debtor(s)

## SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages in each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts from Schedules D, E, and F to determine the total amount of the debtor's liabilities.

|  |  |  | AMOUNTS SCHEDULED | | |
|---|---|---|---|---|---|
| NAME OF SCHEDULE | ATTACHED (YES/NO) | NUMBER OF SHEETS | ASSETS | LIABILITIES | OTHER |
| A - Real Property | Yes | 1 | 82,000.00 | | |
| B - Personal Property | Yes | 2 | 5,870.00 | | |
| C - Property Claimed as Exempt | Yes | 1 | | | |
| D - Creditors Holding Secured Claims | Yes | 1 | | 59,079.00 | |
| E - Creditors Holding Unsecured Priority Claims | Yes | 1 | | 0.00 | |
| F - Creditors Holding Unsecured Nonpriority Claims | Yes | 3 | | 8,428.00 | |
| G - Executory Contracts and Unexpired Leases | Yes | 1 | | | |
| H - Codebtors | Yes | 1 | | | |
| I - Current Income of Individual Debtor(s) | Yes | 1 | | | 1,519.33 |
| J - Current Expenditures of Individual Debtor(s) | Yes | 1 | | | 1,239.00 |
| Total Number of Sheets in Schedules | | 13 | | | |
| Total Assets | | | 87,870.00 | | |
| Total Liabilities | | | | 67,507.00 | |

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

IN RE **Early, Donna La'Shay** _____    Case No. _____

Debtor(s)

## SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a co-tenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether husband, wife, or both own the property by placing an "H" for Husband, "W" for Wife, "J" for Joint, or "C" for Community in the column labeled "HWJC." If the debtor holds no interest in real property, write "None" under "Description and Location of Property".

Do not include interests in executory contracts and unexpired leases on the schedule. List them in Schedule G - Executory Contracts and Unexpired Leases.

If an entity claims to have a lien or hold a security interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim".

If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | H W J C | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION | AMOUNT OF SECURED CLAIM |
|---|---|---|---|---|
| Homestead at | | | 82,000.00 | 50,000.00 |
| **TOTAL** | | | **82,000.00** | |

(Report also on Summary of Schedules)

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

SCHEDULE A - REAL PROPERTY

IN RE **Early, Donna La'Shay** _____    Case No. _____
<div align="center">Debtor(s)</div>

<div align="center">

## SCHEDULE B - PERSONAL PROPERTY

</div>

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "X" in the appropriate position in the column labeled "None". If additional space is needed in any category, attached a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own the property by placing an "H" for Husband, "W" for Wife, "J" for Joint, or "C" for Community in the column labeled "HWJC." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions only in Schedule C - Property Claimed as Exempt.

Do not include interests in executory contracts and unexpired leases on the schedule. List them in Schedule G - Executory Contracts and Unexpired Leased.

If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property".

| TYPE OF PROPERTY | N O N E | DESCRIPTION AND LOCATION OF PROPERTY | H W J C | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 1.  Cash on hand. | X | | | |
| 2.  Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | Checking with Comala Credit Union<br><br>Savings with Comala Credit Union | | 20.00<br><br>25.00 |
| 3.  Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4.  Household goods and furnishings, include audio, video, and computer equipment. | | Household goods | | 500.00 |
| 5.  Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6.  Wearing apparel. | | Clothing | | 200.00 |
| 7.  Furs and jewelry. | X | | | |
| 8.  Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9.  Interest in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | | | | |
| 10.  Annuities. Itemize and name each issue. | X | | | |
| 11.  Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | | 401k with Rheem | | 500.00 |
| 12.  Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 13.  Interests in partnerships or joint ventures. Itemize. | X | | | |
| 14.  Government and corporate bonds and other negotiable and non-negotiable instruments. | X | | | |
| 15.  Accounts receivable. | X | | | |
| 16.  Alimony, maintenance, support, and property settlements in which the debtor is or may be entitled. Give particulars. | X | | | |
| 17.  Other liquidated debts owing debtor including tax refunds. Give particulars. | | Prorated for 2004 | | 200.00 |

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

IN RE **Early, Donna La'Shay** _____     Case No. _____
Debtor(s)

## SCHEDULE B - PERSONAL PROPERTY
### (Continuation Sheet)

| TYPE OF PROPERTY | N O N E | DESCRIPTION AND LOCATION OF PROPERTY | H W J C | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION |
|---|---|---|---|---|
| 18.  Equitable or future interest, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |
| 19.  Contingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 20.  Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |
| 21.  Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 22.  Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 23.  Automobiles, trucks, trailers, and other vehicles and accessories. | | 2001 Dodge Neon SE | | 4,425.00 |
| 24.  Boats, motors, and accessories. | X | | | |
| 25.  Aircraft and accessories. | X | | | |
| 26.  Office equipment, furnishings, and supplies. | X | | | |
| 27.  Machinery, fixtures, equipment, and supplies used in business. | X | | | |
| 28.  Inventory. | X | | | |
| 29.  Animals. | X | | | |
| 30.  Crops - growing or harvested. Give particulars. | X | | | |
| 31.  Farming equipment and implements. | X | | | |
| 32.  Farm supplies, chemicals, and feed. | X | | | |
| 33.  Other personal property of any kind not already listed. Itemize. | X | | | |
| | | | **TOTAL** | **5,870.00** |

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

(Include amounts from any continuation sheets attached. Report total also on Summary of Schedules.)

_____ **0** continuation sheets attached

SCHEDULE B - PERSONAL PROPERTY

IN RE **Early, Donna La'Shay** _____ Case No. _____
                              Debtor(s)

## SCHEDULE C - PROPERTY CLAIMED AS EXEMPT

Debtor elects the exemptions to which debtor is entitled under:

(Check one box)

☐ 11 U.S.C. § 522(b)(1):  Exemptions provided in 11 U.S.C. § 522(d). NOTE: These exemptions are available only in certain states.

☑ 11 U.S.C. § 522(b)(2):  Exemptions available under applicable nonbankruptcy federal laws, state or local law where the debtor's domicile has been located for 180 days immediately preceding the filing of the petition, or for a longer portion of the 180-day period than in any other place, and the debtor's interest as a tenant by the entirety or joint tenant to the extent the interest is exempt from process under applicable nonbankruptcy law.

| DESCRIPTION OF PROPERTY | SPECIFY LAW PROVIDING EACH EXEMPTION | VALUE OF CLAIMED EXEMPTION | CURRENT MARKET VALUE OF PROPERTY WITHOUT DEDUCTING EXEMPTIONS |
|---|---|---:|---:|
| **SCHEDULE A - REAL PROPERTY** | | | |
| Homestead at | Ala. Code § 6-10-2, § 6-10-4 | 5,000.00 | 82,000.00 |
| | | | |
| **SCHEDULE B - PERSONAL PROPERTY** | | | |
| Checking with Comala Credit Union | Ala. Code §§ 6-10-6, 6-10-126 | 20.00 | 20.00 |
| Savings with Comala Credit Union | Ala. Code §§ 6-10-6, 6-10-126 | 25.00 | 25.00 |
| Household goods | Ala. Code §§ 6-10-6, 6-10-126 | 500.00 | 500.00 |
| 401k with Rheem | Ala. Code § 19-3-1 | 500.00 | 500.00 |
| Prorated for 2004 | Ala. Code §§ 6-10-6, 6-10-126 | 200.00 | 200.00 |

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

SCHEDULE C - PROPERTY CLAIMED AS EXEMPT

IN RE **Early, Donna La'Shay** _____    Case No. _____
            Debtor(s)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests. List creditors in alphabetical order to the extent practicable. If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C," respectively, in the column labeled "HWJC."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER. (See instructions above.) | CODEBTOR | HWJC | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND MARKET VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| Account No. | | | **Account for 2001 Dodge Neon SE** | | X | | | |
| **Americredit** Attn: Bankruptcy Dept. P.O. Box 183853 Arlington, TX  76096 | | | | | | | 9,079.00 | |
| | | | Value $     **4,425.00** | | | | | 4,654.00 |
| Account No. | | | **Mortgage for** | | X | | | |
| **Wilmar, Inc.** Attn: Bankruptcy Dept. 444 S. Hull Street Montgomery, AL  36104 | | | | | | | 50,000.00 | |
| | | | Value $     **82,000.00** | | | | | |
| Account No. | | | | | | | | |
| | | | | | | | | |
| | | | Value $ | | | | | |
| Account No. | | | | | | | | |
| | | | | | | | | |
| | | | Value $ | | | | | |
| Account No. | | | | | | | | |
| | | | | | | | | |
| | | | Value $ | | | | | |

**0** Continuation Sheets attached

|  | Subtotal (Total of this page) | 59,079.00 |
|---|---|---|
| (Complete only on last sheet of Schedule D) **TOTAL** | | 59,079.00 |

(Report total also on Summary of Schedules)

SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

IN RE **Early, Donna La'Shay** _____     Case No. _____
                    Debtor(s)

## SCHEDULE E - CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

A complete list of claims entitled to priority, listed separately by type of priority, is to be set forth on the sheets provided. Only holders of unsecured claims entitled to priority should be listed in this schedule. In the boxes provided on the attached sheets, state the name, mailing address, including zip code, and last four digits of the account number, if any, of all entities holding priority claims against the debtor or the property of the debtor, as of the date of the filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entry on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them or the marital community may be liable on each claim by placing an "H," "W," "J," or "C," respectively, in the column labeled "HWJC."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of claims listed on each sheet in the box labeled "Subtotal" on each sheet. Report the total of all claims listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule. Repeat this total also on the Summary of Schedules.

☑ Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

## TYPES OF PRIORITY CLAIMS
(Check the appropriate box(es) below if claims in that category are listed on the attached sheets)

☐ **Extensions of credit in an involuntary case**
Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(2)

☐ **Wages, salaries, and commissions**
Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $4,925* per person earned within 90 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(3).

☐ **Contributions to employee benefit plans**
Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐ **Certain farmers and fishermen**
Claims of certain farmers and fishermen, up to a maximum of $4,925* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(5).

☐ **Deposits by individuals**
Claims of individuals up to a maximum of $2,225* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(6)

☐ **Alimony, Maintenance, or Support**
Claims of a spouse, former spouse, or child of the debtor for alimony, maintenance, or support, to the extent provided in 11 U.S.C. § 507(a)(7).

☐ **Taxes and Other Certain Debts Owed to Governmental Units**
Taxes, customs duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C. § 507(a)(8).

☐ **Commitments to Maintain the Capital of an Insured Depository Institution**
Claims based on commitments to the FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507(a)(9).

* Amounts are subject to adjustment on April 1, 2007, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

_____ **0** Continuation Sheets attached

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

IN RE **Early, Donna La'Shay** _____    Case No. _____
_____ Debtor(s)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code and last four digits of any account number of all entities holding unsecured claims without priority against the debtor or the property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C," respectively, in the column labeled "HWJC."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. <br><br> **Capital One** <br> **Attn: Bankruptcy Dept.** <br> **P.O. Box 85167** <br> **Richmond, VA  23285-5167** | | | **Credit card** | | X | | <br><br><br>847.00 |
| Account No. <br><br> **Cross Country Bank** <br> **Attn: Bankruptcy Dept.** <br> **P.O. Box 310711** <br> **Boca Raton, FL  33431-0711** | | | **Credit card** | | X | | <br><br><br>1,218.00 |
| Account No. <br><br> **Dr. Benjamin J. Cumbus** <br> **Attn: Billing Dept.** <br> **5833 Carmichael Road** <br> **Montgomery, AL  36117** | | | **Medical bill** | | X | | <br><br><br>23.00 |
| Account No. <br><br> **First Premier Bank** <br> **Attn: Bankruptcy Dept.** <br> **P.O. Box 5147** <br> **Sioux Falls, SD  57117** | | | **Credit card** | | X | | <br><br><br>519.00 |
| Account No. <br><br> **First Premier Bank** <br> **Attn: Bankruptcy Dept.** <br> **P.O. Box 5147** <br> **Sioux Falls, SD  57117** | | | **Credit card** | | X | | <br><br><br>530.00 |

_____ **2** Continuation Sheets attached

Subtotal (Total of this page)    3,137.00

(Complete only on last sheet of Schedule F) **TOTAL**

(Report total also on Summary of Schedules)

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

**SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS**

IN RE **Early, Donna La'Shay** _____     Case No. _____
                    Debtor(s)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No.<br>**Genesis**<br>**Attn: Bankruptcy Dept.**<br>**8405 SW Nimbus Avenue**<br>**Beaverton, OR  97008** | | | **Collection account** | X | | | 1,190.00 |
| Account No.<br>**Hcbc Clct**<br>**Attn: Bankruptcy Dept.**<br>**P.O. Box 230609**<br>**Montgomery, AL  36123** | | | **Collection on medical bills** | X | | | 128.00 |
| Account No.<br>**Household Bank**<br>**Attn: Bankruptcy Dept.**<br>**P.O. Box 800410**<br>**Salinas, CA  93912-1622** | | | **Account** | X | | | unknown |
| Account No.<br>**Midland**<br>**Attn: Bankruptcy Dept.**<br>**P.O. Box 939019**<br>**San Diego, CA  92193-9019** | | | **Collection account** | X | | | 866.00 |
| Account No.<br>**Midnight Velvet**<br>**Attn: Billing Dept.**<br>**P.O. Box 8994**<br>**Madison, WI  53794** | | | **Credit account** | X | | | 167.00 |
| Account No.<br>**Palisades**<br>**Des Building 2100, Suite 100**<br>**2425 Commerce Avenue**<br>**Dothan, AL  30096** | | | **Collection account** | X | | | 1,878.00 |
| Account No.<br>**Paul L. Beckman, Esq.**<br>**P.O. Box 4689**<br>**Montgomery, AL  36103-4689** | | | **Collection on medical bill** | X | | | 34.00 |

Sheet _____**1**___ of _____**2** Continuation Sheets attached to Schedule F

Subtotal
(Total of this page)     **4,263.00**

(Complete only on last sheet of Schedule F)  **TOTAL**

(Report total also on Summary of Schedules)

SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

**IN RE** Early, Donna La'Shay _____    Case No. _____
                              Debtor(s)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No. | | | Credit card | X | | | |
| Providian Attn: Bankruptcy Dept. P.O. Box 660433 Dallas, TX 75266-0433 | | | | | | | **unknown** |
| Account No. | | | Credit account | X | | | |
| Spiegel Charge Attn: Bankruptcy Dept. P.O. Box 5811 Hicksville, NY 11802 | | | | | | | **1,028.00** |
| Account No. | | | | | | | |
| | | | | | | | |
| Account No. | | | | | | | |
| | | | | | | | |
| Account No. | | | | | | | |
| | | | | | | | |
| Account No. | | | | | | | |
| | | | | | | | |
| Account No. | | | | | | | |
| | | | | | | | |

Sheet ____ **2** of ____ **2** Continuation Sheets attached to Schedule F

Subtotal (Total of this page) **1,028.00**

(Complete only on last sheet of Schedule F) **TOTAL** **8,428.00**
(Report total also on Summary of Schedules)

**SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS**

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

**IN RE** <u>Early, Donna La'Shay</u>                                          Case No. _____

<div align="center">Debtor(s)</div>

<div align="center">

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

</div>

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests.

State nature of debtor's interest in contract, i.e., "Purchaser", "Agent", etc. State whether debtor is the lessor or lessee of a lease.

Provide the names and complete addresses of all other parties to each lease or contract described.

**NOTE:** A party listed on this schedule will not receive notice of the filing of this case unless the party is also scheduled in the appropriate schedule of creditors.

☑ Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST. STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY. STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
| | |

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

**SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

IN RE <u>Early, Donna La'Shay</u> _____     Case No. _____
                                    Debtor(s)

## SCHEDULE H - CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed by debtor in the schedules of creditors. Include all guarantors and co-signers. In community property states, a married debtor not filing a joint case should report the name and address of the nondebtor spouse on this schedule. Include all names used by the nondebtor spouse during the six years immediately preceding the commencement of this case.

☑ Check this box if debtor has no codebtors.

| NAME AND ADDRESS OF CODEBTOR | NAME AND ADDRESS OF CREDITOR |
|---|---|
| | |

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

IN RE <u>Early, Donna La'Shay</u>                                                      Case No. _____
                        Debtor(s)

## SCHEDULE I - CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by a married debtor in a chapter 12 or 13 case whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.

| Debtor's Marital Status **Divorced** | DEPENDENTS OF DEBTOR AND SPOUSE | |
|---|---|---|
| | RELATIONSHIP **Child** **Child** | AGE **14** **13** |

| EMPLOYMENT: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | **Disabled** | |
| Name of Employer | **Rheem** | |
| How long employed | | |
| Address of Employer | | |

| Income: (Estimate of average monthly income) | DEBTOR | SPOUSE |
|---|---|---|
| Current Monthly gross wages, salary, and commissions (pro rata if not paid monthly) | $ **910.00** | $ |
| Estimated monthly overtime | $ | $ |
| **SUBTOTAL** | $ **910.00** | $ |
| LESS PAYROLL DEDUCTIONS | | |
| a. Payroll taxes and Social Security | $ **47.67** | $ |
| b. Insurance | $ | $ |
| c. Union dues | $ | $ |
| d. Other (specify) _____ | $ | $ |
| _____ | $ | $ |
| **SUBTOTAL OF PAYROLL DEDUCTIONS** | $ **47.67** | $ |
| **TOTAL NET MONTHLY TAKE HOME PAY** | $ **862.33** | $ |
| | | |
| Regular income from operation of business or profession or farm (attach detailed statement) | $ | $ |
| Income from real property | $ | $ |
| Interest and dividends | $ | $ |
| Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above | $ **452.00** | $ |
| Social Security or other government assistance (Specify) **Military/VA Disability** | $ **205.00** | $ |
| _____ | $ | $ |
| Pension or retirement income | $ | $ |
| Other monthly income (Specify) _____ | $ | $ |
| _____ | $ | $ |
| _____ | $ | $ |
| **TOTAL MONTHLY INCOME** | $ **1,519.33** | $ |

**TOTAL COMBINED MONTHLY INCOME $ _____ 1,519.33** (Report also on Summary of Schedules)

Describe any increase or decrease of more than 10% in any of the above categories anticipated to occur within the year following the filing of this document:

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

IN RE **Early, Donna La'Shay** _____    Case No. _____
                              Debtor(s)

## SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)

Complete this schedule by estimating the average monthly expenses of the debtor and the debtor's family. Pro rate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate.

☐ Check this box if a joint petition is filed and debtor's spouse maintains a separate household. Complete a separate schedule of expenditures labeled "Spouse."

| | |
|---|---:|
| Rent or home mortgage payment (include lot rented for mobile home) | $ 510.00 |
| Are real estate taxes included?    Yes ____ No ✓ | |
| Is property insurance included?    Yes ____ No ✓ | |
| Utilities:  Electricity and heating fuel | $ 100.00 |
| Water and sewer | $ 45.00 |
| Telephone | $ 50.00 |
| Other **Cable** | $ 30.00 |
| | $ |
| | $ |
| Home maintenance (repairs and upkeep) | $ |
| Food | $ 150.00 |
| Clothing | $ 25.00 |
| Laundry and dry cleaning | $ 25.00 |
| Medical and dental expenses | $ 15.00 |
| Transportation (not including car payments) | $ 85.00 |
| Recreation, clubs and entertainment, newspapers, magazines, etc. | $ |
| Charitable contributions | $ |
| Insurance (not deducted from wages or included in home mortgage payments) | |
| Homeowner's or renter's | $ 35.00 |
| Life | $ 23.00 |
| Health | $ |
| Auto | $ 96.00 |
| Other | $ |
| | $ |
| | $ |
| Taxes (not deducted from wages or included in home mortgage payments) | |
| (Specify) **Real Estate Taxes** | $ 50.00 |
| | $ |
| | $ |
| Installment payments (in chapter 12 and 13 cases, do not list payments to be included in the plan) | |
| Auto | $ |
| Other | $ |
| | $ |
| Alimony, maintenance, and support paid to others | $ |
| Payments for support of additional dependents not living at your home | $ |
| Regular expenses from operation of business, profession, or farm (attach detailed statement) | $ |
| Other | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| **TOTAL MONTHLY EXPENSES (Report also on Summary of Schedules)** | $ 1,239.00 |

(FOR CHAPTER 12 AND 13 DEBTORS ONLY)
Provide the information requested below, including whether plan payments are to be made bi-weekly, monthly, annually, or at some other regular interval.

| | |
|---|---:|
| A.  Total projected monthly income | $ 1,519.33 |
| B.  Total projected monthly expenses | $ 1,239.00 |
| C.  Excess income (A minus B) | $ 280.33 |
| D.  Total amount to be paid into plan each **Monthly** | $ 280.33 |
| (interval) | |

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)

**IN RE** Early, Donna La'Shay                                      Case No. _____
<div align="center">Debtor(s)</div>

## DECLARATION CONCERNING DEBTOR'S SCHEDULES

### DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of _____ **14** sheets, and that
<div align="right">(Total shown on summary page plus 1)</div>

they are true and correct to the best of my knowledge, information, and belief.

Date: **September  3, 2004** _____       Signature: **_/s/ Donna La'Shay Early_** _____

<div align="right">Donna La'Shay Early                                      Debtor</div>

Date: _____       Signature: _____
<div align="right">(Joint Debtor, if any)</div>

<div align="right">[If joint case, both spouses must sign.]</div>

---

#### CERTIFICATION AND SIGNATURE OF NON-ATTORNEY BANKRUPTCY PETITION PREPARER (See 11 U.S.C. § 110)

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____       _____
Printed or Typed Name of Bankruptcy Petition Preparer       Social Security No.
                                                            (Required by 11 U.S.C. § 110(c).)

_____

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional signed sheets conforming to the appropriate Official Form for each person.

_____       _____
Signature of Bankruptcy Petition Preparer                   Date

_A bankruptcy petition preparer's failure to comply with the provision of title 11 and the Federal Rules of Bankruptcy Procedures may result in fines or imprisonment or both.  11 U.S.C. § 110; 18 U.S.C. § 156._

---

#### DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP

I, the _____ (the president or other officer or an authorized agent of the corporation or a member or an authorized agent of the partnership) of the _____ (corporation or partnership) named as debtor in this case, declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of _____ sheets, and that they are true and correct to the best of my knowledge, information, and belief.
<div align="left">(Total shown on summary page plus 1)</div>

Date: _____       Signature: _____

_____
<div align="right">(Print or type name of individual signing on behalf of debtor)</div>

<div align="center">[An individual signing on behalf of a partnership or corporation must indicate position or relationship to debtor.]</div>

**Penalty for making a false statement or concealing property. Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C. §§ 152 and 3571.**

**DECLARATION CONCERNING DEBTOR'S SCHEDULES**

© 1993-2004 EZ-Filing, Inc.[1-800-998-2424] - Forms Software Only

**United States Bankruptcy Court**
**Middle District of Alabama**

IN RE:                                                                    Case No. _____

**Early, Donna La'Shay**                                                  Chapter **13**
_____
Debtor(s)

# STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs.

Questions 1-18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19-25. **If the answer to an applicable question is "None," mark the box labeled "None."** If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

*DEFINITIONS*

*"In business."* A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within the six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed.

*"Insider."* The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101.

**1. Income from employment or operation of business**

None ☐   State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the **two years** immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

     AMOUNT   SOURCE (if more than one)
     **0.00   Rheem (2002-2004)**

**2. Income other than from employment or operation of business**

None ☐   State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the **two years** immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

     AMOUNT   SOURCE
     **10,848.00   Child support (2002-2004)**

     **4,920.00   VA Disability (2002-2004)**

**3. Payments to creditors**

None ☑   a. List all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600 to any creditor, made within **90 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

None ☑   b. List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**4. Suits and administrative proceedings, executions, garnishments and attachments**

None ☑   a. List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

None ✓ b. Describe all property that has been attached, garnished or seized under any legal or equitable process within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**5. Repossessions, foreclosures and returns**

None ✓ List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**6. Assignments and receiverships**

None ✓ a. Describe any assignment of property for the benefit of creditors made within **120 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and joint petition is not filed.)

None ✓ b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**7. Gifts**

None ✓ List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**8. Losses**

None ✓ List all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement of this case **or since the commencement of this case**. (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**9. Payments related to debt counseling or bankruptcy**

None ✓ List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under bankruptcy law or preparation of a petition in bankruptcy within **one year** immediately preceding the commencement of this case.

**10. Other transfers**

None ✓ List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**11. Closed financial accounts**

None ☐ List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within **one year** immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, association, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE AND NUMBER OF ACCOUNT AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
|---|---|---|
| **Max Federal Credit Union**<br>**Attn: Bankruptcy Dept.**<br>**P.O. Box 244040**<br>**Montgomery, AL  36124** | **Checking and Savings** | **$0 prior year** |

**12. Safe deposit boxes**

None ✓ List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

**13. Setoffs**

None ☑ List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within **90 days** preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

**14. Property held for another person**

None ☑ List all property owned by another person that the debtor holds or controls.

**15. Prior address of debtor**

None ☑ If the debtor has moved within the **two years** immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

**16. Spouses and Former Spouses**

None ☑ If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the **six-year period** immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

**17. Environmental Information**

For the purpose of this question, the following definitions apply:

"Environmental Law" means any federal, state, or local statute or regulation regulating pollution, contamination, releases of hazardous or toxic substances, wastes or material into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes or material.

"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to, disposal sites.

"Hazardous Material" means anything defined as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under an Environmental Law.

None ☑ a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Environmental Law.

None ☑ b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

None ☑ c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a party to the proceeding, and the docket number.

**18. Nature, location and name of business**

None ☑ a. If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the **six years** immediately preceding the commencement of this case.

If the debtor is a partnership, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within the **six years** immediately preceding the commencement of this case.

If the debtor is a corporation, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all  businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within the **six years** immediately preceding the commencement of this case.

None ☑ b. Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

*[If completed by an individual or individual and spouse]*

I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct.


Date: **September  3, 2004**_____     Signature  */s/ Donna La'Shay Early*_____
                                        of Debtor                                                    **Donna La'Shay Early**

Date: _____     Signature _____
                                        of Joint Debtor
                                        (if any)

_____**0** continuation pages attached


*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years or both.  18 U.S.C. § 152 and 3571.*

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

**STATEMENT OF FINANCIAL AFFAIRS**

**United States Bankruptcy Court**
**Middle District of Alabama**

IN RE:                                                    Case No. _____

<u>Early, Donna La'Shay</u>                               Chapter **13** _____
              Debtor(s)

**VERIFICATION OF CREDITOR MATRIX**

The above named debtor(s) hereby verify(ies) that the attached matrix listing creditors is true to the best of my(our) knowledge.

Date: <u>**September 3, 2004**</u> _____     Signature: <u>*/s/ Donna La'Shay Early*</u> _____
                                      **Donna La'Shay Early**                            Debtor

Date: _____     Signature: _____
                                                Joint Debtor, if any

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

VERIFICATION OF CREDITOR MATRIX

Early, Donna La'Shay
3338 Norman Bridge
Montgomery, AL  36105

Americredit
Attn: Bankruptcy Dept.
P.O. Box 183853
Arlington, TX  76096

Capital One
Attn: Bankruptcy Dept.
P.O. Box 85167
Richmond, VA  23285-5167

Cross Country Bank
Attn: Bankruptcy Dept.
P.O. Box 310711
Boca Raton, FL  33431-0711

Dr. Benjamin J. Cumbus
Attn: Billing Dept.
5833 Carmichael Road
Montgomery, AL  36117

First Premier Bank
Attn: Bankruptcy Dept.
P.O. Box 5147
Sioux Falls, SD  57117

Genesis
Attn: Bankruptcy Dept.
8405 SW Nimbus Avenue
Beaverton, OR  97008

Hcbc Clct
Attn: Bankruptcy Dept.
P.O. Box 230609
Montgomery, AL  36123

Household Bank
Attn: Bankruptcy Dept.
P.O. Box 800410
Salinas, CA  93912-1622

Midland
Attn: Bankruptcy Dept.
P.O. Box 939019
San Diego, CA  92193-9019

Midnight Velvet
Attn: Billing Dept.
P.O. Box 8994
Madison, WI  53794

Palisades
Des Building 2100, Suite 100
2425 Commerce Avenue
Dothan, AL  30096

Paul L. Beckman, Esq.
P.O. Box 4689
Montgomery, AL  36103-4689

Providian
Attn: Bankruptcy Dept.
P.O. Box 660433
Dallas, TX  75266-0433

Spiegel Charge
Attn: Bankruptcy Dept.
P.O. Box 5811
Hicksville, NY  11802

Wilmar, Inc.
Attn: Bankruptcy Dept.
444 S. Hull Street
Montgomery, AL  36104

IN RE **Early, Donna La'Shay** _____  Case No. **04-32516** _____
                              Debtor(s)

## AMENDED SCHEDULE I - CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by a married debtor in a chapter 12 or 13 case whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.

| Debtor's Marital Status | DEPENDENTS OF DEBTOR AND SPOUSE | | |
|---|---|---|---|
| **Divorced** | RELATIONSHIP<br>**Child**<br>**Child** | | AGE<br>**14**<br>**13** |

| EMPLOYMENT: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | **Disabled** | |
| Name of Employer | **Rheem** | |
| How long employed | | |
| Address of Employer | | |

| | DEBTOR | SPOUSE |
|---|---|---|
| Income: (Estimate of average monthly income) | | |
| Current Monthly gross wages, salary, and commissions (pro rata if not paid monthly) | $ 910.00 | $ |
| Estimated monthly overtime | $ | $ |
| **SUBTOTAL** | $ 910.00 | $ |
| **LESS PAYROLL DEDUCTIONS** | | |
|   a. Payroll taxes and Social Security | $ 47.67 | $ |
|   b. Insurance | $ | $ |
|   c. Union dues | $ | $ |
|   d. Other (specify) _____ | $ | $ |
| | $ | $ |
| **SUBTOTAL OF PAYROLL DEDUCTIONS** | $ 47.67 | $ |
| **TOTAL NET MONTHLY TAKE HOME PAY** | $ 862.33 | $ |
| | | |
| Regular income from operation of business or profession or farm (attach detailed statement) | $ | $ |
| Income from real property | $ | $ |
| Interest and dividends | $ | $ |
| Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above | $ 452.00 | $ |
| Social Security or other government assistance | | |
| (Specify) **Military/VA Disability** _____ | $ 205.00 | $ |
| | $ | $ |
| Pension or retirement income | $ | $ |
| Other monthly income | | |
| (Specify) **Brother's Help** | $ 200.00 | $ |
|     **Baby Sitting** | $ 200.00 | $ |
| _____ | $ | $ |
| | | |
| **TOTAL MONTHLY INCOME** | $ 1,919.33 | $ |

**TOTAL COMBINED MONTHLY INCOME** $ _____ **1,919.33**  (Report also on Summary of Schedules)

Describe any increase or decrease of more than 10% in any of the above categories anticipated to occur within the year following the filing of this document:

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

IN RE **Early, Donna La'Shay** _____     Case No. **04-32516** _____

_____
Debtor(s)

## AMENDED SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)

Complete this schedule by estimating the average monthly expenses of the debtor and the debtor's family. Pro rate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate.

☐ Check this box if a joint petition is filed and debtor's spouse maintains a separate household. Complete a separate schedule of expenditures labeled "Spouse."

| | | |
|---|---|---:|
| Rent or home mortgage payment (include lot rented for mobile home) | $ | 510.00 |
| Are real estate taxes included?   Yes ____  No ✓ | | |
| Is property insurance included?   Yes ____  No ✓ | | |
| Utilities:  Electricity and heating fuel | $ | 150.00 |
|    Water and sewer | $ | 50.00 |
|    Telephone | $ | 65.00 |
|    Other **Cable** | $ | 30.00 |
|  | $ | |
|  | $ | |
| Home maintenance (repairs and upkeep) | $ | |
| Food | $ | 200.00 |
| Clothing | $ | 25.00 |
| Laundry and dry cleaning | $ | 25.00 |
| Medical and dental expenses | $ | 15.00 |
| Transportation (not including car payments) | $ | 85.00 |
| Recreation, clubs and entertainment, newspapers, magazines, etc. | $ | |
| Charitable contributions | $ | |
| Insurance (not deducted from wages or included in home mortgage payments) | | |
|    Homeowner's or renter's | $ | 35.00 |
|    Life | $ | 23.00 |
|    Health | $ | |
|    Auto | $ | 96.00 |
|    Other | $ | |
|  | $ | |
|  | $ | |
| Taxes (not deducted from wages or included in home mortgage payments) | | |
| (Specify) **Real Estate Taxes** | $ | 50.00 |
|  | $ | |
|  | $ | |
| Installment payments (in chapter 12 and 13 cases, do not list payments to be included in the plan) | | |
|    Auto | $ | |
|    Other | $ | |
|  | $ | |
| Alimony, maintenance, and support paid to others | $ | |
| Payments for support of additional dependents not living at your home | $ | |
| Regular expenses from operation of business, profession, or farm (attach detailed statement) | $ | |
| Other | $ | |
|  | $ | |
|  | $ | |
|  | $ | |
|  | $ | |

| | | |
|---|---|---:|
| **TOTAL MONTHLY EXPENSES (Report also on Summary of Schedules)** | $ | 1,359.00 |

**(FOR CHAPTER 12 AND 13 DEBTORS ONLY)**
Provide the information requested below, including whether plan payments are to be made bi-weekly, monthly, annually, or at some other regular interval.

| | | |
|---|---|---:|
| A.  Total projected monthly income | $ | 1,919.33 |
| B.  Total projected monthly expenses | $ | 1,359.00 |
| C.  Excess income (A minus B) | $ | 560.33 |
| D.  Total amount to be paid into plan each **Monthly** | $ | 560.33 |
|     (interval) | | |

AMENDED SCHEDULE J - CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR(S)

© 1993-2004 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

# EXHIBIT U

**United States Bankruptcy Court**
**Middle District of Alabama**

IN RE:                                    Case No. _____
**DONNA EARLY**                          Chapter 13

## CHAPTER 13 PLAN OR SUMMARY

1. **PAYMENTS TO TRUSTEE:** The Debtor(s) shall pay $ 280 to the Chapter 13 Trustee monthly.

2. **DISTRIBUTIONS BY TRUSTEE FROM THE PAYMENTS RECEIVED SHALL BE MADE AS FOLLOWS:**

First: **Administrative Claims** under 11 U.S.C. § 503(b). The debtor(s) attorney fee is $1,600.00.

Second: **Secured Claims:**
a. Secured claims being paid through the trustee:

| Creditor | Amount of debt | Value of collateral | Interest under the plan | Specified monthly payment |
|---|---|---|---|---|
| Americredit | 9,079 | 4,425 | 8% | 250 |

b. Prepetition defaults being cured through the trustee:

| Creditor | Amount of arrearage | Annual Interest | Date Post-petition Payment will Resume | Specified monthly payment |
|---|---|---|---|---|
| | | | | |

c. Secured claims to be paid directly by the debtor or other party to the creditor:

| Creditor | Amount of debt | Value of collateral | Contractual payment |
|---|---|---|---|
| Wilmar | 50,000 | 82,000 | 510 |

d. Secured claims to be satisfied by the surrender and return of collateral:

| Creditor | Description of Collateral | Amount of Debt | Value of Collateral |
|---|---|---|---|
| | | | |

Third **Priority Claims** (11 U.S.C. § 507(a)(2) to (8):

| Creditor | Amount of debt | Specified monthly payment |
|---|---|---|
| | | |

Fourth: **Specially Classed Unsecured Claims:**

| Creditor | Basis for Classification | Amount of Debt Specially Classified | Specified monthly payment |
|---|---|---|---|
| | | | |

Fifth: **Unsecured Claims:** Including the unsecured portion of secured claims, a pro rata amount equal to 100 % of the claim. If unsecured creditors are to receive less than 100% of their claims, the debtor(s) will pay all projected disposable income to the trustee for at least 36 months.

**3. DURATION OF PLAN**
The expected duration of this plan is 55 months.

**4. PROVISIONS FOR UNSCHEDULED, POST-PETITION, OR LATE FILED CLAIMS ARE AS FOLLOWS:**

**5. PROVISIONS FOR PROPERTY OF THE ESTATE (See 11 U.S.C. § 1303, § 1306 and § 1327):**

**6. PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES (See 11 U.S.C. § 1322(b)(7) and § 365):**

**7. OTHER PROVISIONS:**

The Debtor is one month in arrears with Wilmar but will cure the arrears within 30 days of filing.

Dated: _____

/s/ Donna Early
Signature of Debtor

_____

Signature of Spouse (if applicable)

# EXHIBIT V

**Information Redacted Pursuant to General Order No. 2:04-mc-3228**

Case 2:06-cv-00721-WKW-CSC Document 20-23 Filed 06/06/2007 Page 2 of 5

# Chapter 13 Trustee

Curtis C. Reding
Post Office Box 173
Montgomery, AL 36101-0173
Phone: (334) 262-8371      Fax: (334) 262-8599

**To:**      CAROL_PRICE

**Company:**

**Fax:**      3238888

**From:**

**Memo:**

| Pages (including cover): | 4 | Sent on: | 05/30/07 | At: | 04:09 PM CDT |

CASE STATUS REPORT

DATE: 05/30/07

In Re: DONNA LA'SHAY EARLY

CASE NO. 04-32516

CURRENT STATUS OF CASE
ACTIVE

DATE FILED: 09/03/04

341 DATE: 10/14/04

BAR DATE: 01/12/05

FUNDS ON HAND:    406.88

DIV TO UNSC: 100%

CONF: 11/01/04

PERCENTAGE PD: 68%

Our records indicate the following:

Through the above date, the debtor has paid the Trustee a total of $  8017.00 .

The plan payments are $  385.00  monthly.

| [09/28/04 -> | 373.00 ] | [11/17/04 -> | 374.00 ] | [01/07/05 -> | 380.00 ] | [02/15/05 -> | 380.00 ] | [04/08/05 -> | 380.00 ] |
| [09/22/05 -> | 380.00 ] | [11/04/05 -> | 380.00 ] | [11/29/05 -> | 380.00 ] | [02/08/06 -> | 380.00 ] | [03/24/06 -> | 380.00 ] |
| [05/01/06 -> | 380.00 ] | [06/02/06 -> | 385.00 ] | [07/05/06 -> | 385.00 ] | [08/07/06 -> | 385.00 ] | [09/11/06 -> | 385.00 ] |
| [10/20/06 -> | 385.00 ] | [12/01/06 -> | 385.00 ] | [01/03/07 -> | 385.00 ] | [02/07/07 -> | 385.00 ] | [04/03/07 -> | 385.00 ] |
| [05/30/07 -> | 385.00 ] | | | | | | | | | |

The plan balances are as follows:

| CREDITOR NAME | TYPE | LAST PYMT DATE | LAST PYMT AMOUNT | CLAIM AMOUNT | TOTAL PAID | INTEREST PAID | % TO PAY | BALANCE OWED |
|---|---|---|---|---|---|---|---|---|
| GARY A C BACKUS | ATTORNEY | 04/20/05 | 203.16 | 1600.00 | 1600.00 | .00 | 100 % | .00 |
| RICHARD S ODA | FILING FEES | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| CURTIS C REDING | NOTICE FEES | 05/23/06 | 1.50 | 17.00 | 2.50 | .00 | 100 % | 14.50 |
| AMERICREDIT | SECURED | 02/21/07 | 163.74 | 4425.00 | 4425.00 | 603.80 | 100 % | .00 |
|  | INTEREST |  | 1.09 |  |  |  |  |  |
| WILMAR INC | SECURED | 00/00/00 | .00 | PD DIRECT | .00 | .00 | 100 % | .00 @ |
| CAPITAL ONE | UNSECURED | 04/19/07 | 23.50 | 697.39 | 36.30 | .00 | 100 % | 661.09 |
| ROUNDUP FUNDING LLC | UNSECURED | 04/19/07 | 41.07 | 1218.85 | 63.44 | .00 | 100 % | 1155.41 |
| BENJAMIN J CUMBUS MD | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| PREMIER BANKCARD/CHARTER | UNSECURED | 04/19/07 | 17.53 | 519.51 | 27.06 | .00 | 100 % | 492.45 |
| PREMIER BANKCARD/CHARTER | UNSECURED | 04/19/07 | 17.86 | 530.00 | 27.59 | .00 | 100 % | 502.41 |
| NATIONAL CAPITAL MANAGEMENT LL | UNSECURED | 04/19/07 | 35.85 | 1063.99 | 55.38 | .00 | 100 % | 1008.61 |
| CREDIT BUREAU OF MONTGOMERY | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| JEFFERSON CAPITAL SYSTEMS LLC | UNSECURED | 04/19/07 | 28.81 | 854.07 | 44.48 | .00 | 100 % | 809.59 |
| MIDLAND CREDIT MANAGEMENT | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| MIDNIGHT VELVET | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| PALISADES | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| VICTORIA WELLS MD | UNSECURED | 00/00/00 | .00 | 34.28 | .00 | .00 | 100 % | 34.28 |
| PROVIDIAN | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| CARD SERVICE CENTER | UNSECURED | 04/19/07 | 34.70 | 1028.36 | 53.57 | .00 | 100 % | 974.79 |
| US ATTORNEY | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| SPIEGEL CHARGE | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| AMERICREDIT | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| GENESIS | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| HOUSEHOLD BANK | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| CROSS COUNTRY BANK | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| PAUL L BECKMAN JR | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
| FIRST PREMIER BANK | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |

| PREMIER BANKCARD | UNSECURED | 00/00/00 | .00 | .00 | .00 | .00 | 100 % | .00 |
|---|---|---|---|---|---|---|---|---|
| AMERICREDIT | UNSECURED | 04/19/07 | 161.44 | 4791.52 | 249.38 | .00 | 100 % | 4542.14 |
| CURTIS C REDING | TRUSTEE FEE | | | 1552.81 | 421.62 | .00 | 100 % | 1131.19 |
| | | | | | | | | 11326.46 |
| | | | | | | | - | 406.88 |
| | | | | | | | | 10919.58 |

```
    Total of unsecured claims:    10,737.97
    POT Amount:                         .00
    POT % to Unsecured:             .00%
```

If the plan was to be paid off THIS MONTH, the amount needed would be $  10919.58 .
Any questions should either be directed to the debtor's attorney or in writing to the Chapter 13 Trustee's office.

The debtor's attorney is GARY A C BACKUS
                        ATTORNEY AT LAW

Case 2:06-cv-00727-WKW-CSC Document 20-23 Filed 06/06/2007 Page 5 of 5

P O BOX 1804
MONTGOMERY AL          36102
(334)265-0800

# EXHIBIT W

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                    Case No. 04-32516-DHW
                                         Chapter 13
DONNA LA'SHAY EARLY
Soc. Sec. No. XXX-XX-2278


                        Debtor.

---

PURSUANT TO LBR 1017-1, THIS CASE MAY BE DISMISSED, WITHOUT FURTHER NOTICE OR HEARING, UNLESS A RESPONSE IS FILED WITH THE COURT AND SERVED UPON THE PARTY SERVING THIS NOTICE WITHIN 20 DAYS OF SERVICE.

---

### TRUSTEE'S MOTION TO DISMISS

Comes now  Curtis C. Reding,  Chapter 13 Standing Trustee for this district, and moves the  Court to  dismiss  the above entitled case pursuant to 11 U.S.C.,  §1307 (and LBR 1017-1), in  that the debtor's actions have caused unreasonable delay that is prejudicial to creditors.  As grounds for said motion,  the  Trustee states as follows:

The debtor failed to make payments to the Trustee pursuant to the terms of the debtors confirmed plan.

Dated: January 30, 2006

Office of the Chapter 13 Trustee
P. O. Box 173                        /S/ Curtis C. Reding
Montgomery, AL  36101-0173           Curtis C. Reding, Trustee
Phone: (334)262-8371
Fax: (334)262-8599
email: Ch13Trustee@ch13mdal.com

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Motion to Dismiss on the debtor(s) and the debtor's attorney, by placing them in the  United States Mail,  postage  prepaid,  and properly addressed, or by electronic mail.

Done, this the 30th day of January, 2006.


                                     /S/ Curtis C. Reding
                                     Curtis C. Reding, Trustee


cc: GARY A C BACKUS
    ATTORNEY AT LAW
    P O BOX 1804
    MONTGOMERY AL  36102-1804

# EXHIBIT X

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF ALABAMA**

In re                                    Case No. 04-32516-DHW
                                         Chapter 13
DONNA La'SHAY EARLY,

        Debtor.

### ORDER DENYING MOTION TO DISMISS

The chapter 13 trustee filed a motion under 11 U.S.C. § 1307 to dismiss this case because of a material default by the debtor in payments under the confirmed chapter 13 plan.

The motion came on for hearing on July 10, 2006  by which time the debtor had resumed payments to the trustee.  Accordingly, it is

ORDERED that the motion is DENIED.

However, if a default in payments by the debtor necessitates another motion to dismiss by the trustee within 12 months of the instant motion, this case will most likely be dismissed.

Done this 12 day of July, 2006.


                                    /s/ Dwight H. Williams, Jr.
                                    United States Bankruptcy Judge


c: Debtor
   Gary A. C. Backus,  Attorney for Debtor
   Curtis C. Reding, Trustee

# EXHIBIT Y

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CASE NO. 04-32516** |
| DONNA EARLY, | ) | |
| | ) | **CHAPTER 13** |
| DEBTOR. | ) | |

### OBJECTION TO CONDITIONAL DISMISSAL

COME(S) NOW THE DEBTOR(S), by and through counsel in the above styled cause, and file(s) this Objection to Trustee's Motion to Dismiss. In support thereof the Debtor(s) state(s) as follows:

1.  The Debtor was hospitalized for two months.

2.  The Debtors have made a substantial payment to the Trustee.

3.  The Debtor is now able to resume making payments.

WHEREFORE, THE ABOVE PREMISES CONSIDERED, the Debtor(s) pray(s) that this Court will overrule the Motion to Dismiss.

Respectfully submitted,

By: _Gary acB_

Gary A. C. Backus
Attorney for the Debtor

Of Counsel:
BACKUS & GIL, L.L.C.
P.O. Box 1804
Montgomery, AL 36102-1804
(334) 265-0800

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing instrument upon the following by e-filing or by first class mail, postage prepaid and properly addressed, on this the 6th day of February, 2006.

Honorable Curtis Reding
Chapter 13 Trustee
VIA CM/ECF

Of Counsel

# EXHIBIT Z

**Information Redacted Pursuant to General Order No. 2:04-mc-3228**

Form **8879**

Department of the Treasury
Internal Revenue Service

**IRS e-file Signature Authorization**

▶ **Do not send to the IRS. Keep this form for your records.**
▶ **See instructions.**

OMB No. 1545-1758

**2004**

Declaration Control Number (DCN)   00630298021075

| Taxpayer's name | Social security number |
|---|---|
| DONNA L EARLY | |
| Spouse's name | Spouse's social security number |
| | |

**Part I   Tax Return Information – Tax Year Ending December 31, 2004** (Whole Dollars Only)

| | | |
|---|---|---|
| 1 Adjusted gross income (Form 1040, line 37; Form 1040A, line 22; Form 1040EZ, line 4) . . . . . . . . . . . . | **1** | 17,589 |
| 2 Total tax (Form 1040, line 62; Form 1040A, line 38; Form 1040EZ, line 10) . . . . . . . . . . . . . . . . | **2** | |
| 3 Federal income tax withheld (Form 1040, line 63; Form 1040A, line 39; Form 1040EZ, line 7) . . . . . . . . . | **3** | 1,145 |
| 4 Refund (Form 1040, line 72a; Form 1040A, line 45a; Form 1040EZ, line 11a) . . . . . . . . . . . . | **4** | 4,048 |
| 5 Amount you owe (Form 1040, line 74; Form 1040A, line 47; Form 1040EZ, line 12) . . . . . . . . . . | **5** | |

**Part II   Taxpayer Declaration and Signature Authorization (Be sure you get and keep a copy of your return**

Under penalties of perjury, I declare that I have examined a copy of my electronic individual income tax return and accompanying schedules and statements for the tax year ending December 31, 2004, and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts shown on the copy of my electronic income tax return. I consent to allow my intermediate service provider, transmitter, or electronic return originator (ERO) to send my return to the IRS and to receive from the IRS (a) an acknowledgement of receipt or reason for rejection of the transmission, (b) an indication of any refund offset, (c) the reason for any delay in processing the return or refund, and (d) the date of any refund. If applicable, I acknowledge that I have read the Electronic Funds Withdrawal Consent included on the copy of my electronic income tax return and I agree to the provisions contained therein. I have selected a personal identification number (PIN) as my signature for my electronic income tax return and, if applicable, my Electronic Funds Withdrawal Consent.

RTN=04400003   Acct=RA04XXX420132278

**Taxpayer's PIN:  check one box only**

[X] I authorize MAX TAX SERVICE _____ to enter my PIN  32278 as my signature
                           ERO firm name                                 do not enter all zeros
on my tax year 2004 electronically filed income tax return.

[ ] I will enter my PIN as my signature on my tax year 2004 electronically filed income tax return. Check this box **only** if you are entering your own PIN **and** your return is filed using the Practitioner PIN method. The ERO must complete Part III below.

Your signature ▶ _____ Date ▶ _____

**Spouse's PIN:  check one box only**

[ ] I authorize _____ to enter my PIN _____ as my signature
                           ERO firm name                                 do not enter all zeros
on my tax year 2004 electronically filed income tax return.

[ ] I will enter my PIN as my signature on my tax year 2004 electronically filed income tax return. Check this box **only** if you are entering your own PIN **and** your return is filed using the Practitioner PIN method. The ERO must complete Part III below.

Spouse's signature ▶ _____ Date ▶ _____

**Practitioner PIN Method Returns Only – continue below**

**Part III   Certification and Authentication – Practitioner PIN Method Only**

**ERO's EFIN/PIN.** Enter your six-digit EFIN followed by your five-digit PIN. _____
                                                  do not enter all zeros

I certify that the above numeric entry is my PIN, which is my signature for the tax year 2004 electronically filed income tax return for the taxpayer(s) indicated above. I confirm that I am submitting this return in accordance with the requirements of the Practitioner PIN method and **Publication 1345**, Handbook for Authorized e-file Providers.

ERO's signature ▶ _____ Date ▶ 01-26-2005

**ERO Must Retain This Form – See Instructions**
**Do Not Submit This Form to the IRS Unless Requested To Do So**

For Privacy Act and Paperwork Reduction Act Notice, see instructions.         EEA         Form **8879** (20

Client Copy

Form **1040** Department of the Treasury—Internal Revenue Service
**U.S. Individual Income Tax Return** **200** (99) IRS Use Only—Do not write or staple in this space.

| | | | | OMB. No. 1545-0074 |
|---|---|---|---|---|
| **Label** | For the year Jan. 1-Dec. 31, 2004, or other tax year beginning | , 2004, ending | , 20 | |

**Label** (See instructions on page 16.) Use the IRS label. Otherwise, please print or type.

Your first name and initial: DONNA L   Last name: EARLY

Your social security number

If a joint return, spouse's first name and initial   Last name

Spouse's social security number

Home address (number and street). If you have a P.O. box, see page 16.   Apt. no.

City, town or post office, state, and ZIP code. If you have a foreign address, see page 16.

MONTGOMERY   AL   36105

▲ **Important!**
You **must** enter your SSN(s) above.

**Presidential Election Campaign** (See page 16.)
**Note.** Checking "Yes" will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? . . . . . ▶
You: Yes [X] No   Spouse: Yes [ ] No

**Filing Status**
Check only one box.
1 [ ] Single
2 [ ] Married filing jointly (even if only one had income)
3 [ ] Married filing separately. Enter spouse's SSN above and full name here. ▶
4 [X] Head of household (with qualifying person). (See page 17.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 [ ] Qualifying widow(er) with dependent child (see page 17)

**Exemptions**
6a [X] Yourself. If someone can claim you as a dependent, **do not** check box 6a
b [ ] Spouse

Boxes checked on 6a and 6b
No. of children on 6c who:
● lived with you
● did not live with you due to divorce or separation (see page 18)
Dependents on 6c not entered above
Add numbers on lines above ▶

c Dependents:

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to | (4) Check if qualifying child for child tax credit (see pg 18) |
|---|---|---|---|
| | | SDAUGHTER | [X] |
| | | | [ ] |
| | | | [ ] |
| | | | [ ] |

d Total number of exemptions claimed . . . . . . . . . . . . . . . . . . .

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see page 19.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . | **7** | 17,29 |
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . | **8a** | |
| b | Tax-exempt interest. Do not include on line 8a . . . | 8b | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . . | **9a** | |
| b | Qualified dividends (see page 20) . . . . . . . | 9b | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 20) . . . . . | **10** | 29- |
| 11 | Alimony received . . . . . . . . . . . . . . . . . | **11** | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . | **12** | |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | **13** | |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . | **14** | |
| 15a | IRA distributions . . | 15a | b Taxable amount (see page 22) | **15b** | |
| 16a | Pensions and annuities | 16a | b Taxable amount (see page 22) | **16b** | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | **17** | |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . | **18** | |
| 19 | Unemployment compensation . . . . . . . . . . | **19** | |
| 20a | Social security benefits | 20a | b Taxable amount (see page 24) | **20b** | |
| 21 | Other income . . . . . . . . . . . . . . . . | **21** | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | **22** | 17,58 |

**Adjusted Gross Income**

| | | | |
|---|---|---|---|
| 23 | Educator expenses (see page 26) . . . . . . . | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | |
| 25 | IRA deduction (see page 26) . . . . . . . | 25 | |
| 26 | Student loan interest deduction (see page 28) . . . | 26 | |
| 27 | Tuition and fees deduction (see page 29) . . . . | 27 | |
| 28 | Health savings account deduction. Attach Form 8889 | 28 | |
| 29 | Moving expenses. Attach Form 3903 . . . . . | 29 | |
| 30 | One-half of self-employment tax. Attach Schedule SE | 30 | |
| 31 | Self-employed health insurance deduction (see page 30) | 31 | |
| 32 | Self-employed SEP, SIMPLE, and qualified plans | 32 | |
| 33 | Penalty on early withdrawal of savings . . . . | 33 | |
| 34a | Alimony paid b Recipient's SSN ▶ | 34a | |
| 35 | Add lines 23 through 34a . . . . . . . . . . . . . . . . . | **35** | |
| 36 | Subtract line 35 from line 22. This is your **adjusted gross income** . . . . . . . . ▶ | **36** | 17,58 |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 75.   EEA   Form **1040** (2

Client Copy

Form 1040 (2004) DONNA L EARLY                                                                                    Page

**Tax and Credits**

| | | | |
|---|---|---|---|
| 37 | Amount from line 36 (adjusted gross income) | 37 | 17,589 |

38a Check if: [ ] You were born before January 2, 1940, [ ] Blind. } Total boxes
[ ] Spouse was born before January 2, 1940, [ ] Blind. checked ▶ 38a

b If your spouse itemizes on a separate return or you were a dual-status alien, see pg 31 & check here ▶ 38b [ ]

**Standard Deduction for—**
- People who checked any box on line 38a or 38b or who can be claimed as a dependent, see page 31.
- All others:
Single or Married filing separately, $4,850
Married filing jointly or Qualifying widow(er), $9,700
Head of household, $7,150

| | | | |
|---|---|---|---|
| 39 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | 39 | 9,915 |
| 40 | Subtract line 39 from line 37 | 40 | 7,674 |
| 41 | If line 37 is $107,025 or less, multiply $3,100 by the total number of exemptions claimed on line 6d. If line 37 is over $107,025, see the worksheet on page 33 | 41 | 6,200 |
| 42 | Taxable income. Subtract line 41 from line 40. If line 41 is more than line 40, enter -0- | 42 | 1,474 |
| 43 | Tax (see page 33). Check if any tax is from: a [ ] Form(s) 8814 b [ ] Form 4972 | 43 | 146 |
| 44 | Alternative minimum tax (see page 35). Attach Form 6251 | 44 | |
| 45 | Add lines 43 and 44 ▶ | 45 | 146 |

| | | | |
|---|---|---|---|
| 46 | Foreign tax credit. Attach Form 1116 if required | 46 | |
| 47 | Credit for child and dependent care expenses. Attach Form 2441 | 47 | |
| 48 | Credit for the elderly or the disabled. Attach Schedule R | 48 | |
| 49 | Education credits. Attach Form 8863 | 49 | |
| 50 | Retirement savings contributions credit. Attach Form 8880 | 50 | 9 |
| 51 | Child tax credit (see page 37) | 51 | 137 |
| 52 | Adoption credit. Attach Form 8839 | 52 | |
| 53 | Credits from: a [ ] Form 8396 b [ ] Form 8859 | 53 | |
| 54 | Other credits. Check applicable box(es): a [ ] Form 3800 b [ ] Form 8801 c [ ] Specify | 54 | |
| 55 | Add lines 46 through 54. These are your total credits | 55 | 146 |
| 56 | Subtract line 55 from line 45. If line 55 is more than line 45, enter -0- ▶ | 56 | 0 |

**Other Taxes**

| | | | |
|---|---|---|---|
| 57 | Self-employment tax. Attach Schedule SE | 57 | |
| 58 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | 58 | |
| 59 | Additional tax on IRAs, other qualified retirement plans, etc. Attach Form 5329 if required | 59 | |
| 60 | Advance earned income credit payments from Form(s) W-2 | 60 | |
| 61 | Household employment taxes. Attach Schedule H | 61 | |
| 62 | Add lines 56 through 61. This is your total tax ▶ | 62 | 0 |

**Payments**

If you have a qualifying child, attach Schedule EIC.

| | | | |
|---|---|---|---|
| 63 | Federal income tax withheld from Forms W-2 and 1099 | 63 | 1,145 |
| 64 | 2004 estimated tax payments and amount applied from 2003 return | 64 | |
| 65a | Earned income credit (EIC) | 65a | 2,040 |
| b | Nontaxable combat pay election ▶ 65b | | |
| 66 | Excess social security and tier 1 RRTA tax withheld (see page 54) | 66 | |
| 67 | Additional child tax credit. Attach Form 8812 | 67 | 863 |
| 68 | Amount paid with request for extension to file (see page 54) | 68 | |
| 69 | Other payments from: a [ ] Form 2439 b [ ] Form 4136 c [ ] Form 8885 | 69 | |
| 70 | Add lines 63, 64, 65a, and 66 through 69. These are your total payments ▶ | 70 | 4,048 |

**Refund**

Direct deposit?
See page 54 and fill in 72b, 72c, and 72d.

| | | | |
|---|---|---|---|
| 71 | If line 70 is more than line 62, subtract line 62 from line 70. This is the amount you overpaid | 71 | 4,048 |
| 72a | Amount of line 71 you want refunded to you ▶ | 72a | 4,048 |

▶ b Routing number 0 4 1 0 0 0 0 3 7 ▶ c Type: [X] Checking [ ] Savings
▶ d Account number X X A 0 4 X X X 4 2 0 1 3 2 2 7 8

| | | | |
|---|---|---|---|
| 73 | Amount of line 71 you want applied to your 2005 estimated tax | 73 | |

**Amount You Owe**

| | | | |
|---|---|---|---|
| 74 | Amount you owe. Subtract line 70 from line 62. For details on how to pay, see page 55 | 74 | |
| 75 | Estimated tax penalty (see page 55) | 75 | |

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS (see page 56)? [X] Yes. Complete the following.

Designee's name ▶ PREPARER    Phone no. ▶    Personal identification number (PIN) ▶

**Sign Here**

Joint return? See page 17.
Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature 32278    Date 2005-01-26    Your occupation ASSEMBLY LINE    Daytime phone number

Spouse's signature. If a joint return, both must sign.    Date    Spouse's occupation

**Paid Preparer's Use Only**

Preparer's signature ▶    Date 01-26-2005    Check if self-employed [X]    Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code
MAX TAX SERVICE
1101 ADAMS AVE
MONTGOMERY    AL   36104-4501    EIN    Phone no. 334-834-2008

SEA    Form 1040 (2004)

**SCHEDULES A&B**
**(Form 1040)**

Department of the Treasury
Internal Revenue Service    (99)

**Schedule A – Itemized Deductions**

OMB No. 1545-0074

**2004**

Attachment
Sequence No. **07**

▶ Attach to Form 1040.    ▶ See Instructions for Schedules A and B (Form 1040).

Name(s) shown on Form 1040: DONNA L EARLY

Your social security number

| | | | | |
|---|---|---|---|---|
| **Medical and Dental Expenses** | **Caution.** Do not include expenses reimbursed or paid by others. | | | |
| | 1 Medical and dental expenses (see page A-2) | 1 | 125 | |
| | 2 Enter amount from Form 1040, line 37 | 2  17,589 | | |
| | 3 Multiply line 2 by 7.5% (.075) | 3 | 1,319 | |
| | 4 Subtract line 3 from 1. If line 3 is more than line 1, enter -0- | | 4 | 0 |
| **Taxes You Paid** (See page A-2.) | 5 State and local (check only one box): | | | |
| | a ☒ Income taxes, or | 5 | 453 | |
| | b ☐ General sales taxes (see page A-2) | | | |
| | 6 Real estate taxes (see page A-3) | 6 | 566 | |
| | 7 Personal property taxes | 7 | | |
| | 8 Other taxes. List type and amount ▶ _____ | 8 | | |
| | 9 Add lines 5 through 8 | | 9 | 1,019 |
| **Interest You Paid** (See page A-3.) | 10 Home mortgage interest and points reported to you on Form 1098 | 10 | 5,110 | |
| | 11 Home mortgage interest not reported to you on Form 1098. If paid to the person from whom you bought the home, see page A-4 and show that person's name, identifying no., and address ▶ | 11 | | |
| **Note.** Personal interest is not deductible. | 12 Points not reported to you on Form 1098. See page A-4 for special rules | 12 | | |
| | 13 Investment interest. Attach Form 4952 if required. (See page A-4.) | 13 | | |
| | 14 Add lines 10 through 13 | | 14 | 5,110 |
| **Gifts to Charity** If you made a gift and got a benefit for it, see page A-4. | 15 Gifts by cash or check. If you made any gift of $250 or more, see page A-4 | 15 | 3,000 | |
| | 16 Other than by cash or check. If any gift of $250 or more, see page A-4. You **must** attach Form 8283 if over $500 | 16 | 450 | |
| | 17 Carryover from prior year | 17 | | |
| | 18 Add lines 15 through 17 | | 18 | 3,450 |
| **Casualty and Theft Losses** | 19 Casualty or theft loss(es). Attach Form 4684. (See page A-5.) | | 19 | |
| **Job Expenses and Most Other Miscellaneous Deductions** (See page A-5.) | 20 Unreimbursed employee expenses—job travel, union dues, job education, etc. Attach Form 2106 or 2106-EZ if required. (See page A-6.) | | | |
| | FORM 2106  263 | | | |
| | UNIFORM EXPENSES  300 | 20 | 563 | |
| | 21 Tax preparation fees | 21 | 125 | |
| | 22 Other expenses—investment, safe deposit box, etc. List type and amount ▶ _____ | 22 | | |
| | 23 Add lines 20 through 22 | 23 | 688 | |
| | 24 Enter amount from Form 1040, line 37 | 24  17,589 | | |
| | 25 Multiply line 24 by 2% (.02) | 25 | 352 | |
| | 26 Subtract line 25 from line 23. If line 25 is more than line 23, enter -0- | | 26 | 336 |
| **Other Miscellaneous Deductions** | 27 Other—from list on page A-6. List type and amount ▶ _____ | | 27 | |
| **Total Itemized Deductions** | 28 Is Form 1040, line 37, over $142,700 (over $71,350 if married filing separately)? | | | |
| | ☒ **No.** Your deduction is not limited. Add the amounts in the far right column for lines 4 through 27. Also, enter this amount on Form 1040, line 39. ▶ | | 28 | 9,915 |
| | ☐ **Yes.** Your deduction may be limited. See page A-6 for the amount to enter. | | | |

For Paperwork Reduction Act Notice, see Form 1040 instructions.    EEA    Schedule A (Form 1040) 2004

Client Copy

**SCHEDULE EIC**
(Form 1040A or 1040)

Department of the Treasury
Internal Revenue Service

**Earned Income Credit**

Qualifying Child Information

Complete and attach to Form 1040A or 1040
only if you have a qualifying child.

OMB No. 1545-0074

**2004**

Attachment
Sequence No. **43**

Name(s) shown on return

DONNA L EARLY

Your social security number

**Before you begin:** See the instructions for Form 1040A, lines 41a and 41b, or Form 1040, lines 65a and 65b, to make sure that (a) you can take the EIC and (b) you have a qualifying child.

**CAUTION!**

- If you take the EIC even though you are not eligible, you may not be allowed to take the credit for up to 10 years. See instructions for details.
- It will take us longer to process your return and issue your refund if you do not fill in all lines that apply for each qualifying child.
- Be sure the child's name on line 1 and social security number (SSN) on line 2 agree with the child's social security card. Otherwise, at the time we process your return, we may reduce or disallow your EIC. If the name or SSN on the child's social security card is not correct, call the Social Security Administration at 1-800-772-1213.

| Qualifying Child Information | Child 1 | | Child 2 | |
|---|---|---|---|---|
| | First name | Last name | First name | Last name |
| **1 Child's name**<br>If you have more than two qualifying children, you only have to list two to get the maximum credit. | | | | |
| **2 Child's SSN**<br>The child must have an SSN as defined on page 42 of the Form 1040A instructions or page 44 of the Form 1040 instructions unless the child was born and died in 2004. If your child was born and died in 2004 and did not have an SSN, enter "Died" on this line and attach a copy of the child's birth certificate. | | | | |
| **3 Child's year of birth** | Year _____<br>If born after 1985, skip lines 4a and 4b; go to line 5. | | Year _____<br>If born after 1985, skip lines 4a and 4b; go to line 5. | |
| **4 If the child was born before 1986—**<br>**a** Was the child under age 24 at the end of 2004 and a student? | ☐ **Yes.**<br>Go to line 5. | ☐ **No.**<br>Continue | ☐ **Yes.**<br>Go to line 5. | ☐ **No.**<br>Continue |
| **b** Was the child permanently and totally disabled during any part of 2004? | ☐ **Yes.**<br>Continue | ☐ **No.**<br>The child is not a qualifying child. | ☐ **Yes.**<br>Continue | ☐ **No.**<br>The child is not qualifying child. |
| **5 Child's relationship to you**<br>(for example, son, daughter, grandchild, niece, nephew, foster child, etc.) | DAUGHTER | | | |
| **6 Number of months child lived with you in the United States during 2004**<br>• If the child lived with you for more than half of 2004 but less than 7 months, enter "7".<br>• If the child was born or died in 2004 and your home was the child's home for the entire time he or she was alive during 2004, enter "12". | _12_ months<br>Do not enter more than 12 months. | | _____ months<br>Do not enter more than 12 months. | |

**TIP**   You may also be able to take the additional child tax credit if your child (a) was under age 17 at the end of 2004, (b) is claimed as your dependent on line 6c of Form 1040A or Form 1040, and (c) is a U.S. citizen or resident alien. For more details, see the instructions for line 42 of Form 1040A or line 67 of Form 1040.

For Paperwork Reduction Act Notice, see Form 1040A or 1040 instructions.

EEA

Schedule EIC (Form 1040A or 1040)

Student Copy

| Form **8812** | **Additional Child Tax Credit** | **2004** |
|---|---|---|

OMB No. 1545-1620

Department of the Treasury
Internal Revenue Service  (99)

Complete and attach to Form 1040 or Form 1040A.

Attachment
Sequence No.  **47**

Name(s) shown on return

DONNA L EARLY

Your social security number

## Part I    All Filers

| | | | |
|---|---|---|---|
| 1 | Enter the amount from line 1 of your Child Tax Credit Worksheet on page 38 of the Form 1040 instructions or page 37 of the Form 1040A instructions. If you used Pub. 972, enter the amount from line 8 of the worksheet on page 4 of the publication . . . . . . . . . . . . . . . . . | **1** | 1,000 |
| 2 | Enter the amount from Form 1040, line 51, or Form 1040A, line 33 . . . . . . . . . | **2** | 137 |
| 3 | Subtract line 2 from line 1. If zero, **stop**; you cannot take this credit . . . . . . . . | **3** | 863 |

4a  Enter your total earned income. See the instructions . . . . . . . . . . . . . **4a** 17,295

  b  Nontaxable combat pay included on line 4a . . .  **4b**

5  Is the amount on line 4a more than $10,750?

☐ **No.**    Leave line 5 blank and enter -0- on line 6.

☒ **Yes.**   Subtract $10,750 from the amount on line 4a. Enter the result . . .  **5**  6,545

| | | | |
|---|---|---|---|
| 6 | Multiply the amount on line 5 by 15% (.15) and enter the result . . . . . . . . . | **6** | 982 |

**Next.** Do you have three or more qualifying children?

☒ **No.**    If line 6 is zero, **stop**; you cannot take this credit. Otherwise, skip Part II and enter the smaller of line 3 or line 6 on line 13.

☐ **Yes.**   If line 6 is equal to or more than line 3, skip Part II and enter the amount from line 3 on line 13. Otherwise, go to line 7.

## Part II    Certain Filers Who Have Three or More Qualifying Children

7  Enter the total of the withheld social security and Medicare taxes from Form(s) W-2, boxes 4 and 6. If married filing jointly, include your spouse's amounts with yours. If you worked for a railroad, see the instructions . . . . . . . . . .  **7**

8  1040 filers:    Enter the total of the amounts from Form 1040, lines 30 and 58, plus any uncollected social security and Medicare or tier 1 RRTA taxes included on line 62.  ▶  **8**

   1040A filers:   Enter -0-.

9  Add lines 7 and 8 . . . . . . . . . . . . . . . . . . . . . . . . .  **9**

10  1040 filers:    Enter the total of the amounts from Form 1040, lines 65a and 66.

    1040A filers:   Enter the total of the amount from Form 1040A, line 41a, plus any excess social security and tier 1 RRTA taxes withheld that you entered to the left of line 43 (see the instructions).  **10**

11  Subtract line 10 from line 9. If zero or less, enter -0- . . . . . . . . . . . . .  **11**

12  Enter the larger of line 6 or line 11 here . . . . . . . . . . . . . . . . .  **12**

Next, enter the smaller of line 3 or line 12 on line 13.

## Part III    Your Additional Child Tax Credit

| | | | |
|---|---|---|---|
| 13 | This is your additional child tax credit . . . . . . . . . . . . . . . . . | **13** | 863 |

Enter this amount on
Form 1040, line 67, or
Form 1040A, line 42.

For Paperwork Reduction Act Notice, see instructions.        EEA        Form 8812 (2004)

Client Copy

Form **2106**

Department of the Treasury
Internal Revenue Service    (99)

### Employee Business Expenses

▶ See separate instructions.

▶ Attach to Form 1040.

OMB No. 1545-0139

**2004**

Attachment
Sequence No. **54**

Your name
DONNA L EARLY

Occupation in which you incurred expenses
ASSEMBLY LINE

Social security number

**Part I**    Employee Business Expenses and Reimbursements

**Step 1  Enter Your Expenses**

| | | | Column A Other Than Meals and Entertainment | Column B Meals and Entertainment |
|---|---|---|---|---|
| **1** | Vehicle expense from line 22 or line 29.  (Rural mail carriers:  See instructions.) . . . . . . . . . . . . . . . . . . . | **1** | 263 | |
| **2** | Parking fees, tolls, and transportation, including train, bus, etc., that **did not involve** overnight travel or commuting to and from work | **2** | | |
| **3** | Travel expense while away from home overnight, including lodging, airplane, car rental, etc. **Do not** include meals and entertainment  . . . . . | **3** | | |
| **4** | Business expenses not included on lines 1 through 3. **Do not** include meals and entertainment . . . . . . . . . . . | **4** | | |
| **5** | Meals and entertainment expenses (see instructions)  . . . . . . . . . | **5** | | |
| **6** | **Total expenses.**  In Column A, add lines 1 through 4 and enter the result.  In Column B, enter the amount from line 5 . . . . . . . . | **6** | 263 | |

**Note:**  If you were not reimbursed for any expenses in Step 1, skip line 7 and enter the amount from line 6 on line 8.

**Step 2  Enter Reimbursements Received From Your Employer for Expenses Listed in Step 1**

| | | | | |
|---|---|---|---|---|
| **7** | Enter reimbursements received from your employer that were not reported to you in box 1 of Form W-2.  Include any reimbursements reported under code "L" in box 12 of your Form W-2 (see instructions) . . . . . . . . . . . . . . . . . . . . | **7** | | |

**Step 3  Figure Expenses To Deduct on Schedule A (Form 1040)**

| | | | | |
|---|---|---|---|---|
| **8** | Subtract line 7 from line 6. If zero or less, enter -0-. However, if line 7 is greater than line 6 in Column A, report the excess as income on Form 1040, line 7 . . . . . . . . . . . . . . | **8** | 263 | |
| | **Note:**  If **both** columns of line 8 are zero, you cannot deduct employee business expenses. Stop here and attach Form 2106 to your return. | | | |
| **9** | In Column A, enter the amount from line 8. In Column B, multiply line 8 by 50% (.50). (Employees subject to Department of Transportation (DOT) hours of service limits: Multiply meal expenses incurred while away from home on business by 70% (.70) instead of 50%. For details, see instructions.) . . . . . . . . . . | **9** | 263 | |
| **10** | Add the amounts on line 9 of both columns and enter the total here. **Also, enter the total on Schedule A (Form 1040), line 20.** (Reservists, qualified performing artists, fee-basis state or local government officials, and individuals with disabilities: See the instructions for special rules on where to enter the total.) . . . . . . . . . . . . . . . . . . ▶ | **10** | | 263 |

For Paperwork Reduction Act Notice, see instructions.    EEA    Form **2106** (2004)

Client Copy

Form 2106 (2004)    DONNA L EARLY                                                                    Page **2**

| Part II | Vehicle Expenses | | | |
|---|---|---|---|---|

**Section A – General Information** (You must complete this section if you are claiming vehicle expenses.)

| | | | (a) Vehicle 1 | (b) Vehicle 2 |
|---|---|---|---|---|
| 11 | Enter the date the vehicle was placed in service . . . . . . . . . . | 11 | 2003-01-12 | |
| 12 | Total miles the vehicle was driven during 2004 . . . . . . . . . . | 12 | 15,000 miles | miles |
| 13 | Business miles included on line 12 . . . . . . . . . . . . . . . . | 13 | 700 miles | miles |
| 14 | Percent of business use. Divide line 13 by line 12 . . . . . . . . | 14 | 4.67 % | % |
| 15 | Average daily roundtrip commuting distance . . . . . . . . . . . | 15 | 3 miles | miles |
| 16 | Commuting miles included on line 12 . . . . . . . . . . . . . . . | 16 | miles | miles |
| 17 | Other miles. Add lines 13 and 16 and subtract the total from line 12 | 17 | 14,300 miles | miles |
| 18 | Do you (or your spouse) have another vehicle available for personal use? . . . . . . . . . . . . . . . . . . | | | ☐ Yes ☐ No |
| 19 | Was your vehicle available for personal use during off-duty hours? . . . . . . . . . . . . . . . . . . | | | ☐ Yes ☐ No |
| 20 | Do you have evidence to support your deduction? . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | ☐ Yes ☐ No |
| 21 | If "Yes," is the evidence written? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | ☐ Yes ☐ No |

**Section B – Standard Mileage Rate** (See the instructions for Part II to find out whether to complete this section or Section C.)

| | | | |
|---|---|---|---|
| 22 | Multiply line 13 by 37.5 cents (.375) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 | 263 |

**Section C – Actual Expenses**

| | | | (a) Vehicle 1 | | (b) Vehicle 2 | |
|---|---|---|---|---|---|---|
| 23 | Gasoline, oil, repairs, vehicle insurance, etc. . . . . . . . . . | 23 | | | | |
| 24 a | Vehicle rentals . . . . . . . . | 24a | | | | |
| b | Inclusion amount (see instructions) | 24b | | | | |
| c | Subtract line 24b from line 24a . | 24c | | | | |
| 25 | Value of employer-provided vehicle (applies only if 100% of annual lease value was included on Form W-2 - see instructions) . . . | 25 | | | | |
| 26 | Add lines 23, 24c, and 25 . . . | 26 | | | | |
| 27 | Multiply line 26 by the percentage on line 14 . . . . . | 27 | | | | |
| 28 | Depreciation (see instructions) . . | 28 | | | | |
| 29 | Add lines 27 and 28. Enter total here and on line 1 . . . . . . . | 29 | | | | |

**Section D – Depreciation of Vehicles** (Use this section only if you owned the vehicle and are completing Section C for the vehicle.)

| | | | (a) Vehicle 1 | | (b) Vehicle 2 | |
|---|---|---|---|---|---|---|
| 30 | Enter cost or other basis (see instructions) . . . . . . . . . . | 30 | | | | |
| 31 | Enter section 179 deduction and special allowance (see instructions) | 31 | | | | |
| 32 | Multiply line 30 by line 14 (see instructions if you claimed the section 179 deduction or special allowance) | 32 | | | | |
| 33 | Enter depreciation method and percentage (see instructions) . . | 33 | | | | |
| 34 | Multiply line 32 by the percentage on line 33 (see instructions) . . . | 34 | | | | |
| 35 | Add lines 31 and 34 . . . . . . | 35 | | | | |
| 36 | Enter the applicable limit explained in the line 36 instructions . . . . . | 36 | | | | |
| 37 | Multiply line 36 by the percentage on line 14 . . . . . . | 37 | | | | |
| 38 | Enter the **smaller** of line 35 or line 37. Also enter this amount on line 28 above . . . . . . . . | 38 | | | | |

EEA

Form **2106** (2004)

Client Copy

**Form 8880**

Department of the Treasury
Internal Revenue Service

## Credit for Qualified Retirement Savings Contributions

▶ **Attach to Form 1040 or Form 1040A.**
▶ **See instructions.**

OMB No. 1545-1805

**2004**

Attachment
Sequence No. **129**

Name(s) shown on return
DONNA L EARLY

Your social security number

**CAUTION!** You **cannot** take this credit if **either** of the following applies.

- The amount on Form 1040, line 37, or Form 1040A, line 22, is more than $25,000 ($37,500 if head of household; $50,000 if married filing jointly).
- The person(s) who made the qualified contribution or elective deferral (a) was born after January 1, 1987, (b) is claimed as a dependent on someone else's 2004 tax return, or (c) was a **student** (see instructions).

| | | | (a) You | | (b) Your spouse |
|---|---|---|---|---|---|
| 1 | Traditional and Roth IRA contributions for 2004. **Do not** include rollover contributions . . . . . . . . . . . . . . . . . . . . . . . | 1 | | | |
| 2 | Elective deferrals to a 401(k) or other qualified employer plan, voluntary employee contributions, and 501(c)(18)(D) plan contributions for 2004 (see instructions) . . . . . . . . . . . . . . . . . . . . . | 2 | 18 | | |
| 3 | Add lines 1 and 2 . . . . . . . . . . . . . . . . . . | 3 | 18 | | |
| 4 | Certain distributions received after 2001 and before the due date (including extensions) of your 2004 tax return (see instructions). If married filing jointly, include **both** spouses' amounts in **both** columns. See instructions for an exception . . . . . . . . . . . . | 4 | | | |
| 5 | Subtract line 4 from line 3. If zero or less, enter -0- . . . . | 5 | 18 | | |
| 6 | In each column, enter the **smaller** of line 5 or $2,000 . . . | 6 | 18 | | |
| 7 | Add the amounts on line 6. If zero, **stop**; you cannot take this credit . . . . . . . . . . | | | 7 | 18 |
| 8 | Enter the amount from Form 1040, line 37*, or Form 1040A, line 22 | 8 | 17,589 | | |

9 Enter the applicable decimal amount shown below:

| If line 8 is – | | And your filing status is – | | |
|---|---|---|---|---|
| Over - | But not over - | Married filing jointly | Head of household | Single, Married filing separately, or Qualifying widow(er) |
| | | Enter on line 9 – | | |
| | $15,000 | .5 | .5 | .5 |
| $15,000 | $16,250 | .5 | .5 | .2 |
| $16,250 | $22,500 | .5 | .5 | .1 |
| $22,500 | $24,375 | .5 | .2 | .1 |
| $24,375 | $25,000 | .5 | .1 | .1 |
| $25,000 | $30,000 | .5 | .1 | .0 |
| $30,000 | $32,500 | .2 | .1 | .0 |
| $32,500 | $37,500 | .1 | .1 | .0 |
| $37,500 | $50,000 | .1 | .0 | .0 |
| $50,000 | --- | .0 | .0 | .0 |

| 9 | X. 0.50 |
|---|---|

**Note:** If line 9 is zero, **stop**; you cannot take this credit.

| 10 | Multiply line 7 by line 9 . . . . . . . . . . . . . . . . . . . . . . . . | | | 10 | 9 |
|---|---|---|---|---|---|
| 11 | Enter the amount from Form 1040, line 45, or Form 1040A, line 28 | 11 | 146 | | |
| 12 | Enter the total of your credits from Form 1040, lines 46 through 49, or Form 1040A, lines 29 through 31 . . . . . . | 12 | | | |
| 13 | Subtract line 12 from line 11. If zero, **stop**; you cannot take this credit | | | 13 | 146 |
| 14 | **Credit for qualified retirement savings contributions.** Enter the smaller of line 10 or line 13 here and on Form 1040, line 50, or Form 1040A, line 32 . . . . . . . . . . . . . | | | 14 | 9 |

*See Pub. 590 for the amount to enter if you are filing Form 2555, 2555-EZ, or 4563 or you are excluding income from Puerto Rico.

**For Paperwork Reduction Act Notice, see instructions.**          EEA          Form **8880** (2004)

**FORM 40** Alabama Individual Income Tax Return
RESIDENTS AND PART-YEAR RESIDENTS 2004

For the yr Jan. 1 - Dec. 31, 2004, or other tax yr.

| Beginning: | Ending: | FN (For official use only) |

Your social security number

Spouse's SSN if joint return

Your first name and initial (if joint return, also give spouse's first name and initial)   Last name

DONNA L EARLY

Present home address (number and street or P.O. Box number)

City, town or post office, state, and ZIP code

---

**Filing Status and Exemptions**
Check only one box.

1. ☐ $1,500 Single
2. ☐ $3,000 Married filing joint return (even if only one spouse had income)
3. ☐ $1,500 Married filing separate return. Complete line 5 with spouse's name & soc. sec. no.
4. ☒ $3,000 Head of family (with qualifying person). (See page 7 of instr.) Complete line 5.

5. Name
   Soc. Sec. No.
   Relationship   DAUGHTER

---

**Income and Adjustments**

6. Wages, salaries, tips, etc. (list each employer and address separately).

| | | A - Alabama tax withheld | | B - Income | |
|---|---|---|---|---|---|
| a | DFAS ATTN  DFAS  INDIANAPOLIS | 6a | 8 00 | 6a | 235 00 |
| b | RHEEM MANUFACTUR MONTGOMERY  36117 | 6b | 445 00 | 6b | 15,590 00 |
| c | PRUDENTIAL INS C SCRANTON | 6c | 00 | 6c | 1,470 00 |
| d | | 6d | 00 | 6d | 00 |

7. Interest and dividend income (also attach Schedule B if over $1,500) ▶ 7 | 00
8. Other income (from page 2, Part I, line 9) ▶ 8 | 00
9. Total income. Add amounts in the income column for line 6a through line 8 ▶ 9 | 17,295 00
10. Total adjustments to income (from page 2, Part II, line 8) ▶ 10 | 00
11. Adjusted gross income. Subtract line 10 from line 9 ▶ 11 | 17,295 00

---

**Deductions**

You Must Attach page 2 of Federal Form 1040, Federal Form 1040A, page 1 of 1040EZ, or a copy of your Teletile Schedule if claiming a deduction on line 13.

12. Check box a, if you ☐ a ☒ Itemized deductions, and enter amount from Schedule A, line...
    Check box b, if you ☐ b ☐ Standard Deduction (see instr.) Boxes a or b MUST be checked
    ▶ ☐ a ☒ Itemized Deductions  ▶ ☐ b Standard Deduction | 12 | 10,816 00
13. Federal tax liability (see instructions)
    DO NOT ENTER THE FEDERAL TAX WITHHELD FROM YOUR FORM W-2(S) | 13 | 00
14. Personal exemption (from line 1, 2, 3, or 4) ▶ 14 | 3,000 00
15. Dependent exemption (from page 2, Part III, line 2) ▶ 15 | 300 00
16. Total deductions. Add lines 12, 13, 14, and 15 | 16 | 14,116 00

---

**Tax**

Staple Form(s) W-2, W-2G, and/or 1099 here.

17. Taxable income. Subtract line 16 from line 11 | 17 | 3,179 00
18. Income Tax due. Enter amount from tax table or check if from ☐ Form NOL-85A | 18 | 118 00
19. Less credits from: ☐ Schedule CR and/or ☐ Schedule OC | 19 | 00
20a. Net tax due Alabama. Subtract line 19 from line 18 ▶ 20a | 118 00
20b. Consumer Use Tax (use worksheet on page 11) ▶ 20b | 00
21. You may make a voluntary contribution to the following: Alabama Election Campaign Fund
    a. Alabama Democratic Party ☐ $1 ☐ $2 ☒ none ▶ 21a | 00
    b. Alabama Republican Party ☐ $1 ☐ $2 ☒ none ▶ 21b | 00
    c. or the Neighbors Helping Neighbors ☐ Neighbors Helping Neighbors $ ▶ 21c | 00
22. Total tax liability and voluntary contribution. Add lines 20a, 20b, 21a, 21b, and 21c | 22 | 118 00

---

**Payments**

23. Alabama income tax withheld (from Forms W-2, W-2G, and/or 1099) | 23 | 453 00
24. Amount paid with extension (attach Form 4868A) | 24 | 00
25. 2004 estimated tax payments (see instructions on page 11) | 25 | 00
26. Total payments. Add lines 23 through 25 | 26 | 453 00

---

**AMOUNT YOU OWE**

27. If line 26 is larger than line 22, subtract line 26 from line 22, and enter...
    Place payment check or money order, loose in the mailing envelope.
    If paying by credit card do not include Form 40V and check here ☐ | 27 | 00
28. Estimated tax penalty. Also include on line 27 (see instructions page 11) | 28 | 00

---

**OVERPAID**

29. If line 26 is larger than line 22, subtract line 22 from line 26, and enter amount ▶ 29 | 335 00
30. Amount of line 29 to be applied to your 2005 estimated tax ▶ 30 | 00

---

**Donation Check-offs**

Enter $1, $5, $10, $25, none, or other amount in the appropriate boxes.

| a. Senior Services Trust Fund | 00 | f. AL Indian Children's Scholarship Fund ▶ | 00 |
| b. AL Arts Development Fund | 00 | g. Penny Trust Fund ▶ | 00 |
| c. AL Nongame Wildlife Fund | 00 | h. Foster Care Trust Fund ▶ | 00 |
| d. Child Abuse Trust Fund | 00 | i. Mental Health ▶ | 00 |
| e. AL Veterans Program ▶ | 00 | j. AL Breast & Cervical Cancer Program ▶ | 00 |
| | | k. AL 4-H Club ▶ | 00 |

32. Total. Add line 30 and lines 31a, b, c, d, e, f, g, h, i, j and k | 32 | 00

**PLEASE**
- Verify your social security number
- Recheck your math
- Sign return on page 2
- Attach W-2 form(s)

---

**REFUND**

33. REFUNDED TO YOU. CAUTION: You must sign this return on page 2.)
    Subtract line 32 from line 29. For Direct Deposit, check here ☐ and complete Part V, Page 2 ▶ 33 | 335 00

CLIENT COPY

Form 40 (2004) · DONNA L EARLY

**PART I**

**Other Income**
(see page 13)

| | | | |
|---|---|---|---|
| 1 | Alimony received | 1 | 00 |
| 2 | Business income or (loss) (attach Schedule C or C-EZ) | 2 | 00 |
| 3 | Gain or (loss) from sale of Real Estate, Stocks, Bonds, etc. (attach Schedule D) | 3 | 00 |
| 4a | Total IRA distributions  4a _____ 00  4b Taxable amount (see instructions) | 4b | 00 |
| 5a | Total pensions and annuities  5a _____ 00  5b Taxable amount (see instructions) | 5b | 00 |
| 6 | Rents, royalties, partnerships, estates, trusts, etc. (attach Schedule E) | 6 | 00 |
| 7 | Farm income or (loss) (attach Federal Schedule F) | 7 | 00 |
| 8 | Other income (state nature and source - see instructions) _____ | 8 | 00 |
| 9 | **Total other income.** Add lines 1 through 8. Enter here and also on page 1, line 8 ▶ | 9 | 00 |

**PART II**

**Adjustments to Income**
(see page 16)

| | | | |
|---|---|---|---|
| 1a | Your IRA deduction | 1a | 00 |
| b | Spouse's IRA deduction | 1b | 00 |
| 2 | Payments to a Keogh retirement plan and self-employment SEP deduction | 2 | 00 |
| 3 | Penalty on early withdrawal of savings | 3 | 00 |
| 4 | Alimony paid. Recipient's last name _____ Social security no. ▶ _____ Address _____ City _____ State _____ ZIP _____ | 4 | 00 |
| 5 | Adoption expenses | 5 | 00 |
| 6 | Moving Expenses (Attach Federal Form 3903) to City _____ State _____ ZIP _____ | 6 | 00 |
| 7 | Self-employed health insurance deduction | 7 | 00 |
| 8 | **Total adjustments.** Add lines 1 through 7. Enter here and also on page 1, line 10 | 8 | 00 |

**PART III**

**Dependents**

Do not include yourself or your spouse

(See page 9)

| 1a Dependents: (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you. | (4) Did you provide more than one-half dependent's support? |
|---|---|---|---|
| JAZMINA D   EARLY | 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 | DAUGHTER | YES |
| | | | |
| | | | |
| | | | |

| b | Total number of dependents claimed above | | 1 |
|---|---|---|---|
| 2 | Amount allowed.  (Multiply $300 by the total number of dependents claimed on line 1b.) | | |
| | Enter amount here and on page 1, line 15 ▶ | 2 | 300 00 |

**PART IV**

**General Information**

All Taxpayers Must Complete This Section.

1a  **Residency**  ☒ Full Year  If you were a part-year resident of Alabama during 2004, indicate your period of residence:
Check only one box ▶  ☐ Part Year  From _____ 2004 through _____ 2004. Total months _____

2  Did you file an Alabama income tax return for the year 2003?  ☒ Yes  ☐ No

3  If no, state reason. _____

4  Give name and address of present employer(s). Yours  DFAS ATTN DFAS INDIANAPOLIS
Your Spouse's _____

5  Enter the Federal Adjusted Gross Income $ 27,589  and Federal Taxable Income $ 1,474  as reported on your 2004
Federal Individual Income Tax Return.

6  Do you have income which is reported on your Federal return but not reported on your Alabama return (other than your state tax refund)?  ☐ Yes  ☒ No
If yes, enter source(s) and amount(s) below (other than state income tax refund)?
Source _____ Amount _____ 00
Source _____ Amount _____ 00

**PART V**

**Direct Deposit**

For Direct Deposit of your refund, complete 1, 2 and 3 below. ( See Page 8 instructions to see if you qualify.)
1.  Routing Number: _____  2.  Type:  ☐ Checking  ☐ Savings
3.  Account Number: _____

**Sign Here**

Keep a copy of this return for your records.

☒ I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.
Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature _____ Date _____ Daytime telephone number _____ Your occupation  ASSEMBLY LINE

Spouse's signature (if joint return, BOTH must sign) _____ Date _____ Daytime telephone number _____ Spouse's occupation _____

**Paid Preparer's Use Only**

| Preparer's signature _____ | Date  01-26-2005 | Check if self-employed ☒ | Preparer's SSN or PTIN ◀ |
|---|---|---|---|

Firm's name (or yours if self-employed) and address  MAX TAX SERV  Daytime telephone no.  (334) 834-2008  E.I. No. _____
MONTGOMERY   AL   ZIP Code  36104-4501

If an addressed envelope came with your return, please use it and follow the instructions on the envelope. If you do not have one, mail your return to one of the addresses below.

**WHERE TO FILE FORM 40**

If you are not making a payment, mail your return to:

Alabama Department of Revenue
P.O. Box 154
Montgomery, AL 36135-0001

If you are making a payment, mail your return, Form 40V, and payment to:

Alabama Department of Revenue
P.O. Box 2401
Montgomery, AL 36140-0001

Mail only your 2004 Form 40 to one of the above addresses. Prior year returns, amended returns, and all other correspondence should be mailed to Alabama Department of Revenue, P.O. Box 327464, Montgomery, AL 36132-7464.

AL24

Client Copy

**SCHEDULES A, B, & CR (FORM 40)**

**ALABAMA DEPARTMENT OF REVENUE**

# Schedule A – Itemized Deductions

(See Schedules B and CR)

**ATTACH TO FORM 40 --- SEE INSTRUCTIONS FOR SCHEDULE A**

**200**

Name(s) as shown on Form 40

**DONNA L EARLY**

Your social security number

The itemized deductions you may claim for the year 2004 are similar to the itemized deductions claimed on your Federal return, however, the amounts may differ. Please see instructions before completing this schedule. **PART-YEAR RESIDENTS:** A resident of Alabama for only a part of the year should list below only those deductions actually paid while a resident of Alabama.

| | | | | |
|---|---|---|---|---|
| **Medical and Dental Expenses (See page 19)** | 1 | Medical and dental expenses. Do not include expenses reimbursed or paid by others. | 1 | 125 00 |
| | 2 | Enter amount from Form 40, line 11. **2** 17,295 00 | | |
| | 3 | Multiply line 2 by 4% (.04). Enter the result. | 3 | 692 00 |
| | 4 | Subtract line 3 from line 1. Enter the result. If zero or less, enter -0-. | 4 | 0 00 |
| **Taxes You Paid (See page 20)** | 5 | Real estate taxes. | 5 | 566 00 |
| | 6 | FICA Tax (Social Security and Medicare) and 2004 Federal Self-Employment Tax. | 6 | 1,348 00 |
| | 7 | Railroad Retirement (Tier 1 only). | 7 | 00 |
| | 8 | Other taxes. (List - include personal property taxes.) ▶ | 8 | 00 |
| | 9 | Add the amounts on lines 5 through 8. Enter the total here. | 9 | 1,914 00 |
| **Interest You Paid (See page 20) NOTE: Personal interest is not deductible** | 10 a | Home mortgage interest and points reported to you on Federal Form 1098. | 10a | 5,110 00 |
| | b | Home mortgage interest not reported to you on Federal Form 1098. (If paid to an individual, show that person's name and address.) | 10b | 00 |
| | 11 | Points not reported to you on Form 1098. | 11 | 00 |
| | 12 | Investment interest. (Attach Form 4952A). | 12 | 00 |
| | 13 | Add the amounts on lines 10a through 12. Enter the total here. ▶ | 13 | 5,110 00 |
| **Gifts to Charity (See page 20)** | | **CAUTION:** If you made a charitable contribution and received a benefit in return, see page 20. | | |
| | 14 | Contributions by cash or check. | 14 | 3,000 00 |
| | 15 | Other than cash or check. (You **MUST** attach Federal Form 8283 if over $500.) | 15 | 450 00 |
| | 16 | Carryover from prior year. | 16 | 00 |
| | 17 | Add the amounts on lines 14 through 16. Enter the total here. ▶ | 17 | 3,450 00 |
| **Casualty and Theft Loss (Attach Form 4684)** | 18 a | Enter the amount from Federal Form 4684, line 16 (see page 21) | 18a | 00 |
| | b | Enter 10% of your Adjusted Gross Income Form 40, line 11). | 18b | 00 |
| | c | Subtract line 18b from line 18a. If zero or less, enter -0-. | 18c | 00 |
| **Job Expenses and Most Other Miscellaneous Deductions (See page 21)** | 19 | Unreimbursed employee expenses - job travel, union dues, job education, etc. (You MUST attach Fed Form 2106 if required. See instructions.) ▶ UNIFORM EXPENSES FORM 2106 | 19 | 563 00 |
| | 20 | Other expenses (investment, tax preparation, safe deposit box, etc.). List type and amounts. ▶ TAX PREP FEES | 20 | 125 00 |
| | 21 | Add the amounts on lines 19 and 20. Enter the total. | 21 | 688 00 |
| | 22 | Multiply the amount on Form 40, line 11 by 2% (.02). Enter the result here. | 22 | 346 00 |
| | 23 | Subtract line 22 from line 21. Enter the result. If zero or less, enter -0-. | 23 | 342 00 |
| **Other Miscellaneous Deductions** | 24 | Other (from list on page 22 of instructions). List type and amount. ▶ | 24 | 00 |
| **Qualified Long-Term Care Ins. Premiums** | | **CAUTION:** Do not include medical premiums. | | |
| | 25 | Enter amount here. | 25 | 00 |
| **Total Itemized Deductions** | 26 | Add the amounts on lines 4, 9, 13, 17, 18c, 23, 24, and 25. Enter the total here. Then enter on Form 40, page 1, line 12. ▶ | 26 | 10,816 00 |

CREDIT COPY

Schedule A (Form 40) 2004

Declaration Control Number (DCN)

00 – 630298 – 02107 – 5

**FORM**
**AL8453**

### ALABAMA DEPARTMENT OF REVENUE
### Individual Income Tax Declaration for Electronic Filing

For the year January 1 – December 31, 2004

2004

**Label**

Use Alabama label. Otherwise, please type or print.

Your first name and initial: DONNA L EARLY

Last name

Your social security number

If a joint return, spouse's first name and initial

Last name

Spouse's soc. sec. no. if joint return

Home address (number and street). If a P.O. Box, see instructions.

Apt. no.

Telephone number (optional)

FN (For official use only)

| **Part I** Tax Return Information (Whole dollars only.) | | | |
|---|---|---|---|
| 1 | Alabama taxable income (Form 40, line 17) | 1 | 3,179 |
| 2 | Total tax liability (Form 40, line 22) | 2 | 118 |
| 3 | Total payments (Form 40, line 26) | 3 | 453 |
| 4 | Refund (Form 40, line 33) | 4 | 335 |
| 5 | Amount you owe (Form 40, line 27) | 5 | |

**Part II**
**Direct Deposit**

1 Routing number:

2 Account number:

3 Type of account: ☐ Checking  ☐ Savings

**Part III**
**Declaration of Taxpayer**

(Sign only after Part I is completed.)

Under penalties of perjury, I declare that I have compared the information contained on my return with the information I have provided to my electronic return originator and that the amounts described in Part 1 above agree with the amounts shown on the corresponding lines of my 2004 Alabama individual income tax return. To the best of my knowledge and belief this return, including any accompanying schedules and statements, is true, correct, and complete. Also, I hereby authorize the Alabama Department of Revenue to disclose to my ERO described below, any information concerning the disbursement of the refund requested or any problems encountered in the processing of my return.

☒  I authorize a representative of the Department of Revenue to discuss my return and attachments with my preparer.

**Sign Here** ▶

Your signature    Date    Spouse's signature. If a joint return, BOTH must sign.    Date

**Part IV**
**Declaration of Electronic Return Originator (ERO) and Paid Preparer**

(See instructions.)

I declare that I have reviewed the above taxpayer's Alabama individual income tax return and that the entries on this form are complete and correctly represented based on all information of which I have any knowledge. I also declare that I have followed all other requirements described in IRS PUB. 1345, Revenue Procedures for Electronic Filing of Individual Income Tax Returns (Tax Year 2004), and the Alabama Handbook for Electronic Filers of Individual Income Tax Returns (Tax Year 2004). If I am also the paid preparer, under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

**ERO's Use Only**

ERO's signature    Date    Check if also paid preparer ☒    ERO's SSN or PTIN

Firm's name (or yours if self-employed and address    MAX TAX SERVICE
1101 ADAMS AVE
MONTGOMERY          AL          E.I. No.    ZIP Code 36104-4501

**Paid Preparer's Use Only**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

Preparer's signature    Date    Check if self-employed ☐    Preparer's SSN or PTIN

Firm's name (or yours if self-employed) and address    E.I. No.    ZIP Code

Form AL8453 2004

## DO NOT MAIL TO ALABAMA DEPT. OF REVENUE

AL2

DONNA L EARLY

**2005**

# Refund Anticipation Loan and/or Bonu$ Deposit Account
# with Cashier's Check

## Application/Agreement For Bank One Refund Anticipation Loan
## and/or Bonu$ Deposit Account with Cashier's Check
### Creditor: Bank One, a division of JPMorgan Chase Bank, N.A. ("Bank One")

**Important information about your anticipated tax refund and Bank One tax related products:**

- A Refund Anticipation Loan is not a tax refund. It is a loan based upon your anticipated tax refund. If you receive a Refund Anticipation Loan, you will be obligated to repay it even if you do not receive a tax refund or your refund is less than expected. Bank One does not guarantee that a tax refund will be issued, when a tax refund might be issued or the amount of any tax refund.

- You can apply for a Bonu$ Deposit Account without a Refund Anticipation Loan. However, if you apply for a Refund Anticipation Loan by checking the box on page 2, you will also receive a Bonu$ Deposit Account. Be sure to instruct your tax preparer regarding your choice.

- You can file your income tax return electronically without applying for a Bonu$ Deposit Account or a Refund Anticipation Loan from Bank One.

- You can direct the IRS or State to send your refund check to you or directly deposit your refund to an existing account without applying for a Bonu$ Deposit Account or a Refund Anticipation Loan from Bank One. The time it takes to get your refund will be approximately the same with either a Bonu$ Deposit Account or an electronically filed return with a direct deposit by the IRS to an existing account.

- When the IRS or State issues a refund on an electronically filed return with direct deposit, such refund is typically received within 10-21 days. This can be less than half the time it takes to receive the refund through electronic filing without direct deposit or through paper filing of the tax return.

- If you owe money to Bank One or another RAL lender for Refund Anticipation Loan(s) received in a prior year, and you complete this Application, Bank One will establish a Bonu$ Deposit Account but decline your Refund Anticipation Loan application, if any, and Bank One will apply any tax refund received into your Bonu$ Deposit Account to these outstanding RAL debt(s) with Bank One and/or other RAL lenders.

- Bank One compensates transmitters and eligible tax preparers for referring applicants to Bank One.

- If you apply for a Refund Anticipation Loan and your RAL application is not approved or you do not accept the loan, your tax refund, if any, still will be deposited into a Bonu$ Deposit Account and the Bonu$ Deposit Account processing fee and other terms and provisions of this Application will still apply.

- Bank One's fees are in addition to other fees charged by your tax preparer and the transmitter who electronically files your return.

**BANK ONE FEES** – Bank One's Bonu$ Deposit Account processing fee is $28.00 for either a Federal or State return or $38.00 if both a Federal and State return are filed electronically. If you apply for a Refund Anticipation Loan (by checking the box on page 2) you are also applying for a Bonu$ Deposit Account. If your RAL Application is approved and you accept the loan, the total Bank One fees, including the Bonu$ Deposit Account processing fee and the Bank One RAL fee, which is a finance charge, are:

| Refund Anticipation Loan (RAL) | |
|---|---|
| Loan Amount Range | Total Fee* |
| $200 - $499 | $34.00 |
| $500 - $999 | $54.00 |
| $1,000 - $1,499 | $69.00 |
| $1,500 - $1,999 | $79.00 |
| $2,000 - $5,000 | $99.00 |

*Add $10.00 if you direct both your Federal and State refunds to your Bonu$ Deposit Account.

**RAL ELIGIBILITY** – To be eligible for a RAL, your anticipated Federal income tax refund minus any claimed Earned Income Credit ("EIC") must be $0 or greater. If, according to our records, you have had a RAL, Bonu$ Deposit Account or similar product in the past, you are eligible for a RAL between $200 and $5,000 but in any event no more than your anticipated Federal tax refund. If, according to our records, you have not had a RAL, Bonu$ Deposit Account or similar product in the past, you are eligible for a RAL between $200 and $2,000 but in any event no more than your anticipated Federal tax refund.

## BANK ONE REFUND ANTICIPATION LOAN DISCLOSURE STATEMENT

The RAL is traditionally a single payment loan with a demand feature, which you repay when Bank One receives the direct deposit of your tax refund (which may be less than your anticipated refund). If the direct deposit of your tax refund is not made, or if it is less than the amount of the RAL, Bank One will demand repayment. If Bank One receives a direct deposit amount greater than your loan amount, Bank One will deliver a check to you for the excess amount.

The chart to the right calculates the Annual Percentage Rate ("APR") on Bank One's RAL fee of $6.00, $26.00, $41.00, $51.00 or $71.00, depending on the loan amount, based upon a 10 day period. You prepay this fee when Bank One withholds the fee from your RAL proceeds. Your RAL check includes a check stub that provides specific Truth-in-Lending disclosures.

Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

Wisconsin Residents: Wisconsin law provides that no agreement, court order, or individual statement applying to marital property will affect a creditor's interest unless, prior to the time credit is granted, the creditor is furnished with a copy of the agreement, court order, or statement, or has actual knowledge of the adverse provision.

### REFUND ANTICIPATION LOAN

| Loan Amount | Bank One's RAL Fee (Finance Charge) | Estimated Repayment Period (Days) | Annual Percentage Rate ("APR")* |
|---|---|---|---|
| $200 | $6.00 | 10 | 112.867% |
| $499 | $6.00 | 10 | 44.422% |
| $500 | $26.00 | 10 | 200.211% |
| $999 | $26.00 | 10 | 97.533% |
| $1,000 | $41.00 | 10 | 158.046% |
| $1,499 | $41.00 | 10 | 102.541% |
| $1,500 | $51.00 | 10 | 128.468% |
| $1,999 | $51.00 | 10 | 95.580% |
| $2,000 | $71.00 | 10 | 134.344% |
| $5,000 | $71.00 | 10 | 52.577% |

* This chart estimates an APR using the Bank One RAL Fee. This chart does not include other fees you have authorized Bank One to deduct from the amount of the RAL. If approved for the RAL, you will receive a Truth-in-Lending Statement with your RAL check. This statement will list the Finance Charge, APR, and other fees assessed on your RAL transaction.

**CHECK THIS BOX TO APPLY FOR A REFUND ANTICIPATION LOAN**

[ ] By checking this box, you are applying for a Refund Anticipation Loan (RAL) of $_____ (if left blank, the maximum eligible amount) and a Bonu$ Deposit Account. If your RAL application is approved, you can expect to receive a disbursement check from Bank One within 1-4 business days after approval. The RAL check will be for the amount of your RAL minus the Bank One fees and other fees and charges described in this Application/Agreement. If your RAL application is not approved or you do not accept the loan, the Bonu$ Deposit Account processing fee and the other terms and provisions of this Application will still apply.

**LOAN AGREEMENT** – NOTE: You are not obligated under this Loan Agreement unless and until (i) Bank One offers to lend you money by issuing a RAL check to you and (ii) you accept Bank One's offer by endorsing the check (or otherwise transferring it for value). Your acceptance of Bank One's offer constitutes acceptance of the terms of this Loan Agreement. If you do not accept Bank One's offer, then you are not obligated under this Loan Agreement; however, the other terms and provisions in this Application will continue to apply. By endorsing the RAL check (or otherwise transferring it for value) and thereby accepting the terms of this Loan Agreement, you promise to pay to Bank One the Amount Financed plus the Finance Charge under the terms of this Loan Agreement and those terms disclosed on the check stub attached to the RAL check. Payment is due ON DEMAND or when Bank One receives your income tax refund from the IRS (or State taxing authority, if applicable). You agree that Bank One has the right to withdraw from your Bonu$ Deposit Account sufficient funds to pay off your outstanding RAL at any time. Bank One will notify you promptly if the direct deposit of your tax refund does not equal the amount of your RAL. You agree that you are fully responsible for payment under this Loan Agreement. Bank One may delay enforcing any of its rights under this Loan Agreement without losing them. Bank One can excuse one obligor from certain responsibilities at any number of times without losing rights against your other obligors. You hereby grant Bank One a security interest in the anticipated refund to be paid to you by the IRS (and State taxing authority, if applicable) for the tax year on which the RAL check is based, and in the Bonu$ Deposit Account. If, for any reason, any part of your anticipated refund is disallowed or offset by the IRS (or State taxing authority, if applicable) or if you should receive a refund check in the mail, you agree to advise your tax preparer and promptly repay your RAL to Bank One.

**BONU$ DEPOSIT ACCOUNT** – You authorize and permit Bank One to establish a Bonu$ Deposit Account, a special purpose deposit account, in your name for the purpose of receiving the direct deposit of your anticipated federal and/or State tax refund(s) and repaying your RAL (if any). You will be permitted to make any deposits to or withdrawals from the Bonu$ Deposit Account. At any time nor are you permitted to close the Bonu$ Deposit Account at any time. However, Bank One may close your Bonu$ Deposit Account at any time.

**RECEIVING REFUND AND APPLYING PROCEEDS** – When Bank One receives your tax refund, Bank One will immediately credit your Bonu$ Deposit Account for such amount. Bank One will then deduct (i) the amount owed on your RAL, if applicable, (ii) any unpaid fees or charges owed to your tax preparer and to the transmitter, which Bank One will forward to your tax preparer or the transmitter on your behalf, (iii) the applicable Bank One fees described on page 1 and (iv) any amounts still owed to Bank One or other lenders for RALs from prior years. Bank One will then issue you a check for the remaining balance, if any such balance is greater than $1.00.

**COLLECTION OF OUTSTANDING RAL DEBT** – If you owe money for a RAL from any prior year to Bank One or another RAL lender, including Beneficial National Bank, Household Bank, t.s.b., Santa Barbara Bank and Trust, County Bank, First Bank of Delaware, First Republic Bank, River City Bank, First Security Bank, Republic Bank & Trust Co., Republic First Bank, Imperial Capital Bank, or any of their successors or assigns, you acknowledge such prior obligations and authorize Bank One to deduct the amount of the outstanding RAL obligation(s) from your

Bonu$ Deposit Account and apply such funds to your outstanding RAL obligation(s) with Bank One and/or send such funds to the appropriate RAL lender(s). This provision applies to any Bonu$ Deposit Account, whether or not you apply for a RAL. If you have an outstanding RAL obligation, you understand that Bank One will be acting as a debt collector under the terms of this Application and that any information obtained will be used for that purpose.

**ARBITRATION – PLEASE READ THIS PROVISION CAREFULLY. IT PROVIDES THAT ANY DISPUTE WILL BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING.**

Any claim, dispute or controversy by either you or Bank One against the other (or against the employees, agents, parents, subsidiaries, affiliates, beneficiaries, agents or assigns of the other) arising from or relating in any way to this Application/Agreement or our relationship, including Claims regarding the applicability or validity of this arbitration clause, shall be resolved exclusively and finally by binding arbitration.

All claims are subject to arbitration, no matter what theory they are based on or what remedy they seek. This includes Claims based on contract, tort (including intentional tort), fraud, agency, negligence, statutory or regulatory provisions, or any other sources of law. Claims made and remedies sought as part of a class action, private attorney general or other representative action are subject to arbitration on an individual (non-class, non-representative) basis. As an exception to arbitration, you and Bank One retain the right to file in a small claims court any Claim that is within that court's jurisdiction. If a Claim is brought in a small claims court, it must be asserted on an individual basis.

The party bringing the Claim may select any one of three national arbitration organizations to administer the arbitration of the Claim: the National Arbitration Forum ("NAF"), JAMS/ Endispute ("JAMS"), or the American Arbitration Association ("AAA"). The arbitration organization that is selected will apply its code of procedures in effect at the time the arbitration is filed, subject to this Application/Agreement. The arbitration will be conducted before a single arbitrator and will be limited solely to the Claim between you and us. The arbitration, or any portion of it, will not be consolidated with any other arbitration and will not be conducted on a class action or representative basis.

If you prevail in the arbitration of any Claim against Bank One, Bank One will reimburse you for any fees you paid to the arbitration organization in connection with the arbitration. Any decision rendered in such arbitration proceedings will be final and binding on the parties, and judgment may be entered in a court of competent jurisdiction. Rules and forms may be obtained from, and Claims may be filed with, any of these organizations, as follows: the NAF at P.O. Box 50191, Minneapolis, Minnesota 55405, website at www.arb-forum.com; JAMS at 1920 Main Street, Suite 300, Irvine, California 92614, website at www.jamsadr.com; or the AAA at 335 Madison Avenue, Floor 10, New York, New York 10017, website at www.adr.org. Any arbitration hearing at which you wish to appear will take place at a location within the federal judicial district that includes your residential address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

This arbitration provision applies to all Claims now in existence or that may arise in the future. The arbitration provision shall survive termination of your RAL or Bonu$ Deposit Account as well as voluntary payment of the debt in full by you or any bankruptcy by you.

**IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND BANK ONE MAY OTHERWISE HAVE HAD A RIGHT OR OPPORTUNITY TO BRING CLAIMS IN A COURT, BEFORE A JUDGE OR A JURY, AND/OR TO PARTICIPATE OR BE REPRESENTED IN A CASE FILED IN COURT BY OTHERS (INCLUDING CLASS ACTIONS). BUT EXCEPT AS OTHERWISE PROVIDED ABOVE, THOSE RIGHTS ARE WAIVED AND ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.**

**GOVERNING LAW -** The Loan Agreement shall be governed in accordance with applicable Federal laws and the laws of the State of Ohio, except that the Arbitration section above shall be governed solely by Federal law.

**ASSIGNMENT -** Bank One may assign its rights and obligations under this Application/Agreement in whole or in part.

**DISCLOSURE OF INFORMATION -** You authorize Bank One, your tax preparer, and the transmitter to disclose to each other (a) your tax return information and other information related to the evaluation and processing of this Application, (b) information related to your RAL and/or Bonu$ Deposit Account, and (c) any information related to the collection of prior RALs owed to Bank One or other RAL lenders. If Bank One is legally required to give you any specific notices or disclosures, Bank One may provide such information to your tax preparer for the tax preparer to forward to you. You authorize Bank One to disclose information regarding your Application/Agreement, Bonu$ Deposit Account and/or RAL to other RAL lenders for product eligibility and collection purposes. Bank One may inquire of the IRS (and the State, if applicable) as to the status of your tax refund(s) and may receive from or supply to the IRS (and State, if applicable) information

to expedite the issuance and collection of your RAL. You, your tax preparer, and any transmitter who processes information in connection with your Bonu$ Deposit Account or RAL, will screen your tax return information for indicators of potential fraud or abuse and will forward such information/indicators to the IRS.

**VERIFICATION OF IDENTITY -** Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means to you: When you open an account, we will ask for your name, residential address, date of birth and social security number which will allow us to verify your identity.

**TRANSMITTAL OF APPLICATION -** Once you have signed this Application and the IRS Transmittal Form 8453 or its equivalent (and State Form 8453 or its equivalent, if applicable), your tax preparer will electronically submit your tax return(s) to the IRS and/or State and to Bank One, along with this Application.

Note: Bonu$ Deposit Accounts and RALs are available only to taxpayers who list a tax return address within the United States, one of its possessions, or from a U.S. Military Post Office (APO or FPO).

**The information below must be completed for all customers requesting a RAL and/or a Bonu$ Deposit Account. If the tax return is being filed as Married Filing Joint, it must be completed for both the Primary Taxpayer and the Spouse.**

<div style="border-left:2px solid #000; padding-left:4px">
To be completed by ERO/Tax Preparer

**CUSTOMER INFORMATION:**

**Primary:** Name (First, MI, Last): DONNA L EARLY  (Must be 18 or older)

Date of Birth: ___  Daytime Phone: 334 - ___  Social Security Number: ___

Physical Address: ___  Evening Phone: 334 - ___

**Spouse\*:** Name (First, MI, Last): ___  Social Security Number: ___

Date of Birth: ___  Daytime Phone: ___  Evening Phone: ___

Physical Address: ___

**\* Required only if the tax return is filed Married Filing Joint**

**IDENTIFICATION: In accordance with IRS ERO Guidelines, perform the following verification steps.**

**TWO FORMS OF ID ARE REQUIRED – AT LEAST ONE MUST BE A CURRENT PICTURE ID FROM GROUP A**

**GROUP A: (Must be Picture ID)**
- Driver's License
- BMV/DMV State ID
- Military ID
- US Passport
- Resident Alien ID
- Employee ID
- Student ID

**GROUP B:**
- Major Credit/Discover Card
- SSN Card
- Union Membership
- Check Cashing Card
- Prior Client

**PRIMARY NAME/SOCIAL SECURITY NUMBER VALIDATION: (USE IRS MAILING LABEL WHENEVER POSSIBLE.)**

Verify that the Primary Taxpayer has provided one of the following documents as proof of Name and Social Security Number, and that the Primary information identified above matches the document exactly.

- 2004 IRS Mailing Label
- Valid Social Security Card
- Current Military ID
- Prior Client
</div>

**APPLICANT CERTIFICATION -** By signing this Application, I hereby certify that ___ I do not owe any tax due, am not subject to any tax liens from prior tax years, have not previously filed a Federal (or State, if applicable) Income Tax Return for year 2004, do not owe any delinquent child support and/or alimony payments, do not owe any delinquent student loans, VA loans or other Federally guaranteed loans, do not have a petition (whether voluntary or involuntary) currently filed, nor do I anticipate filing, under any State or Federal bankruptcy or insolvency laws, have not petitioned, or prorated tax, did not have any amount of my 2003 refund applied to my 2004 return, and have not had a RAL with Bank One or any other RAL lender which has been discharged in bankruptcy.

**DEBT COLLECTION NOTICE -** If you owe money to Bank One or another RAL lender for Refund Anticipation Loan(s) received in a prior year, and you complete this Application, Bank One will install a Bonu$ Deposit Account but may decline your Refund Anticipation Loan application, if any, and Bank One will apply any tax refund received into your Bonu$ Deposit Account to those outstanding RAL debt(s) with Bank One and/or other RAL lenders.

**NOTICE TO CONSUMER -** Do not sign this paper before you read it. You are entitled to a copy of this paper. You may prepay the unpaid balance at any time without penalty.

**SEE PAGE 4 OF THIS DOCUMENT FOR ADDITIONAL INFORMATION REGARDING THE REFUND ANTICIPATION LOAN**

I certify that I have read and understand this Application/Agreement, including the IMPORTANT INFORMATION on page 1, the BANK ONE REFUND ANTICIPATION LOAN DISCLOSURE STATEMENT on page 2, APPLICATION on page 2, DISCLOSURE OF INFORMATION on page 3, and the DEBT COLLECTION NOTICE on page 3. I further certify that all my information in this Application/Agreement is correct to the best of my knowledge, that this Application/Agreement is based upon a bona fide 2004 Federal (and State, if applicable) income tax return, that the tax return is true, complete and accurate in all respects, and that I have received the CHASE AND BANK ONE PRIVACY POLICY.

Primary Signature: ___  Date: ___

Spouse Signature: ___  Date: ___

As ERO/Tax Preparer, I certify that I followed the verification steps listed in the Identification section and that I witnessed the applicant(s) signature(s).

Witness Signature: ___  Date: ___

You certify that you have received the following checks and check stubs. If you received a RAL Check, you also received the Truth-in-Lending Disclosures, which were printed on the check stub. (If mailed, indicate "mailed" and date.)

Check Number: ___  Primary or Spouse's Signature: ___  Date: ___

Check Number: ___  Primary or Spouse's Signature: ___  Date: ___

CLIENT COPY

# EXHIBIT AA

**Information Redacted Pursuant to General Order No. 2:04-mc-3228**



E-MAILED
9/28/05

Donna Early

---

**CARRER OBJECTIVE**
To become employed as a Registered Medical Assistant in a medical facility where I will be able to
effectively submit my knowledge, skill, and training in a clinical or laboratory setting.

**EDUCATION**
Capps College, Montgomery, AL
Medical Assistant, September 2005
Course Studied Principle of Math, Medical Law and Ethics, First Aid, Safety and CPR, Communications,
Anatomy and Terminology, Basic keyboarding,Examination Room Techniques,Diagnostic Machines,
Pharmacology, Body System,Clinical Procedures,  Psychology, Hematology, Medical Computer
Application, Phlebotomy, Drug Administration, Medical Insurance with IDC-9CPT training involved,
Anatomical Structures, Urinalysis and Bacteriology
**CERTIFICATION**
CPR, HIPAA, AND FIRST AID

Trenholm
Early childhood Development

U.S. Army
Sams1 Computer
Military Police Academy
Retired

U.S. Army
63J Quatermaster and Chemical

Monroeville County High School
Diploma, 1986

**Experience**
Cancer Care Center of Montgomery
Work-up patients in the center record vitals, venipunture,weight and handling multiple tasks.

Military Police 1984-2003
As a United Stated Militry Police Officer an achievement in law enforcement included leadership,
teamwork, postive work ethic and cross-functional skills. It also entailed hands on experience in aspects of
motor accidents, narcotics, and trafficking criminals.
Secreted Military instillation over-seas base

**CANCER CARE**
**00014**

CANCER CARE
00018

# APPLICATION FOR EMPLOYMENT

## PERSONAL INFORMATION

Name: _Early          Donna          La'Shay_          Date: _____

Present Address: _____

Permanent Address: _____ Street _____ City _____ State _____ Zip

Phone No. _____ Street _____ City _____ State _____ Zip

Social Security No.: _____          Are you 18 years or older? Yes _✓_ N

Are you either a U.S. citizen or an alien authorized to work in the United States? Yes _✓_ No ___

## EMPLOYMENT DESIRED

Position: _Medical Assistant_

Date you can start: _11-4-05_          Referred by: _____

Are you employed now? Yes ___ No _✓_          Salary Desired: _9.50 hr_

May we inquire of your present employer? Yes _✓_ No ___

Ever applied to this company before? Yes ___ No _✓_ Where: _____ When: _____

## EDUCATION

| | Name and location of School | *No. of years attended | *Did you graduate? | Subjects studied |
|---|---|---|---|---|
| High School | Monroeville County High | 12 | Yes | |
| College | Capps College | | Yes | |
| Trade, Business or Correspondence School | Military College - school | | | |

## GENERAL

Subjects of special study or research work: _____

Special Skills: _Communication, typing, And Military MP, Quartermaster Chemical_

Activities (civic, athletic, etc.): _Shopping, church, Travel_

*include names of organizations which indicate the race, creed, sex, age, marital status, color or nation of origin of its members*

U.S. Military Service: _Yes_          Rank _E-5_

Present Membership in National Guard or Reserves: _National Guard_

*Age Discrimination in Employment Act of 1967 prohibits discrimination on the basis of age with respect to individuals who are at least 40 years of age.*

## FORMER EMPLOYERS (List below your past employers, starting with the last one first).

| Date Month and Year | Name and Address of Employer | Salary | Position | Reason for Leaving |
|---|---|---|---|---|
| FROM 1994 / TO 1996 / | Alabama National Guard | | | Active Master General Repair |
| FROM 1996 / TO 2001 / | Alaban National Guard | | MP — Qml | |
| FROM / TO / | | | | |
| FROM / TO / | | | | |

What was your favorite past employment?  MP

What did you like most and least about this job?  going to the field

## REFERENCES  (Give the names of three persons not related to you, whom you have known at least one year)

| Name | Address | Business | Telephone Number | Years Acquainted |
|---|---|---|---|---|
| 1. Leon Houston | | Brick Mason | 399-2791 | 20 |
| 2. Joyce Jackson | | V. A. | 272-4620 3 or 25 | |
| 3. Bridgett Strother | | Payless | 272-0419 | 15 |

I certify that the facts contained in this application are true and complete to the best of my knowledge and understand that, if employed, falsified statements on this application shall be grounds for dismissal.

I authorize investigation of all statements contained herein and the references listed above to give you any and all information concerning my previous employment and any pertinent information they may have, and release parties from all liability for any damage that may result from furnishing the same to you.

I understand and agree that, if hired, my employment is for no definite period and may, regardless of the date payment of my wages and salary, be terminated at any time without prior notice and without cause."

c 10-4-05            Signature  Donna L Early

Southeast Cancer Network, PC
1400 Afflink Place, Suite 100
Tuscaloosa, AL  35406

An Equal Opportunity Employer

**Date:** Tuesday, August 8, 2006 7:10 PM
**From:**
**To:** dundeet@charter.net
**Subject:** (no subject)

Donna Early

**CARRER OBJECTIVE**
To become employed as a Registered Medical Assistant in a medical facility where I will be able to effectively su
my knowledge, skill, and training in a clinical or laboratory setting.

**EDUCATION**
Capps College, Montgomery. AL
Medical Assistant, September 2005
**Course Studied** Principle of Math, Medical Law and Ethics, First Aid, Safety and CPR, Communications, Anator
Terminology, Basic keyboarding,Examination Room Techniques,Diagnostic Machines, Pharmacology, Body
System,Clinical Procedures,  Psychology, Hematology, Medical Computer Application, Phlebotomy, Drug
Administration, Medical Insurance with IDC-9CPT training involved, Anatomical Structures, Urinalysis and Bacte
**CERTIFICATION**
CPR, HIPAA, AND FIRST AID

Trenholm
Early childhood Development

U.S. Army
Sams1 Computer
Military Police Academy
Retired

U.S. Army
63J Quatermaster and Chemical

Monroeville County High School
Diploma, 1986

Police 1986 2004
As a United Stated Military Police Officer an achievement in law enforcement included leadership, teamwork, po
work ethic and cross-functional skills. It also entailed hands on experience in aspects

**Experience**
Military of motor accidents, narcotics, and trafficking criminals.
Secreted Military instillation over-seas base

Cancer  Care Center of Montgomery
Work up patient, taken vital sign, prepared patient for different treatment, phlebotomy,and urinalysis

**CENTRAL AL
UROLOGY 00003**

Central Alabama Urology
# Dr. Alfred Newman Md., PhD.

**1722 Pine Street Suite 904**
**Montgomery, Al. 36106**

## Employment Application

### Applicant Information

**Full Name:** Early                    Donna              L          **Date:** 8-8-06
                  *Street Address*                                              *M.I.*

**Address:** _____
                  *Street Address*                              *Apartment/Unit #*

_____
*City*                                  *State*        *ZIP Code*

**Phone:** (334) _____        **E-mail Address:** _____

**Date Available:** 8-15-06   **Social Security No.:** _____   **Desired Salary:** $ _____

**Position Applied for:** M A

|  | YES | NO |  | YES | NO |
|---|---|---|---|---|---|
| Are you a citizen of the United States? | ☑ | ☐ | If no, are you authorized to work in the U.S.? | ☐ | ☐ |
| Have you ever worked for this company? | ☐ | ☑ | If so, when? _____ | | |
| Have you ever been convicted of a felony? | ☐ | ☑ | | | |

**If yes, explain:** _____

### Education

**High School:** Maureville County High   **Address:** _____

**From:** 82   **To:** 86   **Did you graduate?** YES ☑  NO ☐   **Degree:** _____

**College:** Military School   **Address:** _____

**From:** 86   **To:** 89   **Did you graduate?** YES ☑  NO ☐   **Degree:** MP / 63 J, Sim-1

**Other:** Capps,   **Address:** _____

**From:** 04   **To:** 05   **Did you graduate?** YES ☑  NO ☐   **Degree:** MA

### References

Please list three professional references.

**Full Name:** Joyce Addian Jackson   **Relationship:** Friend / Co-worker
**Company:** V.A   **Phone:** (334) 2
**Address:** _____

**Full Name:** Val Houston   **Relationship:** Friend / Co Worker
**Company:** U.S. Army   **Phone:** (334) 356-8071
**Address:** _____

**Full Name:** Mona Rosa McDonald   **Relationship:** Friend / Co Worker
**Company:** Cancer Care of Mont.   **Phone:** (334) 281-7710
**Address:** _____

**Previous Employment**

Company: _U.S. Army National Guard_    Phone: _( ) Close Down_

Address: _____    Supervisor: _____

Job Title: _Relistment / 63J_    Starting Salary: $ _E-4_    Ending Salary: $ _E-6_

Responsibilities: _63J / Military Police_

From: _98_    To: _04_    Reason for Leaving: _PCS / moving / Retired_

May we contact your previous supervisor for a reference?    YES ☑    NO ☐

Company: _Cancer Care Center_    Phone: _( ) 281-7110_

Address: _2055_    Supervisor: _Angela Bexters_

Job Title: _M A_    Starting Salary: $ _10.00_    Ending Salary: $ _10.50_

Responsibilities: _Taken Vital, Working Pt up, EKG, T.H Test, Shots,_

From: _05_    To: _06_    Reason for Leaving: _____

May we contact your previous supervisor for a reference?    YES ☐    NO ☑    _I want to tell them I'm leaving fir_

Company: _U.S. Army Nation Guard_    Phone: _(251) 743-2149_

Address: _Monroeville AL_    Supervisor: _Mrs. Lee_

Job Title: _63J_    Starting Salary: $ _E-4_    Ending Salary: $ _E-5_

Responsibilities: _63J , MP_

From: _____    To: _____    Reason for Leaving: _Moving to Montgomery_

May we contact your previous supervisor for a reference?    YES ☑    NO ☐

Additional comments you may want to share with us:

_Please wait to call my Employer Now until I tell them I'm leaving._

**Disclaimer and Signature**

I certify that my answers are true and complete to the best of my knowledge.

If this application leads to employment, I understand that false or misleading information in my application or interview may result in my release.

Signature: _Donna L Early_    Date: _8/8/06_

CENTRAL AL
UROLOGY 00004

From: AMERICAN FAMILY CARE　　　334 279 6414　　　02/09/2007 12:55 #009 P.013



**American Family Care**
MEDICAL CENTERS

**2003**

## APPLICATION FOR EMPLOYMENT

(PLEASE PRINT IN INK OR TYPE)

### PERSONAL INFORMATION

Today's Date: *2-2-07*　　Position Applying For: *Medical Assit.*　　Location:

Last Name: *Early*　　First Name: *Donna*　　Middle: *La'Shay*　　SSN:

Street Address:　　City:　　State:　　Zip:　　Minimum Acceptable Salary: *10.50 — 12.50* Other:

Date of Birth: *2/20/68*　　When Can You Begin Work:　　Phone Number: Home:　　Work:

Specific Type of Work Desired: ☑ Full Time　☐ Part Time　☐ Temporary
Specify Days & Hours Willing to Work: *M-F  </Hr  Some weekend*

Who Should We Notify In Case of Emergency:
Name: *Leon Houston / Britton Early*　　Address: *Same as above*　　Phone: *934-7624  399-6513*

Do you have a legal right to be employed in the U.S.?　Yes ☑　No ☐

### EDUCATION

| SCHOOL | NAME | CITY | DATES ATTENDED | GRADUATE | DIPLOMA OR DEGREE REC'D | COURSES OR MAJOR |
|---|---|---|---|---|---|---|
| High School | *Monroeville Cont.* | *Monroeville Al* | *82* to *86* | *86* | | |
| Vocation Technical School | | | to | | | |
| Nursing School | *Capps College* | *Montgomery Al* | *'04* to *'05* | | *MA* | |
| College or University | | | to | | | |
| College or University | | | to | | | |
| Other | *Med. Tech.* | *Fort Benning, GA* | *2000* to *2001* | | *MA* | |

List Scholastic Honors, Membership in Professional Societies, Extracurricular Activities, etc.

Are you fluent in any foreign or sign language? If so list.

### U.S. MILITARY

Are you a Vietnam-era Veteran　Yes ☐　No ☑
Dates of Service From *86* To *02*
Type of Duty: *Army — Army National Guard*
Type of Discharge: *Honorable*

Are you a member of the Reserve or National Guard?　Yes ☐　No ☑
List Service Schools: *Med. Tech. Quarter Master Chemical*

### LICENSES AND SPECIAL SKILLS

List the Number and Expiration Date of any Professional or Occupational License(s) you hold: *Medical Assit.*

Do you have a valid Alabama Driver's License: *Yes*

List Lab or Medical Equipment you operate: *Lab, Bladder scan, CT.*

Do you type? (WPM)　　List any office equipment you operate:

### MISCELLANEOUS

Have you ever worked for AFC before?　Yes ☐　No ☑　If yes, when:
Names of Friends or Relatives Employed at AFC: *Ms. Hollinger*

Have you ever applied for employment with AFC?　Yes ☐　No ☑　When?

Have you ever been convicted of a crime?　Yes ☐　No ☐
Type Offense:　Date of Conviction:　Where Convicted: City: State:

**AFC 00017**

From: AMERICAN FAMILY CARE    334 279 6414    02/1  2007 17:05 #014 P.002/003

## EMPLOYMENT

| Dates of Employment | | Employer's Name U.S. Army | Job Title | | Starting Salary | Ending Salary |
|---|---|---|---|---|---|---|
| | | Employer's Address/Phone Number | | | Duties: | |
| Month | Year | | | | | |
| from 01 | 02 | Supervisor's Name/Title | | | | |
| to 10 | 06 | Reason for Leaving ETS | | | | |

| Dates of Employment | | Employer's Name U.S. Army National Guard | Job Title | | Starting Salary | Ending Salary |
|---|---|---|---|---|---|---|
| | | Employer's Address/Phone Number | | | Duties: | |
| Month | Year | | | | | |
| from 09 | 00 | Supervisor's Name/Title Mrs. Lee | | | | |
| to 01 | 02 | Reason for Leaving Retired | | | | |

| Dates of Employment | | Employer's Name Cancer Care of Montgomery | Job Title | | Starting Salary 10.50 | Ending Salary 11.00 |
|---|---|---|---|---|---|---|
| | | Employer's Address/Phone Number | | | Duties: | |
| Month | Year | | | | | |
| from 06 | 05 | Supervisor's Name/Title | | | | |
| to 09 | 06 | Reason for Leaving PRN | | | | |

| Dates of Employment | | Employer's Name Dr. Newman | Job Title Medical Assis | | Starting Salary 12.50 | Ending Salary |
|---|---|---|---|---|---|---|
| | | Employer's Address/Phone Number | | | Duties: | |
| Month | Year | | | | | |
| from 09 | 00 | Supervisor's Name/Title | | | | |
| to | 07 | Reason for Leaving Present | | | | |

May We Communicate With Your Employer?    Past:   Yes ☑   No ☐    Present:   Yes ☐   No ☑

## AMERICAN FAMILY CARE, INC. STATEMENT OF POLICY

American Family Care, Inc. in Birmingham is an Equal Opportunity / Affirmative Action employer. As such American Family Care, Inc. pledges to take the necessary action to preclude discrimination in recruiting, employment, training, discipline and/or termination of employees because of race, color, creed, age, sex, national origin, handicap status, veteran status, or other reason in accordance with all applicable state and federal statutes, executive orders, and regulations which prohibit discriminatory personnel practices.

## EMPLOYMENT APPLICATION LANGUAGE

I, the undersigned applicant, agree that I will settle any controversy, dispute or claim arising out of or relating to my application or candidacy for employment with American Family Care, Inc, (hereinafter referred to as "AFC"), my employment with AFC or the cessation of my employment with AFC, by final and binding arbitration administered by the American Arbitration Association under its National Rules for the Resolution of Employment Disputes (then in effect), and a judgment upon the award rendered by the single arbitrator may be entered by any court having jurisdiction thereof. By way of example only, such claims shall include, but not be limited to, claims asserted under any federal, state or local statutory or common law, such as the Pregnancy Discrimination Act (as amended), the Americans with Disabilities Act (as amended), the Age Discrimination Act (as amended), the Civil Rights Act (as amended), the Rehabilitation Act (as amended), the Equal Pay Act (as amended), the Family and Medical Leave Act (as amended), the Immigration Reform and Control Act (as amended), the law of contract and the law of tort. The location of the arbitration hearing shall be in Birmingham, Alabama. I understand that we (AFC and the undersigned) shall share equally all of the administrative costs associated with the filing and prosecution of the Arbitration. I understand that I shall bear the expense of my own legal counsel, if necessary. I acknowledge and understand that my prospective or future employment with AFC involves and effects interstate commerce.

## CERTIFICATION OF APPLICANT

I certify that the information given on this application and in any other supporting documentation resume, etc., is true and correct. I understand that any false information; willful or negligent misrepresentation; or failure to disclose and requested information will constitute sufficient grounds for American Family Care, Inc. in Birmingham to terminate my employment without notice. I further understand that American Family Care, Inc. will perform a pre-employment investigation to determine my suitability for employment and I authorize American Family Care, Inc. to secure the information necessary to make a decision. I further understand that American Family Care, Inc. will adhere to the provisions of the Fair Credit Reporting Act and other applicable state and federal status concerning the securing of information, handling, utilization, and release of information obtained in the pre-employment investigation. I also understand that acceptance of this application does not indicate position vacancies or active recruitment by American Family Care, Inc. In addition, I understand that acceptance does not imply or assure either interviews or employment. I acknowledge by my signature that I have read and understand these statements.

Signature _Donna L Emily_    Date 2-7-07

AFC 00018